Michael ROSEN; Barbara Huskey; Emanuel Martin by his next friend, Cheryl Martin; Wanda Campbell; Connie Hoilman; Mark Hughes; Jacob B. by his next friend, Martin B.; Jackie Baggett; Brenda Clabo; Pradie Tibbs, Original Plaintiffs,

and

Gayle Cummings; Bach Thuy Nguyen; Di Nguyen; Sherry Justice; Sean Addison by his next friend, Lisa Addison; Lorri Griffin; Melanie Jackson; and Wilson Dale Jackson on their own behalf and on behalf of all others similarly situated; Mid–South Arc, a nonprofit Tennessee corporation; and the Tennessee Disability Coalition, a nonprofit Tennessee corporation, Additional Plaintiffs,

v.

TENNESSEE COMMISSIONER OF FINANCE AND ADMINISTRATION, Defendant.

No. 3:98–0627.

United States District Court,
M.D. Tennessee.
Nashville Division.

Dec. 18, 2002.

As Amended Dec. 19, 2002.

744

George Gordon Bonnyman, Jr., Lisa J. D'Souza, Shawn L. Caster, Michele M. Johnson, Tennessee Justice Center, Inc., Nashville, TN, for Plaintiffs.

Linda A. Ross, Jennifer Helton Hann, Sue A. Sheldon, Office of the Attorney General and Reporter, Katherine Anne Brown, Willis & Knight, Ronald W. McNutt, Mitch Grissim & Associates, Nashville, TN, Charles A. Miller, Julie L.B. Johnson, Robert D. Wick, Covington & Burling, Washington, DC, for Defendant.

Michael James Passino, Nashville, TN, for Special Master.

## *MEMORANDUM*

HAYNES, District Judge.

### *TABLE OF CONTENTS*

I. PROCEDURAL HISTORY ............................................751

II. SUPPLEMENTAL CLAIMS ........................................755

III. PLAINTIFFS' FIFTH MOTION FOR PRELIMINARY INJUNCTION .......755

IV. ISSUES TO BE DECIDED ........................................756

V. SUMMARY OF RULING...........................................757

VI. FINDINGS OF FACT .............................................758
 A. Origin of the TennCare Program ......................................758
 B. The New TennCare Waiver ...........................................759
 C. Policies and Procedures for the New TennCare Program ..................761
 1. The July 1, 2002 to December 31, 2002 Reverification Rules and Policies ......................................................762
 2. TennCare's Policies and Rules for Reverification and Enrollment after January 1, 2003 ........................................765
 D. Defendant's Administration of the New TennCare Program...............767
 1. TDHS's Management Capacity as Administrator ......................768
 2. Notice and Appeal Practices from July 1, 2002 to December, 2002.....771
 3. Pacific Health's Monitoring of TDHS's Administration .................776

 4. Appeals Process ................................................778
 5. Accommodations for Enrollees with Severe and Persistent Mental Illness ("SPMI") and Seriously Emotionally Disturbed Children ("SEDC")................................................780
 6. Accommodations for Enrollees with Limited English Proficiency ("LEP")................................................789
 7. The Effects of Multiple Eligibility Reverification ......................790
 a. Waiver Eligible Redetermination Process ......................791
 8. The Medical Care Advisory Committee ("MCAC") ...................792
 E. Individual Plaintiffs ................................................792
 F. Other Individuals and Class Members................................798
 G. Organization Plaintiffs ...........................................805
 H. TennCare Advocacy Groups ......................................805

**VII. CONCLUSIONS OF LAW** ............................................811
 A. The Purposes of the Medicaid Act ...................................811
 B. Plaintiffs' Standing ................................................813
 1. Individual Plaintiffs ...........................................814
 2. Organizational Plaintiffs ......................................816
 C. Plaintiffs' Implied Right of Action to Enforce Medicaid Regulations .........819
 D. Plaintiffs' MCAC Claims ..........................................822
 E. Plaintiffs' Procedural Due Process Claims ............................827
 1. Plaintiffs' Claims of Notice Violations............................830
 a. Adequacy of Notices to SPMI and SED Enrollees ..............830
 b. Lack of Notice of Good Cause ................................830
 c. Inadequate Notices of Appeals at the Termination Stage ..........831
 d. Inadequate Notice of Reasons of Denial ........................832
 F. Plaintiffs' Rights to Accommodations ................................832
 G. Lack of LEP Accommodations .....................................835
 H. Arbitrary Policies and Administration................................836
 1. The 45 Day Rule ..............................................837
 2. TennCare's Failure to Consider All Eligibility Statements.............839
 3. A Current CRG/TPG Assessment for SPMI and SED Enrollees ........840
 4. SPMI and SED Enrollee's Personal Signature Requirement ..........841
 I. Limiting Scope of Appeals and Coverage ..............................841

**VIII. RELIEF AWARDED** ................................................842

## INTRODUCTION:

Plaintiffs, Michael Rosen, Barbara Huskey, Emanuel Martin, by his next friend, Cheryl Martin; Wanda Campbell, Connie Hoilman, Mark Hughes, Jacob B., by his next friend, Martin B.; Jackie Baggett, Brenda Clabo, and Pradie Tibbs, on behalf of all others similarly situated; filed this action under 42 U.S.C. § 1983 against the Defendant, the Tennessee Commissioner of Finance Administration. Plaintiffs assert claims that the Commissioner's administration of Tennessee's TennCare plan, a managed health care program established under Title XIX of the Social Security Act, 42 U.S.C. 1396 *et seq.*, violates Plaintiffs' procedural rights under the Due Process Clause of the Fourteenth Amendment and applicable federal regulations. This action has been an extensive and complex proceeding.[1]

---

1. The Court deeply regrets the length of this Memorandum. As the Supreme Court observed, the Medicaid Act is "among the most intricate ever drafted by Congress." *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). Similarly, the Second Circuit described the Medicaid Act as statutes of "unparalleled complexity." *DeJe-* *sus v. Perales*, 770 F.2d 316, 320 (2d Cir. 1985). In sum, this complexity of this action increased with consideration of the extensive Medicaid regulations, the Defendant's change of waiver plans and his ongoing policy modifications as well as the number of Plaintiffs with their broad scale challenges and the Defendant's legal defenses.

## I. PROCEDURAL HISTORY

In earlier proceedings, the Court granted the original Plaintiffs' second motion for a preliminary injunction to reinstate their coverage under TennCare, citing the lack of any response by the Defendant to the merits of the motion. (Docket Entry No. 27). Plaintiffs' first motion for preliminary injunction (Docket Entry No. 2) was denied as moot. (Docket Entry No. 27). The Court ordered reinstatement of TennCare coverage to all class members who were denied coverage without the benefit of due process. *Id.* In response, the Defendant temporarily suspended termination of insured and uninsured enrollees. The Defendant then filed a motion for relief (Docket Entry No. 29), citing the parties' ongoing settlement discussions that delayed Defendant's response to Plaintiffs' preliminary injunction motions. (Docket Entry No. 29). On May 5, 2000, the Court granted that motion (Docket Entry No. 106) that had actually become moot. In the interim, on September 13, 1999, the Court granted a joint motion to modify the January 20, 1999 Order. (Docket Entry No. 53).

Under the September 13, 1999 Order, the Defendant used its TennCare eligibility base of insured and uninsureds to notify and allow *Rosen* class members to reenroll in TennCare without an eligibility review or payment of past premiums. *Id.* at 2. In a word, this Order allowed the State to substitute the prior notice procedure for immediate reinstatement of those persons affected by the Court's earlier Order. *Id.* at 3–4. Under this Order, 14,994 class members re-enrolled. *Id.* Class members who did not respond, would receive a second notice and notices of reenrollment would be posted at public places. *Id.* at 5. Re-enrollment was reopened for sixty (60) days. *Id.* at 6. Further, by April, 2000, the Defendant agreed that enrollees who had lost Medicaid coverage and were not enrolled as uninsured or uninsurable, would be given notice of their rights to reapply as an uninsured or uninsurable or to have an administrative appeal of their earlier losses of coverage.

On April 28, 2000, Plaintiffs renewed their motion for preliminary injunction (Docket Entry No. 87) citing continuing violations of the Court's September 13, 1999 Order because none of the notices required by that Order had been mailed and the Defendant failed to provide due process requirements in the TennCare administrative appeal process. (Docket Entry No. 88). A state audit had documented these appellate deficiencies. Plaintiffs also cited other instances of terminations of coverage without notice or receipt of notice after termination. Reverification notices were sent during one quarter in 2000 for 100,000 enrollees on their continued eligibility for TennCare coverage. (Docket Entry No. 144, Transcript of Proceedings, October 3, 2000, at 12–17).

On May 5, 2000, Plaintiffs filed an application for a Temporary Restraining Order (Docket Entry No. 92), citing the Defendant's continuing violations of the Court's injunction and Plaintiffs' procedural due process rights. The Court granted the Plaintiffs' application for a temporary restraining order (Docket Entry No. 96), requiring compliance with 42 C.F.R. § 431, Subpart E before any termination or disruption of a class member's TennCare coverage.

On September 7, 2000, Plaintiffs filed a motion to hold the Defendant in contempt because the notices required by the September 19, 1999 Order still had not been mailed. (Docket Entry No. 112). A hearing was held on October 2 and 3, 2000, on whether to issue the preliminary injunction and to hold the Defendant in contempt. Pending a decision, the prior Restraining Order was subsequently modified and extended by agreement of the parties.

(Docket Entry No. 166). Before a decision, the parties engaged in negotiations and at the parties' request, the Court reserved consideration of the Plaintiffs' contempt motion. The parties then agreed to settle their remaining disputes and submitted an Agreed Order on March 7, 2001 that was entered on March 8th. (Docket Entry No. 171).

In the March 8th Order, the parties, in sum, agreed to allow uninsured class members the right to re-enroll in the TennCare program with revised procedures to address Plaintiffs' due process claims. For a period of two years after the entry of the Order, the Defendant was required to file quarterly reports to document their compliance with the terms of the Order and the parties' Settlement Agreement. *Id.* at 11. The particular provisions of the Agreed Order at issue are discussed *infra.*

On July 27, 2001, Plaintiffs' filed a motion to enforce the March 8th Agreed Order (Docket Entry No. 184), asserting: (1) that the Defendant was imposing upon class members the financial requirement of payment of all past premiums to be reinstated with TennCare coverage and (2) that the Defendant was denying due process to class members with Serious and Persistent Mental Illness ("SPMI") and Severely Emotional Disturbed Children ("SEDC"). The latter class members are applicants whom the Defendant referred to local community health centers to evaluate their eligibility. Class members were told by these local agencies that they lacked any process to perform their roles as facilitators of these persons' eligibility for TennCare coverage. These class members allegedly also did not receive adequate notice of TennCare coverage for mentally ill persons or were denied coverage with an inadequate statement of reasons for the denial and/or without citation to relevant law for the denial of coverage. The latter were cited as due process violations of federal regulations governing the Tenn-Care program. In the earlier Agreed Order, the Defendant promised to abide by these regulatory due process requirements.

After an evidentiary hearing on September 13, 2001, the Court granted the Plaintiffs' motion to enforce the Agreed Order. (Docket Entry Nos. 200 and 201). As a matter of law, the Court concluded that under Sixth Circuit precedents, the Agreed Order and Settlement Agreement must be construed to preserve the basic relief for which the Plaintiffs bargained. As pertinent here, the Court found that the Agreed Order was designed to provide a remedy for applicants who did not receive due process in their terminations from TennCare. Further, the Court concluded that enforcement of the past premium rule completely foreclosed any meaningful remedy to these class members. This conclusion did not bar the Defendant's collection of past due premiums under its deferred payment policy for current TennCare enrollees. Further, the Court concluded that the Defendant's existing process for TennCare applicants with serious mental illnesses did not provide adequate notice of the application procedures to inform these class members of their coverage eligibility. The Defendant effectively denied these class members' applications and failed to comply with due process requirements set forth in the Agreed Order by providing inadequate statements of reasons for the denials and failing to cite the applicable law for the denials.

At a chambers conference on September 27, 2001, the State informed the Court and counsel for the plaintiffs that the next day the Defendant would issue changes in the TennCare program that would take effect October 1, 2001. The Defendant had requested from the federal Center for Medicare and Medicaid Services ("CMS") an

amendment to the federal waiver controlling the TennCare program. The amended new TennCare plan would permit the state to close TennCare to adult uninsurables. According to the state, projected spending through the end of fiscal year 2001 (June 2002) exceeded both state appropriations and the federal spending cap imposed by the federal waiver. In addition, the number of individuals enrolled in TennCare was approaching the enrollment cap set by the federal waiver. Initially, the TennCare plan had an enrollment cap of 1,300,000 enrollees that was later extended to 1,500,000. (Docket Entry No. 230, Defendant's Memorandum, Attachment Nos. 2 and 3). Under the original plan, as the number of enrollees reached the enrollment cap, the plan would limit the further enrollment of uninsureds. *Id.*

The Plaintiffs sought and obtained a temporary restraining order (Docket Entry No. 217) barring implementation of the rule closing TennCare to adult uninsurables, based upon the pertinent provisions of the Agreed Order reciting the State's agreement to reopen enrollment to uninsured adults during finite enrollment periods under stated conditions. (Docket Entry No. 171, Agreed Order at 3). In addition, Plaintiffs' asserted a breach of other provisions in the Settlement Agreement that was attached to the parties' joint motion to approve the settlement. The Joint Motion to approve the Settlement Agreement, signed by both parties on March 8, 2001, also stated that the policy of reopening enrollment to uninsured adults *"is consistent with Tenn-Care's original design and the state's longstanding goals for the program."* (Docket Entry No. 170, Joint Motion at 3) (emphasis added). The Plaintiffs also cited the Settlement Agreement that contains a section requiring prior consultation with the Plaintiffs on future policies and procedural changes.

Plaintiffs' filed their fourth motion for a preliminary injunction this time to bar the Defendant's implementation of his proposed October, 1, 2001 amendment to the TennCare plan to exclude adult uninsurables from its medical coverage. (Docket Entry No. 204). Plaintiffs contended, in essence: (1) that the Defendant's October 1st amendment to the TennCare plan was not reviewed by a Medical Care Advisory Committee ("MCAC"), as required by federal Medicaid regulations; (2) that the Defendant's amendment to TennCare also breached the parties' Settlement Agreement and Agreed Order in this action to maintain TennCare's current program design; (3) that the Defendant's amendment deprived the Plaintiffs of the benefits bargained for and contemplated in the parties' Settlement Agreement; and (4) that the Defendant failed to give the requisite prior notice of this plan amendment, as required by the parties' Settlement Agreement.

In response, the Defendant argued, in sum: (1) that Plaintiffs lacked standing to challenge its new amendment to the Tenn-Care program; (2) that the Agreed Order provided only procedural protections and did not bar unilateral substantive changes to TennCare's plan; (3) that the notice requirements in the Agreed Order and Settlement Agreement applied only to procedural changes; (4) that the TennCare plan for uninsurables is not subject to federal regulations requiring review by a Medical Care Advisory Committee; (5) that if applicable, Plaintiffs could not enforce this regulation; (6) that the Tenn-Care program had serious financial difficulties and the State could not be limited in its policy decisions absent a clear agreement to do so; (7) that acute care remained available for uninsurables through other public and private health programs; and (8) that the Eleventh Amendment barred the relief sought.

The Court earlier granted Plaintiffs' application for temporary restraining order on this plan amendment (Docket Entry No. 217) and after a hearing on the motion for preliminary injunction, the Court entered a provisional preliminary injunction to extend the temporary restraining order until a decision on the preliminary injunction issues. (Docket Entry No. 237). For that injunction, the Court adopted its findings in the Temporary Restraining Order that the Defendant violated the notice requirements of the parties' Settlement Agreement. *Id.* The Defendant requested expedited consideration of the preliminary injunction issues.

The Court granted Plaintiffs' fourth motion for preliminary injunction, concluding first that Plaintiffs possessed standing to challenge the Defendant's October 1st policy, as class representatives and as parties to the Settlement Agreement and Agreed Order. (Docket Entry Nos. 258 and 259). Second, the Court concluded that Medicaid statutes and regulations can be enforced by enrollees and applicants for enrollment in a Medicaid Waiver Plan. *Id.* Third, the Defendant did not honor Medicaid's regulations' requirement to consult a Medical Care Advisory Committee in adopting its October 1st policy, despite a prior ruling of this Court that such consultation was a "clear" and "mandatory" requirement. *Id.* Fourth, the Agreed Order and Settlement Agreement, when construed together, required the Defendant to provide Plaintiffs thirty (30) days prior notice of any change in TennCare's "program design" and "policies." *Id.* The Defendant did not provide such notice for its October 1st amendment. Fifth, under the Supremacy Clause of the federal constitution, the Court's prior Orders that awarded relief for violations of Plaintiffs' procedural rights and substantive entitlements to TennCare coverage and those Orders cannot be superceded by the October 1st rule changes. *Id.* Sixth, the Eleventh Amendment did not bar in-

junctive relief against a state official alleged to be violating a federal law. *Id.* Class members who are uninsurable were found to be irreparably injured by this October 1st policy that would result in loss of medical care and medications necessary for their serious medical conditions. *Id.* In addition to a preliminary injunction, the Court appointed a Special Master. *Id.*

On October 29, 2001, the Defendant appealed the Court's preliminary injunction issued on October 25, 2001, and its September 14, 2001 Order. (Docket Entry No. 260). On appeal, the Sixth Circuit affirmed this Court's ruling on the September Order, but vacated the injunction on the October 1st amendment. *Rosen v. Tenn. Commissioner of Finance & Administration,* 288 F.3d 918 (6th Cir.2002). The Sixth Circuit did not reach the merits of this Court's ruling on the October 1st amendment, finding that the original plaintiffs lacked standing as current enrollees to challenge the prospective closure of enrollment to new uninsurable applicants. *Id.* In its opinion the Sixth Circuit stated that:

> A review of the plaintiffs' amended complaint challenging the October 1 rule and their motion for a temporary restraining order to block implementation of the rule reveals that both focus solely on the plaintiff class members who are not presently members of TennCare; nowhere in these filings do the named plaintiffs claim that the rule will affect them. As explained above, it is the plaintiff's burden to demonstrate the bases [sic] for standing. Without the benefit of specific allegations as to how there is an imminent threat of injury to the named plaintiffs—i.e., an immediate threat of one or more of them being removed from the TennCare rolls such that the October 1 rule would affect them—it is impossible for this court to hold that the threat posed to the named

plaintiffs by the operation of the October 1 rule is anything other than "conjectural" and "hypothetical."

288 F.3d at 929–30.

## II. SUPPLEMENTAL CLAIMS

On remand, Plaintiffs filed a motion for leave to file a supplemental complaint (Docket Entry No. 337) contemporaneously with another motion for a preliminary injunction. The Court granted the motion to file the supplemental complaint. (Docket Entry No. 375). The supplemental complaint added as named Plaintiffs, Sherry Justice, Mid–South Arc, a non-profit Tennessee corporation, and the Tennessee Disability Coalition ("TDC"), a non-profit Tennessee corporation, with three additional legal claims. (Docket Entry No. 376). Later, Plaintiffs Motion for Leave to File a Second Revised Supplemental Complaint (Docket Entry No. 382) that was granted. (Docket Entry No. 454). This latter complaint added as Plaintiffs, Gayle Cummings, Bach Thuy Nguyen and Di Nguyen who were affected by an administrative change in the eligibility determinations in the new TennCare program. (Docket Entry No. 382).

Plaintiffs then filed another motion to file a third supplemental complaint (Docket Entry No. 424), that added as Plaintiffs Wilson Dale Jackson, Melanie Jackson, Sean Addison by his mother Lisa Addison, and Lorri Griffin, who are allegedly adversely impacted by the new eligibility process. (Docket Entry No. 440). The Court granted that motion. (Docket Entry No. 439). These latter Plaintiffs are individuals who had begun or had completed the reverification process and asserted, *inter alia*, denial of notices and appeals from denials of their applications in the reverification process. (Docket Entry

Nos. 440 through 444). In the supplemental complaints, Plaintiffs assert that they are not receiving adequate notices, hearings and appeals as well as the loss of continued coverage pending the disposition of their appeals, in violation of 42 C.F.R. Part 431, Subpart E.

## III. PLAINTIFFS' FIFTH MOTION FOR PRELIMINARY INJUNCTION

On June 26, 2002, Plaintiffs filed their fifth motion for preliminary injunction (Docket Entry No. 339), as supplemented by amended answers and declarations that, in effect, seeks to prevent the implementation of the new TennCare demonstration waiver that took effect on July 1, 2002. (Docket Entry Nos. 342 through 360, 392). The Defendant filed a response (Docket Entry No. 373), to which the Plaintiffs filed a reply (Docket Entry No. 374).

The new TennCare program significantly changed the structure and scope of TennCare program, to include three distinct benefit or coverage categories: (1) TennCare–Medicaid, that covers those persons who qualify for Medicaid eligibility; (2) TennCare–Standard, that covers non-Medicaid eligible participants; and (3) TennCare–Assist that assists persons without insurance to buy or maintain health insurance. This latter category element takes effect in fiscal year 2004, subject to legislative appropriation of the necessary funds. In a word, under the new TennCare program, eligibility for the non-Medicaid applicants is limited to those persons: (1) whose income is below a level to be specified annually;[2] (2) who do not currently have insurance or access to insurance; or (3) who are uninsurable or medically eligible.

---

**2.** During periods of open enrollment, the income limit will not apply for those who meet the criteria for being "medically eligible."

Otherwise, the income limit for medical eligibility is 100% of the federal poverty level.

In their fifth motion, Plaintiffs assert, in sum, that: (1) the State has failed and is failing to identify and reasonably accommodate class members with disabilities or limited English proficiency ("LEP") during the notice, eligibility reverification determination and appeal processes, in violation of Section I(A)(7) of the Settlement Agreement, which is incorporated by reference into the Agreed Order of March 12, 2002 (Docket Entry No. 171); (2) the State's inadequate procedures and administration will result in the denial, reduction or termination of TennCare coverage without adequate notice and opportunity to appeal, as guaranteed by Paragraph 1 of the Agreed Order (Docket Entry No. 171) and 42 C.F.R. Part 431, Subpart E; and (3) the State's procedures were adopted without prior consultation with a duly constituted MCAC, as required by 42 U.S.C. § 1396a (a)(4) and 42 C.F.R. § 431.12. Plaintiffs request the Court to enjoin the Defendant from denying, reducing or terminating TennCare benefits for plaintiff class members without first complying with the provisions set forth in the Agreed Order of March 12, 2001; 42 U.S.C. § 1396a (a)(4); and 42 C.F.R. § 431.12.

In response, the Defendant argues, in essence that: (1) none of the individual or organizational plaintiffs has demonstrated standing to advance their claims; (2) Section I(A)(7) of the Settlement Agreement does not impose the obligations Plaintiffs seeks, but instead requires only review and recommendations for State policies and procedures to accommodate for persons with known disabilities or LEP; (3) this accommodation requirement has been fulfilled in accordance with the Settlement Agreement; (4) subjecting class members to the normal Medicaid eligibility process violates neither the Agreed Order nor 42 C.F.R. Part 431, Subpart E; (5) transition period procedures and processes to enable plaintiff class members to exercise their rights to notice and opportunity for hearing before termination or denial of coverage, comply with Paragraph 1 of the Agreed Order and 42 C.F.R. Part 431, Subpart E; (6) the MCAC regulation is inapplicable to section 1115 waiver programs; (7) the MCAC regulations do not create a private right of action for non-Medicaid eligible individuals to enforce; and (8) the Defendant, in fact, consulted with a MCAC for its new TennCare program.

An evidentiary hearing was held on July 19 and 22, 2002, and oral argument by the parties' counsel on August 16, 2002. (Docket Entry No. 388). The parties reached an agreement on two of the issues in Plaintiffs' motion for preliminary injunctions. (Docket Entry No. 394). At and after the evidentiary hearing, the parties submitted additional exhibits. *See* Docket Entry Nos. 378, 379, 384, 397 through 405, 408 through 415, 419 through 421, 428 through 434. On October 24, 2002, the parties filed a Stipulation with several exhibits. (Docket Entry No. 437). On November 27, 2002, after a status conference, the parties filed a Stipulation on the then current statistical results of the reverification process. (Docket Entry No. 448).

## IV. ISSUES TO BE DECIDED

As to the pending motion for preliminary injunction, the Court conducted a status conference at which the parties identified the core issues that essentially are as follows:

1. Whether Plaintiffs have the standing to challenge the Defendant's new TennCare policies and administration of the new TennCare program and if so, whether Plaintiffs' have an implied right of action under the Social Security Act to assert those claims under 42 U.S.C. § 1983.

2. Whether the State's procedures will result in the denial, reduction or termi-

nation of TennCare coverage without adequate notice and opportunity to appeal, as guaranteed by numbered Paragraph No. 1 of the Agreed Order and 42 C.F.R. Part 431, Subpart E of the Medicaid Act regulations.

3. Whether the Defendant has failed and is failing to identify and reasonably accommodate class members with disabilities or LEP during notice, eligibility determination and appeal processes, in violation of Section I(A)(7) of the Settlement Agreement, which is incorporated by reference into the Agreed Order of March 12, 2002 (Docket Entry No. 171).

4. Whether the State's new TennCare Plan and polices were adopted without prior consultation with a duly constituted MCAC, as required by 42 U.S.C. § 1396(a)(4) and 42 C.F.R. § 431.12.

5. Whether the State's public necessity rule to close enrollment in TennCare to new adults uninsurables is a violation of this Court's Agreed Order of March 8, 2001, and 42 C.F.R. § 431.12, requiring the State to consult a MCAC before adopting the new rule.

See Docket Entry No. 450 and Plaintiffs' Proposed Revised Findings of Fact and Conclusions of Law.

The Court held a status conference to inquire about consolidation of the hearing on Plaintiffs' motion for preliminary injunction with a resolution of the merits of all of Plaintiffs' claims under Fed.R.Civ.P. 65(a)(2), and to set a deadline for submissions for all claims, defenses, and evidence. (Docket Entry No. 435). The parties agreed to the consolidation.

In addition to the issues on Plaintiffs' motion for preliminary injunction, the remaining issues that arise from the Plaintiffs' supplemental complaints (Docket Entry No. 382) involve claims about the Defendant's January 1, 2003 verification and application policies. These issues, in sum, are whether the Defendant's policies to terminate automatically TennCare coverage without an appeal; to limit the scope of an administrative appeals; and to eliminate TennCare coverage pending an appeal, violates the Medicaid Act, 42 C.F.R. § 431, Subpart E and other regulations, as well as the Agreed Order. The parties agreed that the latter issues are purely legal questions and did not require any evidentiary submissions. (Docket Entry No. 435, Agreed Order).

This Memorandum addresses all remaining issues in the Plaintiffs' motion for preliminary injunction and Plaintiffs' other legal claims in their supplemental complaints. Pursuant to Fed.R.Civ.P. 52(a) and 65(d), this Memorandum sets forth the Court's findings of fact and conclusions of law on all pending claims.

## V. SUMMARY OF RULING

For the reasons set forth below, the Court concludes that the State's new reverification procedures for July 1, 2002 to present has resulted in the termination of TennCare coverage for a substantial number of TennCare enrollees without adequate notice and opportunity to appeal, as guaranteed by applicable Medicaid regulations, 42 C.F.R. Part 431, Subpart E and Paragraph 1 of the Agreed Order (Docket Entry No. 171). Defendant's terminations of enrollee's coverage, including for failure to submit a timely application, were done without adequate prior notice of the Defendant's intended action and without a statement of the applicable federal regulation for reverification in violation of Medicaid regulations. Further, the terminations were without prior notice of the Defendant's good cause extension rule for timely submission of reverification papers, as required by federal Medicaid regulations. The Court also concludes that the Defendant's January 1, 2003 policy, impermissibly eliminates appeals for termination of

coverage and improperly restricts the scope of administrative appeals.

The Court further concludes that the Defendant has failed and is failing to identify and to make reasonable accommodations for substantial numbers of class members with mental and physical disabilities during the eligibility reverification process as well as during the appeal processes. These inadequacies violate federal Medicaid policy and Section I(A)(7) of the Settlement Agreement, that is incorporated by reference into the Agreed Order of March 12, 2002. (Docket Entry No. 171).

The Court once again concludes that the Defendant's failure to secure prior consultation with a duly constituted MCAC in the submission of the amended TennCare waiver program violated 42 U.S.C. § 1396a (a)(4) and 42 C.F.R. § 431.12.

Accordingly, the Court requires the Defendant to reinstate those Plaintiffs and members of the Plaintiffs' class who were enrollees and have had their TennCare coverages terminated during the reverification process from July 1, 2002 to the present. Any further termination of Tenn-Care coverage under the new TennCare policies for any class member and all enrollees must include continued coverage pending the conclusion of the enrollee's administrative appeal. The Defendant cannot bar an applicant's or enrollee's challenge to TennCare rules policies and procedures in an administrative appeal.

## VI. FINDINGS OF FACT

### A. Origin of the TennCare Program

On November 18, 1993, the Tennessee Commissioner of Public Health received approval of the State's application for its "TennCare" waiver plan from the Administrator of the former Health Care Financing Administration ("HCFA") in the United States Department of Health and Human Services that is now the Centers for Medicare and Medicaid Services

("CMS"). (Docket Entry No. 230, Defendant's Memorandum, Attachment No. 2). The TennCare plan was a "waiver-only demonstration" that was subject to "special terms and conditions". The purpose of the TennCare plan was to provide medical benefits not only to Medicaid recipients, but also to other persons who were not covered under Title XIX of the Social Security Act. The HCFA's Administrator's approval provided that:

Under the authority of section 1115(a)(2) of the SSA, expenditures made by the state for the items identified below (which are not otherwise included as expenditures under section 1903) shall, for the period of this project, be regarded as expenditures under the State's Title XIX plan

i. Expenditures which would otherwise be precluded by section 1903(f) For the following eligibility groups:

+ those who are uninsurable because of pre-existing conditions; and

+ those who are uninsured.

*Id.* at Attachment, Administrator's November 18, 1993 letter at 3.

The old TennCare program was administered by the TennCare Bureau with defined procedures and policies for initial eligibility and reverification determinations. As discussed earlier in the procedural history section of this Memorandum, those policies and procedures were subject to successful legal challenges and Court Orders.

As to benefits, the former TennCare provided medical services and prescription drugs to eligible persons who were covered by Medicaid; who were financially unable to secure private medical insurance; and/or who were uninsurable by private medical insurance due to their medical condition. Federal participation was, in essence, a type of block grant based upon what Medicaid would have expended in

Tennessee without the TennCare program. The federal funds are supplemented with state funding. The combined funds were expended for Medicaid enrollees and waiver eligible enrollees.

## B. The New TennCare Waiver

On May 30, 2002, CMS, the current governing federal agency, approved Tennessee's proposed amendment to its TennCare waiver program.[3] Under the new TennCare waiver, the federal government continues to provide a majority of the funding for TennCare, but the terms of federal financial participation have changed. As opposed to the former block grant approach, the federal contribution is now set at a specified amount per month for each Medicaid-eligible participant, supplemented with other federal and state funds. There are supplemental federal funds to pay for non-Medicaid participants. To the extent that federal money is unavailable for these later costs, the State must bear the difference. (Docket Entry No. 380, Johnson Testimony at 149–51). Under the new program, coverage is reviewed and waiver eligible coverage is based upon the amount of state funds appropriated annually by the state legislature.

For enrollees, the principal changes in the new TennCare program are its different coverage groups and application procedures. The first coverage group is TennCare Medicaid, covering those who qualify for Medicaid eligibility and that coverage is essentially the same as under the old TennCare program. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 2). The second category is TennCare–Standard, that covers non-Medicaid eligible participants with a benefit package comparable to the Health Maintenance Organization ("HMO") option available to state employ-

ees. *Id.* ¶ 2–3 The third category is TennCare–Assist, that provides assistance to persons to buy or maintain private health insurance, but that coverage does not start until the fiscal year 2004, subject to state legislative appropriations. *See* Defendant's Revised Proposed Findings of Fact and Conclusions of Law at 2, n. 2.

TennCare Standard coverage, however, has two categories, i.e., the "uninsured" category, for individuals who have been denied Medicaid, but who are uninsured, lack access to insurance, and have income that does not exceed specified levels to be set annually by the Legislature. This income cannot exceed 200% of the federal poverty level for children and 100% for adults. A new applicant whose income falls within the levels established by the Legislature may qualify for TennCare Standard as a uninsured person, but only during a time designated as a period of open enrollment. TennCare Standard coverage also includes the Medically Eligible ("ME"), enrollees who are comparable to the "uninsurable" group in the old TennCare program. An individual who is enrolled in TennCare as uninsured or uninsurable as of June 30, 2002, and who has been found, through the eligibility redetermination process, to be ineligible for TennCare Standard as a qualified uninsured person due solely to excess income, may qualify under the ME component of TennCare Standard, provided additional specified criteria are met. *Id.* ¶ 3.

As of June 30, 2002, all individuals enrolled in TennCare as waiver-eligibles, i.e., uninsured and uninsurables, are subject to a reverification process for eligibility as determined under the terms of the new waiver for TennCare Standard. An enrollee qualifies as an uninsured person, if ap-

---

**3.** The Defendant notes that under its new waiver, amendments to its plan affecting waiver eligible enrollees are not required to be submitted to CMS for approval. (Defendant's Exhibit No. 20, New TennCare Waiver Attachment at 4).

plicable income levels are met and other eligibility criteria are satisfied, despite the absence of an open enrollment period. *Id.* ¶ 3 and Attachment A. During the reverification process, the applicable income limits will be 100% of the federal poverty level for adults and 200% of the federal poverty level for children. *Id.* ¶ 7. *See also* Docket Entry No. 381, Smith Testimony at 274–76.

In the formulation of its reverification policies, the Defendant determined that to ensure receipt of the maximum amount of federal funds, the new TennCare program required a correct determination of each enrollee's benefit package, with an emphasis on Medicaid eligibility. (Docket Entry No. 380, Johnson Testimony at 149–51). As a waiver program under section 1115 of the Social Security Act, TennCare is subject to the budget neutrality principles that affect the amount of federal funds available for the program. Federal funds in a waiver program still cannot exceed, over the period of the waiver, what the federal government would have expended on the Medicaid program in Tennessee in the absence of a waiver.

The premise for Defendant's reverification process for all waiver eligibles under the new waiver is the budget neutrality principle. Under this principle, the Defendant contends that the ceiling for the total federal funds that the State can draw for TennCare, is determined by calculating the per-member-per-month rate times the number of individuals who are enrolled as Medicaid eligibles. (Docket Entry No. 331, Defendant's Notice to Court of New TennCare Waiver, Attachment B at 7). In the Defendant's calculation, enrollees who

are not Medicaid eligible are not counted for the federal contribution. Thus, in the Defendant's view, it is vitally important to ensure that as many waiver eligibles are evaluated for Medicaid benefits to enable the State to have sufficient funds for TennCare. There are deadlines set for this redetermination process.[4]

Yet, the Plaintiffs correctly note that under the CMS waiver, aside from the per person Medicaid allocations, there is a separate appropriation of federal funds referred to as the disproportionate share of hospital payments or "DHS adjustment." These federal funds represent the estimated payments to hospitals that provide medical services to a significant number of medically needy persons who lack the resources to pay for those services. *Id.* at 8. For the fiscal year 2003, this appropriation is $413,700,907. *Id.* Under the new TennCare program, these funds do not go to these hospitals, but instead are part of the funds available to pay services under contracts with the private insurance companies that administer the new TennCare program. (Docket Entry No. 391, Transcript at 57–58; Docket Entry No. 381, Smith Testimony at 286–88).

In Plaintiffs' view, this separate appropriation, discounts the Defendant's priority and insistence on Medicaid eligibility redeterminations for all waiver eligibles and renders unnecessary the dual applications and redeterminations of eligibility as well as dual appeals for Medicaid eligibility and TennCare Standard eligibility. Plaintiffs also contend that the multiple processes will have the effect of eliminating coverage of those current enrollees who are in the

---

**4.** The Plaintiffs note that in earlier controversies, Defendant had applications pending for five (5) years (Docket Entry No. 380, Johnson Testimony at 134). Only recently has the Defendant emphasized this 45–day regulation that is a mandate imposed upon the Defendant, 42 C.F.R. § 435.911(c)(1), but in Plain-

tiffs' view the Defendant can not use this deadline as ground to deny coverage. See Docket Entry No. 391, Transcript at 46. Plaintiffs' counsel also notes that the 45 days starts from the date of the signed application, not the completed application. (Docket Entry No. 391, Transcript at 113).

greatest medical need and who also require more financial resources for their medical needs. Plaintiffs contend that the fiscal limitations are best met by coverage of fewer Medicaid eligible enrollees who have a greater benefit package than Tenn-Care enrollees who have less benefits and must share in the costs of medical services. (Docket Entry No. 391, Transcript at 122).[5]

The premise for the Defendant's reverification policies and his requirement of massive redeterminations of TennCare eligibility is clearly debatable. The premise is that these policies are needed to maximize federal funds. Yet, with the over $400 million in DHS payments available to pay for TennCare waiver eligibles, the co-payments by TennCare waiver eligibles and the fewer benefits available to waiver eligibles, the increase in Medicaid funds from reverification likely would not produce equivalent sums. Thus far, only 8% of all the reverifications have been found Medicaid eligible. (Docket Entry No. 448). Yet, as the Court noted, the policy choice is the Defendant's, not the Court's.

As its primary focus, the new TennCare program shifts from a social services model to a private market model. As stated in the Defendant's application for the amendment, the new TennCare waiver is to be "consistent with our goal of making Tenn-Care Standard program mirror commercial health insurance programs." (Docket Entry No. 436, Defendant's Memorandum, Exhibit F, Tighe Letter of May 29, 2002, at 4). As discussed *infra*, the effect of this philosophical change is a set of multiple reverification procedures for the former uninsurables who require more costly services. Under new TennCare rules and policy, absent Medicaid coverage, most of these uninsurables must complete a second application process to be considered eligible for coverage under the new TennCare program. As discussed *infra*, since the Defendant's new reverification policy has been implemented, an effect of these redetermination processes is a projected loss of coverage to more than 200,000 prior Tenn-Care enrollees. (Docket Entry No. 448).

### C. Policies and Procedures for the New TennCare Program

In summary, under the new TennCare waiver, all waiver eligible enrollees must initially complete the Medicaid eligibility reverification process. If the enrollee does not satisfy the Medicaid eligibility standards, the enrollee has an opportunity to be considered for eligibility under Tenn-Care Standard as an uninsured or medically eligible or ("ME"). Under TennCare rules, if the enrollee fails to complete the Medicaid application process, for example, due to an inability to compile all of the needed documentation within the 45–day limit, his or her TennCare coverage ends. In some instances, if the enrollee does not submit a complete and timely application in the reverification process, the enrollee loses any right to appeal the termination of his or her coverage.

There are, however, two sets of rules that govern reverification (1) for all waiver eligibles from July 1, 2002 to December 31, 2002, and (2) for reverification and new applications beginning January 1, 2003. Plaintiffs challenge both sets of rules. The policies and rules are set forth separately to be followed by findings on the actual administration of the TennCare reverification process with the primary focus on the July 1, 2002 to December 31, 2002 reverifications.

**5.** As discussed *infra*, under the law, the State makes the policy choice. The Court's obligation is to decide if the policy satisfies the requirements of the Medicaid statutes and regulations as well as the parties' Agreed Order.

### 1. The July 1, 2002 to December 31, 2002 Reverification Rules and Policies

Defendant's final TennCare regulations for this time period require current enrollees to apply for the TennCare reverification during the period from July 1, 2002 through December 31, 2002 and to submit the Medicaid reverification papers within 90 days from the date of the mailing of the initial notice. (Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 12, 13; Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14.02(8)(c) at 20).[6] After the submission of a signed reverification, the TennCare enrollee also must arrange for an appointment to review his or her eligibility materials with Tennessee Department of Human Service ("TDHS") worker. (Docket Entry No. 437, Exhibit E, Rule 1200–13–14–02.(7)(b)).

Enrollees who do not satisfy the Medicaid requirements or uninsured under TennCare Standard, may undergo a separate reverification of medical eligibility requirements for TennCare Standard. TennCare rules impose a second 45–day deadline on the enrollee's completion of the second ME phase of the reverification process. *Id.* at Rule 1200–13–14–.02(7)(e) and (f). During this period, an enrollee or new applicant can enroll in the program only if they qualify for TennCare Standard as medically eligible ("ME") or uninsured. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 9). The new TennCare regulations do not except individuals designated by the Defendant as SPMI/SED enrollees from the reverification process, but the Defendant has an accommodation policy that is contained in the TennCare rules:

"Reasonable accommodation will be made for persons with disabilities who require assistance in responding to a renewal request." (Docket Entry No. 382; Plaintiffs' Exhibit No. 27, TennCare Rule 1200–13–14–.02(6)(a)).

The text of the pertinent provisions of the reverification rules for July 1, 2002 to December 31, 2002 provide as follows:

7. Redetermination of eligibility during the waiver transition period from July 1, 2002 to December 31, 2002 will be conducted in accordance with the following procedures:

 (a) All waiver eligible (non-Medicaid) enrollees in TennCare must reapply for TennCare under the terms of the new waiver eligibility requirements which take effect on July 1, 2002 or their coverage will be terminated.

 \*　　\*　　\*　　\*　　\*　　\*

 (b) The initial notice informs the enrollee that his/her coverage will end on the ninetieth (90th) day unless s/he submits the application. The enrollees must then schedule an interview with a Department of Human Services (DHS) caseworker.

 (c) If an application is not received by DHS on or before the thirtieth (30th) day from the date of the initial notice:

 1. A reminder notice is sent to the enrollee informing him/her that s/he has sixty (60) days more to submit a completed application to DHS, and

---

**6.** These rules were preceded by public necessity rules initiated on July 1, 2002. (Docket Entry No. 342, Plaintiffs' Notice of Filing Documents; Plaintiffs' Exhibit No. 27, TennCare Rules, Rule 1200–13–14.03(1)(a)). The parties stipulate (Docket Entry No. 449) that a final set of TennCare rules (Docket Entry No. 437, Attachment E) tracks, in substantial part, the former emergency rules. (Plaintiffs' Exhibit No. 51). The most recent rules are subject to legislative change and extension as temporary rules. (Docket Entry No. 499).

2. That s/he will be terminated on the ninetieth (90th) day unless the application is received prior to that day.

\*　　\*　　\*　　\*　　\*　　\*

(e) Enrollees submitting an application to DHS before the ninetieth (90th) day will have forty-five (45) days additional to complete the process (from the date the application is received). This includes scheduling an appointment with the DHS office in the county in which s/he lives and completing the application process. If the enrollee cannot come to the DHS office in person s/he must request other arrangements with DHS to accommodate his/her special needs. During the appointment, the DHS caseworker will review the enrollee's eligibility information, including income, social security number, address, existence of access to other insurance, household information and other information as required to determine eligibility.

\*　　\*　　\*　　\*　　\*　　\*

(g) The DHS caseworker will review the applicant's eligibility for Medicaid. If the enrollee meets the TennCare Medicaid eligibility requirements, s/he will be enrolled in TennCare Medicaid with the effective date being in accordance with DHS policies.

(h) If the enrollee does not meet the Medicaid criteria, s/he will be denied for TennCare Medicaid and will receive a denial notice from DHS with the appropriate appeal rights. All appeals of TennCare Medicaid applications are handled by DHS.

(i) To qualify for TennCare Standard as a qualified uninsured person,

enrollees must meet the technical eligibility requirements, be uninsured, lack access to health insurance, and have income below one hundred (100%) percent of poverty (for adults) and below two hundred (200%) percent of poverty (for children). If the enrollee is eligible for TennCare Standard as a qualified uninsured person, s/he will be enrolled in the program with an effective date of coverage as of the date of approval of his/her application. Included in the approval notice is a fixed end date of coverage, before which time the enrollee must complete the renewal/reapplication process or coverage will end.

\*　　\*　　\*　　\*　　\*　　\*

(k) Applicants not meeting the technical requirements for TennCare Standard will not be allowed to apply as a medically eligible person. Medical eligibility applications received from persons not meeting the technical eligibility requirements for TennCare Standard will be denied with a notice that includes appeal rights.

\*　　\*　　\*　　\*　　\*　　\*

(m) If the enrollee does not qualify for TennCare Standard as an uninsured person based solely on excess income, s/he will be informed that s/he may qualify as a medically eligible person, and asked if s/he wishes to apply. Enrollees with a qualifying medical condition (i.e. a condition on the TennCare Medical Condition List)—as evidenced by the presence of the qualifying diagnosis on a claim/encounter in the Bureau's database (from 1999 to the present) will be medically eligible for TennCare. If the enrollee

has a current (within the past twelve(12) months) CRG 1, 2, 3/TRG2 assessment s/he will be medically eligible...

\* \* \* \* \* \*

(n) Enrollees who do meet the eligibility criteria for TennCare Standard (as a qualified uninsured person) except for excess income and who do not have a current CRG 1, 2, 3/TPG 2 assessment in TCMIS or a qualifying medical condition (as evidence by encounter/claims data) may be able to qualify for TennCare Standard as a medically eligible person.

If the enrollee chooses to apply as a medically eligible person, TennCare will mail a Medical Eligibility Determination packet to the enrollee including instructions on how to apply as a medically eligible person. The packet includes instructions, forms, and a medical records release statement, which must be signed by the enrollee

\* \* \* \* \* \*

The enrollee has forty-five (45) days from the date the Medical[ ] Eligibility Determination packet is received by the enrollee to file a completed packet with the Bureau. Incomplete applications received within forty-five (45) days will be returned by the Bureau to the enrollee.

(Docket Entry No. 437, Exhibit E, New TennCare Rules 1200–13–14–02.(7)(a) through (n)).[7]

For the reverification deadlines, there is a rule that authorizes a good cause extension of the eligibility deadlines.

Packets submitted to the Bureau after the forty-five (45) day period will be denied and the enrollee will be terminated. The denial notice will include appeal rights and the "good cause" reasons for not completing the process timely. These reasons include:

1. The enrollee was sick.

2. Somebody in the enrollee's immediate family was very sick.

3. The enrollee had a family emergency or tragedy.

4. The enrollee could not get the medical records s/he needed from a provider. It was not his/her fault.

5. The enrollee asked for help because s/he has a disability. Neither the Bureau nor TDHS gave the help that the enrollee needed.

6. The enrollee asked for help because s/he does not speak English. Neither the Bureau nor TDHS gave the help that the enrollee needed.

(Docket Entry No. 437, Exhibit E, TennCare Rule 1200–13–14–02.(7)(n)).

Rule 1200–13–14–.12(7)(e) and (f) provide for notice of an appeal for denial of coverage due to an untimely and incomplete application or failure to schedule a TDHS interview.[8]

(e) If the application is not submitted by the eighty-ninth (89th) day, the enrollee will be terminated from the program effective on the ninetieth (90th) day with a notice including appropriate appeal rights. If s/he

---

7. These rules are at pages 21 through 24 of Exhibit E to Docket Entry No. 437.

8. At oral argument, Defendant's counsel agreed that pending the Court's decision, that if a person, including a SPMI and SED, complained that he or she did not understand

their appeal rights, the Defendant will reinstate "coverage pending appeal," (Docket Entry No. 391, Transcript at 24, 25, 27), if they originally had coverage. Under federal and state policy, an oral statement is sufficient to qualify as an appeal. (Docket Entry No. 380, Johnson Testimony at 189).

appeals within ten (10) days from receipt of the letter of termination, coverage will be continued/reinstated pending the outcome of the appeal. Appeals received within thirty (30) days (from receipt of the notice) will be processed by the TennCare Administrative Appeals Unit and the Office of General Counsel in accordance with the appropriate policies and procedures (See TennCare Administrative Appeals Policies and Procedures). Appeals received by the Bureau after the thirtieth (30th) day (from receipt of the notice) are automatically denied as "untimely."

(f) An enrollee who does not complete the entire application process by the forty-fifth (45th) day after his/her application was received by DHS, including the appointment process, will have his/her application denied and TennCare coverage will be terminated with appropriate appeal rights. The only exception to the forty-five (45) day limit is a good cause extension. DHS may grant a good cause extension in accordance with Bureau/DHS policies.

*Id.*

The Defendant's draft of the Operational Protocol for administrative appeals made unclear that appeals are available to all enrollees during the reverification process:

"*Except in those cases when a TennCare Standard member is disenrolled for failure to get reverified,* if TennCare disenrolls an enrollee, the TennCare enrollee may appeal."

\*　　\*　　\*　　\*　　\*　　\*

If TennCare denies an application for non-Medicaid enrollment (or determines that an enrollee will be disenrolled), it must notify the applicant or enrollee in writing *unless the disenrollment is for a* *TennCare Standard enrollee who has failed to get reverified.*

\*　　\*　　\*　　\*　　\*　　\*

In the case of a disenrollment or proposed disenrollment, [logging an appeal] prevents the enrollee's coverage from ending before a final decision *unless the disenrollment is a TennCare Standard enrollee who has failed to get reverified.*

(Plaintiffs' Exhibit No. 26, Operational Protocol New TennCare Waiver, at V–2 and V–3)(emphasis added).

Where an application is completed, but coverage is denied, an administrative appeal is clearly available.

(h) If the enrollee does not meet the Medicaid criteria, s/he will be denied for TennCare Medicaid and will receive a denial notice from DHS with the appropriate appeal rights. All appeals of TennCare Medicaid applications are handled by DHS.

(Docket Entry No. 437, Exhibit E, TennCare Rule 2100–13–14–.02(7)(h)).

Yet, from the Court's review of the rules, it is unclear if notices of appeals are not given to those enrollees whose ME reverification papers are returned as incomplete packets. "Incomplete applications [received within the 45 days] will be returned by the Bureau to the enrollee with a denial notice." *Id.* at Rule 1200–13–14–.02(7)(n). As discussed *infra,* notice of return does not refer to any appeal. Yet, "[p]ackages submitted to the Bureau after the forty-five (45) day period will be denied and the enrollee will be terminated. The denial notice *will include appeal rights . . . " Id.* (italics added).

### 2. TennCare's Policies and Rules for Reverification and Enrollment after January 1, 2003

The new TennCare rules to govern reverification and enrollment after January 1, 2003, provide for an automatic termination of coverage without any appeal

rights, if the reverification process is not completed. Rule 1200–13–14–.02(9)(f) states that "The enrollee's right to appeal [a decision regarding TennCare Standard ME eligibility is set out at rule 1200–12–14–.12."]. Plaintiffs cite Rule 1200–13–14–.12(1) that provides, in pertinent part:

(a) TennCare Standard applicants and enrollees will be given an opportunity to have an administrative hearing before a Hearing Officer or an Administrative Judge regarding denial of his/her application, cost sharing disputes, and disputes regarding disenrollment from TennCare Standard. Requests for appeals must be made within thirty (30) days of receipt of the notice of the adverse decision. If the enrollee being terminated wants his/her coverage to remain in effect while the appeal is being processed, s/he must submit his/her appeal within ten (10) days of receipt of the termination notice.

\* \* \* \* \* \*

(c) *TennCare Standard enrollees must complete the entire renewal process prior to the expiration date of his/her coverage. A failure to do so will result in coverage lapsing as of the expiration date. Enrollees will not be permitted to appeal the expiration of his/her coverage in this situation.* However, s/he may appeal on the grounds that:

1. S/he did, in fact, complete the renewal process but an administrative error on the part of the State resulted in his/her coverage expiring, or

2. S/he was prevented from completing the renewal process by specific acts or omissions of state employees. This ground for appeal does not include challenges to relevant TennCare rules, policies, or time-frames.

An enrollee will receive a notice of the expiration of his/her coverage and the right to appeal as set out above, within 10 days. *There will be no continuation or reinstatement of coverage pending appeal.*

(Docket Entry No. 437, Exhibit E at 85, 86) (emphasis added).

In the event of an incomplete application, after January 1, 2003, the Defendant's rules provide that in addition to automatic coverage termination, there are also no appeals.

Under the new waiver, eligibility for the non-Medicaid population will be determined initially for a period that can range from six to twelve months, to permit an even spread of re-enrollments throughout the year. Beginning January 1, 2003, re-enrollment or new enrollment will be for one-year periods... New enrollees and re-enrollees will be advised of the term of their enrollment and of the need to re-apply for another term of coverage before the end of their eligibility period. Shortly before the expiration of the eligibility period, the enrollee will be sent a reminder of the need to re-apply for another term of TennCare coverage. *If the enrollee fails to submit a complete application to the Department of Human Services by the end of the eligibility period, coverage will automatically cease. No appeal will be provided for these cases.* However, *if a timely complete application is denied, or if an enrollee is terminated due to an administrative error, the regular Medicaid appeals procedures will be available ...*

(Docket Entry No. 331, Notice of Waiver at 15–16) (emphasis added).

The rationale of the Defendant's policy of automatic termination of coverage without an appeal for those TennCare enrollees who do not submit timely reverification applications is that the termination is caused by the enrollee's inaction, not state action.

The only changes [in the new waiver] that could conceivably implicate any pro-

vision of the Agreed Order are the introduction of fixed eligibility periods and a reapplication requirement for non-Medicaid enrollees. *The coverage of non-Medicaid enrollees who do not submit a timely application for renewal of coverage will automatically expire at the end of their eligibility period,* just as would be the case if these enrollees were covered by commercial insurance. This program feature helps to assure that only those who continue to meet eligibility requirements will be served by the program.... *if the enrollee allows his or her coverage to lapse by not submitting a timely application for renewal, the expiration of coverage at the end of the enrollment period will not have resulted from an action of the State but rather from the failure of the enrollee to take required action.*

(Docket Entry No. 331, Notice of Waiver at 19)(emphasis added).

In addition, the Plaintiffs rely upon the Defendant's expert's summarization of the effect of the new policies.

Each enrollee approved for TennCare Standard [during the period between July 1 and December 31, 2001], whether as a qualified uninsured person or as a medically eligible person, will be sent an approval notice with a specified fixed end date of coverage. *Each new applicant approved for TennCare Standard will also be sent such a notice with a fixed date of expiration of coverage. These TennCare Standard enrollees' coverage will lapse on that end date in the absence of completion of a renewal/reapplication process by the end date.*

The specified end dates will be spread among enrollees so that approximately one-twelfth of the TennCare Standard enrollees will have a fixed end date in each month of 2003. Expiration of coverage, and the attendant renewal/reapplication process, will not begin to occur until January 2003.

TennCare Standard enrollees will be notified at the time of their redetermination or acceptance of the need to reapply before their specified end date. They will be reminded again of this obligation by means of a notice sent to them 60 days in advance of the their end date. If the enrollee does not complete the renewal application process by the end date, coverage will lapse.

No right of appeal is available to establish eligibility after coverage lapses. In other words, the appeal process cannot be used as a substitute for timely completion of the renewal/reapplication process. However, an appeal will be permitted if the individual claims either (1) that the renewal process was, in fact, completed on a timely basis but an administrative error on the part of the state resulted in the expiration of coverage; or (2) the individual was prevented from completing the renewal process by a specific act or omission of a state employee. The individual will be sent a notice of the expiration of their coverage and of their right to appeal as set out above. If the appeal is successful, coverage will be reinstated back to the lapse date, pending completion of the renewal application process.

(Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 50–54) (emphasis added).

### D. Defendant's Administration of the New TennCare Program [9]

CMS, that approved these amendments to TennCare's waiver program, required

---

9. This section discusses how the new reverification process actually operates. As Plaintiffs note, although the Defendant has rules and policies for its new TennCare Waiver program, as late as the evidentiary hearing, there were on-going changes in the administration of the TennCare program that did or will

the State to develop an Operational Protocol for the new waiver. (Docket Entry No. 331, Notice of Waiver, Exhibit A, Centers for Medicare and Medicaid Services Special Terms and Conditions ¶ 2). The Defendant assigned the Tennessee Department of Human Services ("TDHS") the primary responsibility for reverification and eligibility determinations that are functions previously assigned to the TennCare Bureau and shared with local health departments. (Docket Entry No. 331, Notice of Waiver, Exhibit D, Affidavit of Alicia Smith ¶ 25).

Plaintiffs assert that in the fall of 2001, the State decided to adopt the new eligibility process to require reverification of TennCare waiver eligible enrollees. (Plaintiffs' Exhibit No. 1, Reynolds Deposition at 5–6). According to Mark Reynolds, TennCare's former director, when the Defendant decided to transfer the TennCare eligibility functions to TDHS, the Defendant was aware that it would be "nearly impossible" for people with cognitive impairments to complete the Medicaid eligibility process unaided. (Docket Entry No. 257, Reynolds Testimony at 59). *See also* Docket Entry No. 381, Johnson Testimony at 230–32, 235.[10] According to Reynolds, at that time, State officials were also well aware of the complexity of the Medicaid eligibility requirements and that substantial numbers of eligible people fail to obtain or maintain Medicaid coverage because they cannot complete that program's complex eligibility process. (Docket Entry No. 257, Reynolds Testimony at 40–59).

As discussed *infra*, the initial Medicaid eligibility process is described by witnesses for both parties as complex and demanding.

The overarching theme in Plaintiffs' proof questions the capacity of TDHS and its eligibility caseworkers to implement the reverification process without effectively depriving enrollees of their rights under Subpart E of the Medicaid regulations. In Plaintiffs' view, TDHS lacks sufficient staff to meet the increased workload from the TennCare reverification processes. Plaintiffs also cite TDHS's history of inadequate implementation of its other Medicaid eligibility obligations under other federal regulations and guidelines. Plaintiffs contend that the procedural rights of a substantial number of enrollees to be heard prior to termination as well as their rights to appeal a wrongful termination have been and will be violated. Further, Plaintiffs assert that the new TennCare regulations lack adequate accommodations for persons with mental disabilities and language difficulties, as required by the Agreed Order and the parties' Settlement Agreement. Finally, Plaintiffs challenge the new TennCare reverification programs as imposing an excessive and unnecessary burden on enrollees to appeal wrongful denials and to maintain coverage pending appeal.

### 1. TDHS's Management Capacity as Administrator

For the first six months of the new TennCare reverification program, TDHS was selected to be responsible for that

---

result in the modification and/or clarification of the rules and policies. As Beverly Johnson, the Defendant's expert monitor, testified: "All I can say is we are making additional modifications to policies, and those will have to ultimately be specified in the rules." (Docket Entry No. 380, Johnson Testimony at 218, 221–22). Plaintiffs also cite the inadequate administration as a likely cause of the Defen-

dant's violations of Medicaid regulations and the Agreed Order.

10. In earlier proceedings, the Court also requested the Special Master to perform an assessment of TDHS's capacity to conduct the reverification process (Docket Entry No. 314), but that ended with the Sixth Circuit's reversal of the October Order appointing the Special Master.

process. Prior to the new TennCare program, TDHS determined Medicaid eligibility of applicants as well as eligibility for other federal assistance programs.

For its other eligibility duties, Plaintiffs presented proof that in 2000 and 2001, federal officials found that TDHS did not assess Medicaid eligibility as required by Section 1931 of the Social Security Act, and was not properly conducting *ex parte* reviews of all possible sources of eligibility before terminating Medicaid coverage. (Plaintiffs' Exhibit No. 62, Department of Health and Human Services TANF/Medicaid Review (4–30–01), at 7–8, 30). Only on July 1, 2002 did TDHS issue a policy to comply with Section 1931. *Id.;* Defendant's Exhibit No. 7, Rudolph Declaration ¶ 12. TDHS agreed to remedy that, but did not integrate the policy change with its computer system and TDHS workers will have to perform their new functions manually.

During the first two weeks of each month, TDHS sets appointments to process only federal food stamp applications. (Defendant's Exhibit No. 28, Rudolph Third Declaration, ¶ 4; Plaintiffs' Exhibit No. 80, Blackburn Second Declaration, ¶ 4). Thus, any TennCare appointment for reverification has a limited time span to be scheduled and completed. Moreover, Plaintiffs note that TDHS also administers the Families First program, now called the Temporary Assistance for Needy Families ("TANF") and the successor to the former Aid to Families with Dependant Children ("AFDC"). (Docket Entry No. 391, Transcript at 69). The TANF is described as the "most complicated" program to administer. *Id.* at 69, 70. There were not any precise statistics provided for TDHS's caseload for its TANF responsibilities, *id.* at 70, but TANF has an estimated 62,000 "caseload." (Docket Entry No. 381, Dedmon Testimony at 246).

With its new TennCare functions, TDHS estimated its eligibility counselors can determine Medicaid and TennCare eligibility for 396,895 "new" cases. (Docket Entry No. 381, Dedmon Testimony at 247–48). In Plaintiffs' view, TDHS underestimated the number of its new cases because TDHS only counted a case as "new" if the file had not been "closed for longer than six months." (Plaintiffs' Exhibit No. 77, at 4). For this estimate, TDHS also assumed that 25% or 156,000 of the approximately 625,000 TennCare enrollees as of April 22, 2000 who are subject to recertification will "choose not to participate" and thus, will not require TDHS resources. (Plaintiffs' Exhibit No. 77, at 4; Docket Entry No. 381, Dedmon Testimony at 251). TennCare earlier estimated that less than half of that number, or about 75,000, would become ineligible after the reverification process. (Plaintiffs' Exhibit No. 1, Reynolds Deposition, at 46–47).[11] Prior to the addition of these "new" TennCare cases, TDHS had 1,275 eligibility counselors to handle an unduplicated caseload of 338,844. (Defendant's Exhibit No. 5, Dedmon Declaration ¶ 2; Plaintiffs' Exhibit No. 78, 3rd unnumbered page).

TDHS has added 252 eligibility counselors to respond to the additional workload for the TennCare reverification. (Defendant's Exhibit No. 5, Dedmon Declaration ¶ 2). Based upon this data, the average caseload per TDHS eligibility counselor has increased to 482 cases from 265 cases.

---

11. When TennCare processed applications, the period of determination averaged 20 days (Docket Entry No. 380, Johnson Testimony, at 186), but in April 2002, TennCare had more than 200,000 applications pending. *Id.* at 193. TennCare simply closed all of those applications as incomplete, but with notice of a right to appeal. *Id.* at 195–97. If an applicant were successful on appeal, the person would be reenrolled in the old TennCare program. *Id.* at 198.

Defendant's TennCare reverification process requires a determination of Medicaid eligibility be followed by a determination of TennCare Standard, if the person does not qualify for Medicaid. (Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 7–8).

For this reverification process, the TDHS caseworker must interview the enrollee and review the enrollee's documentary proof of identity, age, citizenship or alien status, address, income, resources (including bank accounts, savings bonds, property and automobiles), cost of utilities, life insurance and health insurance. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, 9th–10th unnumbered pages, ("What to Bring with You to the TDHS Office")). An unemployed person must submit proof of unemployment benefits or a layoff notice. *Id.* Persons who have a "physical or mental problem" are told that "We will need your medical records." *Id.*

TDHS's preliminary test of the TennCare reverification process revealed that the average interview alone required one hour. (Plaintiffs' Exhibit No. 77, at 4). This estimate, however, did not include the assignments of eligibility determinations for TennCare Standard to TDHS that had not been developed at the time of the TDHS's estimate. (Docket Entry No. 381, Dedmon Testimony at 256–58). Moreover, the TDHS estimate also did not account for time required to secure and review an enrollee's medical records. *Id.*

Cyndy Johnson, the Defendant's expert consultant from Pacific Health Policy Group ("Pacific Health"), conceded that TDHS's estimate of one hour as the length of an interview for each case might not be adequate. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 86–87). Using TDHS's assumptions, Johnson calculated that TDHS would be unable to complete the reverification of the current enrollee population by December 31, 2002. Johnson calculated that TDHS could interview about 60,000 enrollees a month with its existing staff and new hires. *Id.* at 85–86. Johnson conceded that the Defendant's actual plan is for TDHS to process 415,000 applications over a five month period, an average of 83,000 a month. *Id.* at 249–50.

TDHS experienced difficulties before the first of the three monthly mailings of notices to enrollees. (Plaintiffs' Exhibit No. 80, Blackburn Second Declaration, ¶ 5; Defendant's Exhibit No. 28, Rudolph Third Declaration ¶ 5). The first set of notices of this reverification process were mailed to at least 115,000 class members on June 28, 2002. (Docket Entry No. 342, Plaintiffs' Notice of Filing Documents, Exhibit 28, Initial Reverification Notice and Attachment). By August 15, 2002, more than a month after the preliminary mailing to 11,700 enrollees, and two weeks after a mailing to another 134,000 households, only 13,000 enrollees had been scheduled for redetermination appointments. (Defendant's Exhibit No. 28, Third Declaration of Mary Ann Rudolph ¶ 4). Subsequent monthly mailings of reverification notices were sent to more than 300,000 individuals in August, September and October. (Docket Entry No. 448). 555,253 individuals have been sent reverification notices since July 30, 2002. *Id.*

In addition to staffing, TDHS eligibility workers need training in the complex new TennCare rules and procedures that is critical to TDHS's performance in accordance with its projected. (Docket Entry No. 381, Teasley Testimony at 168–69). Training for the Defendant's new policies and procedures was completed before July 1, 2002. (Docket Entry No. 380, Johnson Testimony at 221–22). Yet, in response to Plaintiffs' criticisms, the Defendant added to the policy and procedures. These policy changes require additional time to train

TDHS staff on implementation (Docket Entry No. 380, Johnson Testimony at 242–43), but there are not any formal plans to retrain them on the new policy revisions. (Docket Entry No. 381, Teasley Testimony at 171).

Given Johnson's testimony and the Defendant's actual number of reverifications, the Court finds that TDHS made erroneous estimates of its increased caseload and the amount of interview time required for the TennCare reverifications. These facts lead the Court to find that, in all likelihood, for this limited period of reverification TDHS lacked the administrative resources to process *all* enrollees so as to complete the reverification process in the 45–day periods governing the reverification decisions.

**2. Notice and Appeal Practices from July 1, 2002 to December, 2002**

The initial notice to the enrollee, informs the enrollees that he or she must apply [12] through the local TDHS office for a redetermination of his or her coverage eligibility. This notice and its attachments are written at a 4th to 6th grade reading level, and include a flyer, "Do You Need Special Help?", listing free telephone numbers to call for assistance. (Docket Entry No. 1, Johnson Declaration, Attachment B at 6; Docket Entry No. 380, Johnson Testimony at 141–43). The initial step requires a signed application, two-page form with a legible name and address sent to TDHS by the end of the 89th day after the date of this notice. (Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 12–13; Docket Entry No. 381, Teasley Testimony at 82).

The initial notice of redetermination directs enrollees to bring with them to the TDHS interview those items of necessary information to establish their eligibility and income, (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, unnumbered pages 9–10, ("What to Bring with You to the TDHS Office")), including technical and financial eligibility requirements set forth in TennCare Standard Rule 1200–13–14–.02(2). (Plaintiffs' Exhibit No. 51; Docket Entry No. 380, Johnson Testimony at 225). The notice also tells the enrollee:

**IMPORTANT**

**TennCare has changed.**

**We must check to see if you are still eligible by <DATE>.**

**Read this letter carefully. Follow all the directions.**

\*　　\*　　\*　　\*　　\*　　\*

**Follow the directions in this letter.**

**If you do not, you could lose you TennCare.**

\*　　\*　　\*　　\*　　\*　　\*

*Do the things in numbers 1 and 2 in the next 45 days or sooner if possible.*

(Defendant's Exhibit No. 1, Johnson Declaration, Attachment B at unnumbered page 1). In addition this notice states, "If we say you cannot keep your TennCare, you can appeal. Our letter will tell you how to appeal." *Id.* at unnumbered page 2.

The first letter also stated that if an enrollee needs "Special Help", including "learning or mental health problem" or "serious need for health care or medicine" to call one of several telephone numbers. *Id.* at unnumbered page 6. This form letter and attachments have a Spanish language version. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B). In

---

**12.** Although the Defendant's rules refer to the reverification as on application for eligibility, these persons are enrollees and the process under Medicaid regulations, discussed *infra* refer to redetermination or reverification, not application.

addition, limited instructions are given on other languages.

If a response is not received within 30 days of the initial notice, then a reminder notice is sent and that reminder notice contains, in pertinent part, with the following language:

## IMPORTANT

**TennCare has changed.**

**We must check to see if you are still eligible**

**You only have until <date of 90th day> to get you application to [T]DHS.**

**Your coverage will end on that date if you do not get your application to [T]DHS.**

\* \* \* \* \* \*

**Read this letter carefully. Follow the directions as you could lose your TennCare.**

\* \* \* \* \* \*

2. Call the DHS office and make an appointment. DHS will try to find a time that works for you. If you do not call them to set a time, they will make an appointment for you when they get your application.

If you cannot come to the DHS office in person because of a medical problem or a disability, call DHS and tell them. They will help you make other arrangements.

If you have problems getting the help you need, call the TennCare Information Line. Their number is 1–800–758–1638. If you or someone in your home has a mental illness, you can get help from the TennCare Partners Advocacy Line.

**Do Things in Numbers 1 and 2 in the next 45 days or sooner if possible**

\* \* \* \* \* \*

6. Go to DHS for your appointment.

If you cannot go the, you need to call DHS to set another time.

Remember, you must complete the interview process and get all of the required information to DHS within 45 days of filing your application. If you do not do this, your TennCare will end. When you go to DHS, they will check to see if you can get TennCare Medicaid or TennCare Standard. There is more information about changes to TennCare. Read the paper called "TennCare is Changing" with this letter. You can call the TennCare Information Line if you have questions. Their number is 1–800–669–1851. This is a free call. In Nashville, call 741–4800.

After DHS decides if you are still eligible, you will get a letter. It will tell you if you can keep your TennCare. It will tell you if there is a change in how much you must pay for your TennCare. If we say you cannot keep your TennCare, you can appeal. Our letter will tell you how to appeal.

*Id.*, Attachment C at 1–2. In addition, TDHS procedures require that each applicant be informed of their appeal rights during the interview process. (Defendants' Exhibit 26, at unnumbered page 1).

Persons in the reverification process are notified to provide documentary proof of identity, age, citizenship or alien status, address, income, resources (including bank accounts, savings bonds, property and automobiles), cost of utilities, life insurance and health insurance. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, at unnumbered pages 9–10, ("What to Bring with You to the TDHS Office")). If an enrollee lacks a particular piece of documentation, the TDHS case manager possesses the discretion to accept the enrollee's self-declaration of income "as a last resort". (Docket Entry No. 380,

Johnson Testimony at 228–32; Docket Entry No. 381, Teasley Testimony at 87–88).

The same notices are sent to the entire TennCare population, regardless of disability, including those who are mentally disabled who must self-identify as disabled. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 11 and Attachment B; ¶ 12 and Attachment C; ¶ 13 and attachment D; ¶ 17 and Attachment F; ¶ 25 and Attachment H; ¶ 26 and Attachment I; ¶ 42 and Attachment N; ¶ 43 and Attachment O; ¶ 44 and Attachment P).

The notices were adopted without participation by persons knowledgeable of the need to adapt the notices to the needs of the mentally impaired. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 108–09). There was not any field testing of the notices appropriateness for that population. *Id.* If an enrollee who receives a reverification notice does not call for an appointment, then within a few days, the TDHS caseworker schedules an appointment that the person can reschedule. *Id.* at 56–59. If a person calls the designated state helpline, that employee will work with TDHS to secure necessary assistance. *Id.* at 61.

The notice to these enrollees instructs them to provide medical records, without providing guidance as to the type or quantity required. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, at unnumbered page 10; Attachment O, Part A, TennCare Application for Determination of Health Insurance Status, at 2; Docket Entry No. 380, Blackburn Testimony at 43–44; Docket Entry No. 381, Westlake Testimony at 29–30).

As stated earlier, the eligibility interview was expected to last 1 hour, but the Court finds that estimate is unreasonable given the complexity of the Medicaid eligibility rules, the numbers of documents to be reviewed and the existence of substantial number of enrollees who have a mental disability.

If an application is not submitted by the eighty-ninth (89th) day after the first notice, then the enrollee's TennCare coverage terminates on the 90th day with a right to reinstatement of continuous coverage upon filing an appeal within 30 days after the ninety-day termination date. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 13). If an application is submitted, there is a 45–day period to complete the application. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 15). This 45 day period begins on the date the signed application was received during which the enrollee must have a redetermination interview with a TDHS worker. *Id.*

Although TDHS caseworkers have the discretion to extend the 45–day deadline for good cause, the initial notices to current enrollees do not inform enrollees of the availability of such an extension to enable the enrollee to request an extension. *Id.*, ¶ 16 and Attachment B. The termination of coverage notices to individuals for failing to complete the eligibility process in 45 days is silent on the good cause exception. (Defendant's Exhibit No. 1, Johnson Declaration, Attachments F and N).

For the 45–day period after the signed application, there was a factual dispute between the Defendant's expert and the TDHS Deputy Commissioner on the scope of TDHS's eligibility review. Cyndy Johnson, the Defendant's consultant, explained that "[i]f they don't get us everything that the Bureau needs to make that decision, they will get a notice that tells them at the end of the 45 days, your application has been denied because its incomplete. And it will tell them that these are a number of good cause reasons why you may appeal and ask for more time. And it lists those reasons." (Docket Entry No. 380, John-

son Testimony at 144). Johnson further testified that:

Q. The situation where the person simply fails to complete the Medicaid process, but it is documented that they are, in fact, eligible for TennCare?

A. Well, the waiver documentation that I have seen all makes it clear that people will go through the Medicaid eligibility determination process first.

Q. I understand that. Is there anything in the waiver that indicates that if they show that they are TennCare waiver eligible but cannot finish the process, that they are to lose their TennCare coverage?

A. *I believe that the requirement is they complete the Medicaid process. So if they do not, they would not be permitted to enroll under the waiver program. That's my understanding.*

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And if they fail to complete the Medicaid process, even though they show that they meet those technical requirements, they will still be denied; is that correct?

A. *If they do not complete the Medicaid process, yes, they will be denied.*

&ast; &ast; &ast; &ast; &ast; &ast;

Q. A person who wants to be considered for all sources of eligibility, including possible medical eligibility, will have to apply twice; will they not?

A. They will apply first through Medicaid to determine if they meet those requirements. And then, if they do, if their income is a certain level— I'm talking about redetermination folks right now. If their income is above certain levels. But then they also have to prove that they are

medically eligible. So it is a two step process.

Q. And similarly, they will have to appeal twice, will they not, if they want all sources of eligibility to be considered on appeal?

A. Yes. If they have to appeal their Medicaid denial, and then also, if they want to, to appeal their TennCare standard denial.

(Docket Entry No. 380, Johnson Testimony at 233, 235, 236)(emphasis added).

Moreover, during the Medicaid eligibility screening, if the enrollee is determined ineligible for Medicaid, but satisfies the "technical eligibility requirements of TennCare Standard; is uninsured; lacks access to health insurance; and has income at or below 100% of the federal poverty level [the enrollee] may qualify for TennCare Standard" as medically eligible. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 43). Johnson testified that the TDHS worker "will flag the system, prompting the TennCare Bureau to send the applicant a Medical Eligibility Determination packet." *Id.*

Yet, according to Michael Dedmon, TDHS's Deputy Commissioner, if, during the Medicaid eligibility process, the enrollee is denied Medicaid eligibility, the enrollee would still be evaluated for TennCare Standard.

Q. A question was raised to Ms. Cyndy Johnson that I wanted to follow up with you about. At the end of an applicant's time to complete their application, if the application remains incomplete at that time, what happens to that person's eligibility for Medicaid?

A. If the application is incomplete for Medicaid because the Department does not have information on resources, on assets, then that appli-

cation goes on and is tested for [S]tandard eligibility.

Q. And so they are not automatically denied in terms of TennCare [S]tandard if the rest of their application is complete in terms of that program; is that correct?

A. No, they are not.

Q. If Cyndy Johnson testified different than you have just stated, do you have an explanation for that?

A. There was differing understandings between the Department of Human Services and the Bureau of Tenn-Care as to how the situation you described would be handled. DHS was under the impression that TennCare wanted the incomplete medication—the incomplete Medicaid application denied at that point, and that would be the end of the process. The TennCare Bureau wanted the application to go forward and be tested for standard.

Q. And which one of those two are you to follow?

A. What the Bureau wanted the Department to do.

Q. So the TennCare [S]tandard review will go ahead even if the denial takes place?

A. That's correct.

(Docket Entry No. 381, Dedmon Testimony at 242–44).

The Court finds that this dispute between Johnson and Dedmon, in all probability, reflects the Defendants' modification of the TennCare rule in response to Plaintiff's conclusion that Medicaid regulations require consideration of all basis of eligibility.

In any event, there is a standard notice form that advises an enrollee whether he or she qualified for "uninsured", and then enrollees are informed of a ME determination at the separate phase of the eligibility process, for which there is a second 45–day deadline. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment O, at 1). With exceptions discussed *infra*, an enrollee must file a separate application for "medical eligible" or ME reverification.

The TennCare Bureau, sends the enrollee a ME packet, with instructions and necessary forms for establishing medical eligibility criteria. *Id.* at ¶ 23 and Attachment G. The ME packet explains three ways to establish eligibility, by submission of: (1) a current letter from an insurance company denying health insurance; (2) a signed physician letter attesting that the individual has a qualifying medical condition on the TennCare Medical Condition List; or (3) an updated CRG/TPG assessment performed by a CMHC, reflecting the enrollee's SPMI/SED status. *Id.* An enrollee's TennCare coverage usually continues throughout the ME application and reverification process. *Id.* ¶ 24.

Enrollees who submit ME packets are informed of the good cause extension, but only after TennCare has denied them for failure to complete the ME process within the 45 day ME packet deadline. *Id.*, Attachment P, at 3 and unnumbered page 6. As to the 45–day extension for good cause, "TDHS *may* grant [the good cause extension]... in accordance with Bureau/DHS policies." Docket Entry No. 437, Exhibit E at Rule 1200–13–14.02(8)(h). The good cause extension of the 45–day limit is intended for "rare" circumstances. (Plaintiff's Exhibit No. 50, Johnson Deposition at 74; Defendant's Exhibit No. 1, Johnson Declaration ¶ 16). Other extensions are permitted to enable individuals to obtain an outstanding item of information or proof of eligibility. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 16). For example, if there is an item of information missing on the 44th day, and at 5:00 p.m., the applicant is hospitalized as a result of a

car accident; such circumstances could justify an extension beyond the 45 days. (Plaintiffs' Exhibit No. 50, Johnson Deposition, at 74; Defendant's Exhibit No. 1, Johnson Declaration, Attachment E at 2). This "good cause" exception for failing to meet the 45–day time limit does not address the inability of the SPMI or SED enrollee to complete the eligibility process without extensive accommodation.

A separate application is not required in some instances. (Defendant's Exhibit No. 1, Johnson Deposition ¶ 35). For example, an enrollee who has income in excess of the criteria for TennCare Standard as an uninsured person, but has a current qualifying CRG/ TPG assessment in the TennCare/TDHS databases, will be "deemed" to qualify for TennCare Standard as a medically eligible person. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 22). Moreover, if the applicant were treated for a medical condition that is on the TennCare Medical Condition List, that fact will be noted on the TDHS database. *Id.* ¶ 35. According to the Johnson, the TDHS eligibility caseworker is aware of this fact. Further, if the enrollee satisfies the technical eligibility requirements for TennCare Standard, and asks to be considered for coverage as a medically eligible person, a qualifying medical condition satisfies the ME requirement. In such an instance, the second application also is unnecessary for the Medicaid eligibility process. *Id.* If, however, the enrollee does not qualify with a condition on the TennCare Medical Condition List, TDHS concludes the reverification process and terminates the individual's TennCare coverage, *id.*, without determining if the person would still qualify as a "medical eligible."

Yet, for the enrollees who fail to complete the Medicaid application process, even if the enrollee could be flagged as having a qualifying condition, the enrollee is nonetheless terminated, despite the State's documentation of the enrollee's medical eligibility condition for TennCare Standard. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 48). Johnson conceded that "federal policy" requires the state "to explore all avenues" of eligibility. (Docket Entry No. 380, Johnson Testimony at 190). Without a "deeming" of medical eligibility, a second application starts the second 45–day time limit, within which the enrollee must complete the nonMedicaid eligibility phase of the reverification process.

### 3. Pacific Health's Monitoring of TDHS's Administration

The Defendant hired the Pacific Health Group to monitor its compliance with the Agreed Order, Settlement Agreement and the Court's other Orders in this action. (Docket Entry No. 170, Settlement Agreement, Section I at 2, Section I; Plaintiffs' Exhibit No. 50, Johnson Deposition at 5, 34). The State also retained Pacific Health to conduct a federally mandated readiness review of new managed care contractors before the contractors were permitted to participate in the TennCare program. (Plaintiffs' Exhibit No. 1, Reynolds Deposition at 31–32; Docket Entry No. 380, Johnson Testimony at 239–40).

The Pacific Health consultants only monitor those areas that the TennCare Bureau directs them to monitor. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 64–65). Pacific Health proposed a similar monitoring plan for TDHS, but the Defendant rejected it. (Docket Entry No. 380, Johnson Testimony at 240). Pacific Health again proposed to evaluate TDHS's readiness for its new duties, but the Defendant again declined the request. *Id.* at 240–41. For that reason, Pacific Health did not assess fully TDHS's readiness to implement the new procedures to comply with the Agreed Order and Settlement

Agreement. (Docket Entry No. 380, Johnson Testimony at 249).

Pacific Health did not assess the adequacy of State's computer systems to implement the new TennCare policies and procedures. (Plaintiffs' Exhibit No. 50, Johnson Deposition, at 47–48). Pacific Health consultants did not test the TDHS system to insure that individuals in the TennCare computer system actually had their data transferred to the TDHS computer system. (Docket Entry No. 380, Johnson Testimony at 245). Johnson acknowledged data entry errors in the Defendant's computers that could impact the parties' settlement agreement. *Id.* at 248. The TennCare computer system has also had difficulties in complying with the Orders in this case, but improvements have been made to correct these deficiencies. *Id.* at 245–49. Deficiencies in the computer system are critical, given the fact that the Defendant's new policies require the denial or termination of TennCare coverage, if the reverification process is not completed within 45 days. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(7)(e),(f) and (m); Rule 1200–13–14–.02(8)(c) and (g)).

Pacific Health also has never evaluated TDHS computer and information systems, (Docket Entry No. 380, Johnson Testimony at 239), the TDHS appeal process, *id.* at 236–37, the adequacy of TDHS staffing, *id.* at 250, TDHS's training. *Id.* To be sure, Pacific Health examined the written training materials, but did not attend any of the training sessions. *Id.* at 241–242; Plaintiffs' Exhibit No. 50, Johnson Deposition at 13.

Pacific Health, however, has done limited monitoring of TDHS's actual performance of the reverification. Although Pacific Health did not assess the adequacy of the notice for purposes of informing people with mental impairments, Pacific Health surveyed a group of randomly selected TennCare enrollees who received the notices and found that roughly 19%, or 8 of 43 respondents who recalled receiving the notices, found the notice difficult to understand. Six persons "were unaware after reading the letter that they were required to contact TDHS," to keep their TennCare coverage. (Plaintiffs' Exhibit No. 81, Pacific Health Policy Group August 2002 Report, at 7). Five of six persons were elderly. *Id.* Sixty-four (64) percent of the respondents were elderly, i.e., age 64 or older. *Id.*

Pacific Health also made test calls to the TDHS County office shortly before the last preliminary injunction hearing and half of the calls had not been returned a week later. (Docket Entry No. 380, Johnson Testimony at 243–44). Pacific Health's report found that over half of calls to Davidson County TDHS workers were simply never returned. (Plaintiffs' Exhibit No. 81, Pacific Health Policy Group August 2002 Report at 6). A fourth of Pacific Health's telephone calls to other TDHS offices produced similar results. *Id.* According to Cyndy Johnson, because of the State's 45 day deadline for enrollees to complete the application process, such delays can result in the loss of an enrollee's health coverage. (Docket Entry No. 380, Johnson Testimony at 243–45).

Further, Pacific Health's test of select counties revealed that nearly a quarter of TDHS's county offices lacked basic information about the new process when requested during telephone calls (Plaintiffs' Exhibit No. 54, Pacific Health Policy Group report "DHS Undercover Calls" (7–2–02)). Seven (7) of the ten (10) TDHS county offices could not process a telephone call from a Spanish speaker. (Plaintiffs' Exhibit No. 55, Pacific Health Policy Group report "Spanish Monitoring Calls" (7–10–02); Docket Entry No. 380, Johnson Testimony at 157–58; Plaintiffs'

Exhibit No. 50, Johnson Deposition, at 28–29).

Moreover, Pacific Health's testing revealed that 50% of those who requested an appointment with TDHS did not secure an interview. *Id.* Although 40% reported TDHS to be "very helpful" and 10% "somewhat helpful", 50% described TDHS as "not helpful." *Id.* at 7B, at 3. For the two people who had an appointment, one person found TDHS "very helpful" and the other person "somewhat helpful." Acknowledging the limitation of the group size of its survey, Pacific Health concluded that "the results do suggests that the noticing process, while not perfect, worked as intended for most of the 50 respondents." *Id.* at 7. Yet, of the five persons who secured an appointment, only 2 persons had been interviewed. *Id.* at 7B, at 2, 3. For the subsequent, 555,253 mailings of notices of reverification, 190,278 have completed interviews and received decisions on their terminations. (Docket Entry No. 448).

As to the TennCare information line, after the first mailing to 11,712 enrollees went out on July 1, the Pacific Health's test calls to the Information Line encountered average waiting times of 28 minutes for calls made after the noon hour. (Plaintiffs' Exhibit No. 81, Pacific Health Policy Group August 2002 Report at 7–8 and Attachment 8). In its latest report summarizing the results of its test calls to the Information Line, Pacific Health stated: "In general, the operators seemed uninformed about the recent changes to the TennCare program." (Plaintiffs' Exhibit No. 81, Pacific Health Policy Group August 2002 Report at 9).

#### 4. Appeal Process

If an enrollee submitted a complete application and is denied Medicaid coverage, a notice of the proposed termination of TennCare coverage is mailed with a statement of appeal rights and the availability of continued coverage pending appeal. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 17). For denials of applications, the Defendant's denial form provides a checklist of reasons for a denial, including lack of U.S. citizenship or legal residency, access to private health insurance and Medicare eligibility as well as other reasons. (Docket Entry No. 380, Johnson Testimony at 146). Yet, in some denial forms, the notice of the enrollee's ineligibility for TennCare Standard lacks specificity to inform the applicant or enrollee of the reasons for termination of coverage.

The Defendant informs some enrollees who are denied coverage: "You did not finish the application process for TennCare", but does not identify the specific deficiency or how the enrollee can remedy it. (Plaintiffs' Exhibit No. 79, Robertson Declaration ¶ 4; Defendant's Exhibit No. 1, Johnson Declaration, Attachment F, at unnumbered pages 6–8; Attachment K, at 6–7; Attachment N, at unnumbered pages 3–5; Docket Entry No. 380, Johnson Testimony at 212–15). Plaintiffs contend that this generic statement could cover a wide range of alleged deficiencies in the person's application, and does not provide an adequate explanation to prepare an appeal on whether the State's termination was correct, or how they might remedy the problem. (Plaintiffs' Exhibit No. 79, Robertson Declaration ¶ 4; Defendant's Exhibit No. 1, Johnson Declaration, Attachment F, at unnumbered pages 6–8; Attachment K, at 4; Attachment N, at 3–unnumbered page 5; Docket Entry No. 380, Johnson Testimony at 212–15).

If there is an incomplete application in the reverification process for continued eligibility for Medicaid, such as a failure or inability to verify assets/resources, TennCare coverage is terminated but is given notice to file an appeal within 30 days that will also reinstate TennCare coverage.

(Defendant's Exhibit No. 1, Johnson Declaration at Attachment D). Yet, this denial notice does not refer to the good cause extension rule.

Notice of denials of medical eligibility, however, reflect that a person can appeal if good cause were shown for not completing the application in time, (Defendant's Exhibit No. 1, Johnson Declaration, Attachment I, at 3).

The new TennCare process establishes separate appeals to two different agencies to obtain review of the different bases of eligibility. Adverse Medicaid eligibility determinations must be appealed to TDHS, but decisions on TennCare Standard eligibility must be appealed to the TennCare Bureau Appeals Unit. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 81–82, 106–07; Docket Entry No. 380, Johnson Testimony at 151, 236). To ensure consideration for entitlement to TennCare coverage under all possible eligibility criteria, the enrollee would be wise to appeal to both forums. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 105–06).

The notices, however, do not inform plaintiff class members of this dual appeal requirement. (Docket Entry No. 380, Johnson Testimony at 236). A denial for an incomplete application does not include an appeal form. (Defendant's Exhibit No. 1, Johnson Declaration at Attachment D). There is an appeal form for denials of enrollees who sought Medicaid Eligibility coverage. (Defendant's Exhibit No. 1, Johnson Declaration at Attachment I), and a separate notice for denial of ME coverage for "New Applicants." *Id.* at Attachment P. There are also separate forms for denials for "Technical/Insurance Reasons," *id.* at Attachments F and N, and "because their income is too high." *Id.* at Attachment G. These notices have separate appeal forms. Once an appeal is filed on a reverification denial, TennCare coverage

continues. (Docket Entry No. 380, Johnson Testimony at 155–56).

The TennCare Information Line is available for class members who need assistance in the appeal process. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, unnumbered page 6 ("Do You Need Special Help?"), Attachment K at 2; Docket Entry No. 381, Teasley Testimony at 142–43).

On September 20, 2002, TDHS discovered that the yellow appeals information sheet entitled "Want to change what's happening to the help you get from us? Here is what you can do," was not enclosed with DHS notices of disposition sent to individuals between August 15, 2002 and September 16, 2002. (Docket Entry No. 430, Rudolph Fifth Declaration ¶ 3). In total, the notices were not inserted into 425,783 ACCENT generated notices of disposition sent to all Family Assistance programs (Families First, Food Stamps and Medicaid). *Id.* The Department of General Services that stuffs and mails all notices exhausted its existing supply of yellow appeals sheets. Although additional supplies had been ordered, no one from General Services notified TDHS when the supply was exhausted on August 15, 2002. *Id.* General Services received a new supply of forms on September 16, 2002 and began using the new supply at that time. *Id.*

To remedy this error, TDHS issued a special mailing to Family Assistance program individuals who should have, but did not receive the yellow appeals information sheet. This special mailing began October 1, 200 and was completed October 5, 2002. *Id.*

> Additional time will be afforded to those individuals. Specifically, they will have until December 31, 2002 to appeal the negative action (for a new 90 day time frame). Individuals wanting to continue

their existing benefits may do so by appealing by October 31, 2002. Although this period is normally 10 days after notice, [T]DHS is providing this extended periods to ensure that these individuals are afforded ample opportunity to appeal and continue their benefits during the appeal.

*Id.*

The TennCare Bureau appeals unit has a history of backlog an excessive delay in the processing of administrative appeals. A study of this backlog resulted in a restructuring of the agency. *See* Plaintiff's Exhibit No. 81. At the time of the new TennCare waiver, this appeals unit was not current with the existing volume of appeals. *Id.* Johnson, however, described the appeals unit as making significant progress. (Docket Entry No. 380, Johnson Testimony at 237). As of November 25, 2002, the reverification process had added 11,560 appeals. *See* Docket Entry No. 448 at unnumbered page 2.

5. **Accommodations for Enrollees with Severe and Persistent Mental Illness ("SPMI") and Seriously Emotionally Disturbed Children ("SEDC")** [13]

Plaintiffs assert that the Defendant has failed to develop policies and procedures to identify enrollees who are SPMI or SED and to accommodate those enrollees in the reverification process. Accommodations for enrollees and their special needs are critical to determine their eligibility under newly implemented Medicaid policies to retain their TennCare coverage.

As noted earlier, TennCare rules provide that "Reasonable accommodation will be made for persons with disabilities who require assistance in responding to a renewal request." (Docket Entry No. 234;

Plaintiffs' Exhibit No. 27, TennCare Rule 1200–13–14.02(6)(a)). According to Johnson, federal Medicaid policy also requires equal treatment and accommodations for applicants and enrollees. (Docket Entry No. 380, Johnson Testimony at 255). In the initial reverification process, the Defendant has "Redetermination/Medicaid Rollover process for SPMI/SED Enrollees." (Defendant's Exhibit No. 1, Johnson Declaration at Attachment K).

As to persons with disabilities, TennCare rules define the SPMI as adults with a diagnosable mental, behavioral or emotional disorder resulting in functional impairment which substantially interferes with or limits major life activities including basic living skills (e.g., eating, bathing, dressing); instrumental living skills (maintaining household, managing money, getting around in the community, taking prescribed medication); and functioning in social, family and vocational/educational context. (Docket Entry No. 437, Exhibit E, Rule 1200–13–14–.01(93)(a)3). The rules identify the SPMI and SED as individuals who suffer from disorders with episodic, recurrent or persistent features. *Id.* at Rule 1200–13–14–.01(92)(b) and (93)(a)2.

To qualify as medically eligible on the basis of SPMI or SED status, a current enrollee or new applicant must have received a CRG/TPG classification within the past 12 months (Docket Entry No. 437, Exhibit E, Rule 1200–13–14–.01(92)(b) and (93)(a)2. SPMI adults and SED children are identified through clinical and functional assessments, known by the acronyms CRG or TPG. CRG/TPG assessments are performed primarily by the community mental health centers, then processed by

---

**13.** As discussed *infra* for both the mentally disabled and the LEP, the Defendant contends that its agreement to have policies developed for this group did not convey the Defendant's authority to decide TennCare reforms that may impact this group. The issue is discussed in the Conclusions of Law section of this Memorandum.

the Department of Mental Health and Developmental Disabilities ("DMHDD"). (Plaintiffs' Exhibit No. 50, Johnson Deposition at 8–9; Defendant's Exhibit No. 1, Johnson Declaration ¶ 49).

The SPMI individuals are classified in one of three clinically related groups, designated as CRG 1, CRG 2, and CRG 3, with CRG 1 being the most severely impaired. (Docket Entry No. 381, Blackburn Testimony at 24–31). Plaintiff class members in CRG 1 are known to the State to require constant assistance or supervision with daily living activities and to display an inability to relate to others. (Docket Entry No. 437, Exhibit E, Rule 1200–13–14–.01(93)(b)1. The latter limitation interferes with these enrollees' ability to work and their family relationships and usually results in social isolation in the community. *Id.* Changes in the environment are stressful and may result in further withdrawal or dysfunction in other areas. *Id.* Support is needed to insure the person's safety and survival. *Id.*

Plaintiff class members who are rated as CRG 2 are known to have extensive problems with performing daily routine activities and to require frequent assistance. These enrollees have substantial impairments in their ability to take part in social activities or relationships that often results in social isolation in the community. *Id.* Such a person has extensive difficulty in adjusting to change. *Id.* Assistance with activities of daily living is necessary to survival in the community. *Id.* Such individuals are known to the State to have difficulty completing simple tasks. *Id.* at Rule 1200–13–14–.01(93)(b).

Even those SPMI enrollees who are the least impaired, and who are therefore classified as belonging to CRG 3, are known to the State to "generally need[ ] long term continued support." *Id.* at Rule 1200–13–14–.01(93)(b)3. Characteristics of this population may include regular or frequent problems performing daily routine activities. A person in this subset of the SPMI population "may require some supervision although [the person] can survive without it. . . There is sometimes noticeable difficulty in accepting and adjusting to change and the person may require some interventions." *Id.* .

A child who is SED is likewise defined as having a diagnosable mental, behavioral or emotional disorder with episodic, recurrent or persistent features, which substantially interferes with or limits the child's role or functioning in family, school, and community activities as well as their ability to maintain appropriate social, behavioral, cognitive, communicative, or adaptive skills. *Id.,* at Rule 1200–13–14–.01(92). The families of such children have difficulty coping with the types of administrative requirements imposed by the new TennCare eligibility rules. (Docket Entry No. 380, Bryson Testimony at 104–05). Such difficulties require accommodation to permit the families to complete successfully their children's re-applications for TennCare coverage. *Id.*

As a practical matter, for these groups, these disabling conditions do not go away, and the person does not "get well". (Docket Entry No. 380, Blackburn Testimony at 29–30; Bryson Testimony at 105–06; Docket Entry No. 381, Westlake Testimony at 30). Given the persistent and chronic nature of the SPMI/SED condition, once a person receives a CRG/TPG assessment that he or she is SPMI or SED, in all likelihood, the person continues to suffer these serious impairments despite the lack of a current CRG/TPG in his or her medical record (Docket Entry No. 380, Blackburn Testimony at 29–30; Bryson Testimony at 105–06).

Since 1996, TennCare has classified approximately 190,000 enrollees as SPMI or SED. (Plaintiffs' Exhibit No. 64, Progress

Report on TennCare Partners Program (March 2002) at 7). Enrollees assessed as SPMI or SED are identified as such in the TennCare management information system. (Docket Entry No. 380, Johnson Testimony at 257–58).

Although TennCare's management information system has a data field for "disabled", effective July 1, 2002 the Defendant started a new TDHS application that deletes the data field for identifying the applicant as having a disability. Defendant's Exhibit No. 1, Johnson Declaration, Attachment B at unnumbered page 4; "Tennessee Department of Human Services Application or Review of Eligibility for Families First, Food Stamps, Medicaid/TennCare"; (Docket Entry No. 381, Teasley Testimony at 164). The Defendant could have used this data field, but did not. (Docket Entry No. 380, Johnson Testimony at 259). The Defendant could have also worked around the limitations of the management information system, for example, through the use of a PC-based system, but did not. (Docket Entry No. 380, Johnson Testimony at 258–59).

TennCare and TDHS have separate computer data systems. (Plaintiffs Exhibit No. 50, Johnson Deposition at 46–47). Although TennCare still retains in its computer system where the enrollee self-identifies as disabled, at one time this data was not accessible to the TDHS caseworkers who are relied upon to identify and accommodate the needs of people with disabilities. *Id.* at 12–13. The TennCare Bureau's management information system had a data field for "disabled" that includes two types of disabilities, physically disabled and seriously emotionally disabled. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 8). Based upon its assessments at the local mental health centers provided to Defendant, the TennCare Bureau's computer data bases includes those persons with serious mental illnesses, i.e.,

SPMI and SED individuals. (Docket Entry No. 50, Johnson Deposition at 8–9). Yet, the TDHS application form deleted all references to disability. (Docket Entry No. 380, Johnson Deposition at 202).

The TennCare Bureau's computer, however, has encounters data that reflects clinical encounters between enrollees and health care providers and contains information showing that the persons received treatment for a condition that is on the TennCare Medical Condition List, a fact reflected in the TDHS database. In these situations, TennCare will transmit this information to the relevant TDHS computer database, accessible to TDHS caseworkers for a determination of eligibility. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 22). Yet, TennCare transmits that information to TDHS only if an SPMI or SED enrollee has a current CRG/TPG and it will be flagged in the TDHS computer record, so that the case manager assigned to the case will know that the person has been so designated.

The Defendant mails initial notice of re-verification only to those enrollees with current CRG/TPG assessments. Individuals who have a current CRG/TPG assessment, and meet the TennCare regulatory definition of SPMI or SED, are the subjects of additional notification efforts. (Defendant's Exhibit No. 1, Johnson Declaration ¶ 33 and Attachment K at 3). According to Johnson, the current implementation plan is to issue mailings to all persons to be followed by telephone calls to those persons with disabilities requesting special assistance. (Plaintiffs Exhibit No. 50, Johnson Deposition at 36).

When the first 45–day period commences, TDHS asserts that it will accommodate individuals with special needs. (Docket Entry No. 380, Johnson Testimony at 166, 173; Docket Entry No. 381, Teasley Testimony at 87–94, 97–99, 104,

165; Smith Testimony at 270, 297–99). TDHS eligibility caseworkers are to provide assistance to other persons encountering difficulty completing the application process, including obtaining verification of requested information for the individual. (Docket Entry No. 381, Teasley Testimony at 82–83).

If necessary to accommodate an enrollee's special needs, alternative arrangements include a telephone or in-home interview, completion of the interview by an authorized representative of the enrollee, or an interview conducted at alternative sites, such as a CMHC. (Docket Entry No. 381, Teasley Testimony at 104).

With the policy requiring a current CRG/TPG, the Defendant excluded the majority of enrollees who have been previously identified as SPMI or SED. *See* Docket Entry No. 380, Blackburn Testimony at 28–30. If the enrollee lacks a current CRG/TPG or an encounter data entry showing that the applicant has a qualifying medical condition, the applicant must obtain a new CRG/TPG and submit it with a fully completed medical eligibility application packet. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment A at 3–5). The applicant must complete his/her portion of the form and sign it. *Id.*, and Attachment K at 5–6. Failure to do so will result in rejection of the packet and termination of coverage. *Id.* Attachment A at 4.

Yet, even if an enrollee lacks a current CRG/TPG, the enrollee may still be deemed to be medically eligible by virtue of having a qualifying mental health condition (that is, a condition on the TennCare Medical Condition List developed for the medical eligibility process), as evidenced by the presence of the qualifying diagnosis on the claim/ encounter record in TennCare's database for calendar year 1999 to the present. *Id.* ¶ 22 and Attachment K at 5–6; Attachment G (including TennCare Medical Condition List).

If an SPMI or SED enrollee completes the Medicaid eligibility process, satisfies the technical eligibility requirements for TennCare Standard, and asks to be considered for coverage as a medically eligible person, the database notation of either a current CRG/TPG or a qualifying diagnosis will satisfy the ME requirement, and the person need not submit the separate application required of other enrollees. *Id.* ¶ 35.

Without a "deeming," a medical eligibility packet is mailed to the enrollee. The packet must be completed and submitted within 45 days from mailing by the TennCare Bureau. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules at Rule 1200–13–14.02(7)(n)). The enrollee must obtain a new CRG/TPG and submit it with a fully completed medical eligibility form or must submit a fee and undergo an underwriting review by the State's contractor. (Defendant's Exhibit No. 1, Johnson Declaration, Attachment M at 4). In either event, the SPMI/SED applicant must complete the appropriate Medical Eligibility form and sign it. *Id.* Failure to do so within the 45 day limit will result in rejection of the packet and denial of coverage. *Id.* at 2–3.

During the indispensable first phase of the process, to complete a Medicaid application, this enrollee must still submit supporting documentation. If the first phase is not completed, the enrollee will not be considered for TennCare Standard or ME coverage. (Docket Entry No. 380, Johnson Testimony at 232). Even enrollees who are flagged as having a current CRG/TPG will be terminated, if they fail to complete the Medicaid application process. Termination of coverage occurs even if they meet the technical requirements for TennCare Standard. *Id.* In such instances, the Defendant's record reflects that the enrollees are medically eligible for TennCare Standard (because they meet the

technical eligibility requirements and have current CRG/TPGs), but will nonetheless deny them for failure to complete the Medicaid process. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 48; Defendant's Exhibit No. 1, Johnson Declaration ¶ 16).

To be eligible as an SPMI/SED enrollee, a current CRG/TPG assessment, i.e., within the preceding 12 months, is required for reverification, but many SPMI/SED enrollees do not have current CRG/TPG assessments. Only about one fourth (46,104 in fiscal year 2000–2001) of TennCare enrollees identified since 1996 as SPMI/SED have a current CRG/TPG assessment. (Plaintiffs' Exhibit No. 15, Blackburn Declaration, ¶ 3; *see also* Docket Entry No. 380, Blackburn Testimony at 28–31; Docket Entry No. 380, Bryson Testimony at 97–98, 112–15). Mentally ill applicants who have a listed psychiatric condition, but lack a current CRG/TPG, must reestablish their medical eligibility within the 45–day time limit. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules at Rule 1200–13–14–.02(8)(g); Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 43–46 and Attachment M at 2–4; Attachment O). For example, there are months long delays in obtaining new CRG/TPG assessments from some CMHCs, and until now there has not been a need to update one's assessment to qualify for TennCare benefits. (Docket Entry No. 380, Blackburn Testimony at 48–49; Docket Entry No. 380, Bryson Testimony at 102–04).

To obtain new CRG/TPG assessments from some CMHCs, can take months. (Docket Entry No. 380, Blackburn Testimony at 48–49; Bryson Testimony at 102–04). It is difficult, if not impossible, to obtain a new SPMI/SED designation within the 45–day time limit, even if the individual, or someone acting on her behalf, acts promptly to obtain such an assessment. (Docket Entry No. 380, Blackburn Testimony at 48–49; Bryson Testimony at 120; Docket Entry No. 381, Westlake Testimony at 30–31). Because new TennCare policies cast doubt on the ability of mental health providers to be paid for these evaluations that are required for a CRG or TPG designation, it is unlikely that many individuals can obtain current assessment at all. (Docket Entry No. 380, Blackburn Testimony at 64–65, 88; Womack Testimony at 271–72).

In addition to a completed ME packet, the enrollees must gather "medical records" to document their medical condition or their applications will be returned. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14.02(8)(g)(1); *See also* Defendant's Exhibit No. 1, Johnson Declaration, Attachment H, "We are returning your 'Medical Eligibility' Application" ("You must send your medical records to support your application.") and Attachment O, 7th unnumbered page, Part A—TennCare Application, at 1 ("Send all of your forms, $25.00 and medical records in one package. If you do not send it together, it will be denied as incomplete."); *cf.* Docket Entry No. 380, Blackburn Testimony at 43–44, 67–68). If the medical records are submitted separately by a health care provider, the application will also be returned because the enrollee's medical eligibility packet is deemed incomplete. *Id.*; Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(8)(g), at 21.

For the SPMI or SED enrollees, acquiring a necessary letter of declination from an insurance company within the 45 day limitation likewise is difficult. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(7)(m)(1), at 19; Docket Entry No. 380, Blackburn Testimony at 60–61; Docket Entry No. 380, Bryson Testimony at 120; Docket Entry No. 381, Westlake Testimony at 33). The requirement of a declination letter seems unneces-

sary to determine that the current enrollee lacks access to private insurance, because enrollees who have been designated in the past as SPMI or SED, usually lack access to private insurance. *Id.* Otherwise, the current enrollee would not be on Tenn-Care.

Many of the SPMI individuals and many of the families of SED children need direct one-on-one personal help, and cannot satisfactorily cope with the telephone or written notice. (Docket Entry No. 380, McCormick Testimony at 14–17; Docket Entry No. 380, Bryson Testimony at 116–17).

TennCare has amended its contract with the Mental Health Association of Middle Tennessee, to advocate on behalf of SPMI/SED individuals. TennCare also retained the TennCare Partners Advocacy Line ("TPAL"), to expand assistance to be provided to SPMI/SED enrollees during the redetermination process. (Docket Entry No. 381, Smith Testimony at 270–71; Mc-Lean Declaration ¶ 17).

TPAL, a state contractor, also offers assistance to enrollees who fail to respond to the initial redetermination notice. TPAL's efforts consist of telephone contacts and mailed notices within 30 days of the initial redetermination notice. (Docket Entry No. 381, Smith Testimony at 271). TPAL is to contact the last known provider or case worker of the SPMI/SED enrollee and will utilize a variety of ways to offer assistance and information. TPAL's role is to ensure that each SPMI/SED enrollee who has failed to respond to the initial notice has a current provider or mental health case manager at a CMHC or other person, who will assist them in navigating the reverification process. (Docket Entry No. 381, Smith Testimony at 272,

284). TPAL's assistance, however, is limited to persons with recent CRG/TPG designations, and does not extend to either the mentally ill who lack recent CRG/TPGs, or to the physically disabled. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 54–55).

In any event, telephone contact is considered by several mental health workers to be insufficient to accommodate the mentally ill population that needs in-person assistance as provided by mental health case managers at the CMHCs. (Docket Entry No. 381, Smith Testimony at 283; Docket Entry No. 380, Blackburn Testimony at 33–35; Docket Entry No. 380, Bryson Testimony at 115–16; Docket Entry No. 380, Womack Testimony at 265–66; Docket Entry No. 381, Westlake Testimony at 21–26). A pilot project undertaken by the State involving similar assistance from TPAL convinced the State to exempt the SPMI/SED from the reverification process in place prior to July 1, 2002, pending the development of more appropriate eligibility determination procedures for that population. (Plaintiffs' Exhibit No. 57, Reverification Pilot Project Outcomes; Docket Entry No. 380, Blackburn Testimony at 54–55; Plaintiffs' Exhibit No. 50, Johnson Deposition at 9, 64, 99–100).

The Defendant asserts that it has now established a helping role for the local Community Health Centers to assist mentally disabled enrollees.[14] (Docket Entry No. 215). At the Court's direction, a September 2001 protocol with CMHC's was established for processing eligibility for the SPMI/SED. (Docket Entry No. 201). The CMHCs are intended to be the "front line" in serving this vulnerable population. (Plaintiffs' Exhibit No. 50, Johnson Depo-

---

14. Actually, after a hearing and status conference on the difficulties of class members with mental disabilities, the Court directed the Defendant to develop a written protocol with CMHC to ensure a mutual understanding of their obligations to make their participation effective. (Docket Entry No. 201).

sition at 17–18, 38). Under the protocol, the CMHC providers were assigned the crucial role of actually submitting Tenn-Care applications and supporting documentation for individuals who qualify as SPMI/SED. (Docket Entry No. 215, TMHDD Procedures, Initial Steps for Categories 1 & 2). From October 1, 2001 to June 30, 2002, CMHCs processed 2,300 applications. (Docket Entry No. 380, Johnson Testimony at 160).

CMHC's that have sent mentally ill individuals to TDHS to apply for TennCare report that their patients are told that they are not Medicaid eligible, and that TennCare Standard enrollment for ME coverage is closed. (Plaintiffs' Exhibit No. 80, Blackburn Second Declaration ¶ 3; Plaintiffs' Exhibit No. 73, Letter to whom it may concern from TDHS worker Sandra Sorrells, 7–18–02; Docket Entry No. 381, Womack Testimony at 268–71).

According to the Executive Director of the Tennessee Association of Mental Health Organizations ("TAMHO"), the CMHCs are concerned about their reimbursement for the costs of performing a CRG/TPG assessment for a new applicant not yet covered by TennCare. (Docket Entry No. 380, Blackburn Testimony at 65; Docket Entry No. 381, Smith Testimony, at 279). In July, 2002, the TennCare Bureau placed those individuals to be processed by CMHCs into a state-funded program while their TennCare applications are pending. (Docket Entry No. 381, Smith Testimony at 280). In this program, the State pays the CMHCs, with state monies, for the costs of the CRG/TPG assessments that are necessary for the applicant to obtain TennCare coverage as medically eligible. *Id.* The State sent the instructions and protocols for these placements to the CMHCs on July 18, 2002 for review and comment, and immediate implementation. *Id.* at 281–282.

The TDHS Family Assistance Line is also cited by the State as an important resource for assisting people with special needs, including the SPMI, through the eligibility process. Yet, the Defendant's notices that instruct current enrollees regarding the re-application process do not provide information about that resource, nor how to use it. (Plaintiffs' Exhibit No. 79, Robertson Declaration ¶ 7; Defendant's Exhibit No. 6, Teasley Declaration, at 15–16, ¶ F; *cf.* Defendant's Exhibit No. 1, Johnson Declaration, Attachment B; Docket Entry No. 380, Johnson Testimony at 253; Docket Entry No. 381, Teasley Testimony at 101–11, 116–17, 142–44). Finally, Plaintiffs note that these contacts by TDHS and TPAL workers are directed to the enrollee (Plaintiffs' Exhibit No. 35, 2nd–3th unnumbered pages; Plaintiffs' Exhibit No. 50, Johnson Deposition at 54–55; Docket Entry No. 381, Smith Testimony at 283–84) and do not reasonably accommodate the needs of this population who need personal assistance to communicate effectively.

TDHS has offered to outstation case managers at CMHCs, but only if the CMHCs provide space and telephones to accommodate them, and if the CMHCs have sufficient TennCare SPMI/SED application caseloads to justify these case workers. (Docket Entry No. 381, Dedmon Testimony at 221; Docket Entry No. 380, Blackburn Testimony at 51–53, 57–60).

TDHS eligibility caseworkers can be assigned to a CMHCs that serves the SPMI/SED population, to TennCare applications or redetermination processes at that location. (Docket Entry No. 381, Dedmon Testimony, at 222). Every CMHC that requested an outstationed TDHS eligibility caseworker and has sufficient caseload to occupy that worker, has received one. *Id.* TDHS has worked with the CMHCs to finalize agreements to assign full-time

TDHS staff at five locations, effective August 1, 2002. *Id.,* Williams Testimony, at 301–02. West Tennessee, TDHS, has agreements with the three primary CMHCs in that area to assign staff at 10 sites. *Id.,* Davis Testimony, at 320–22. The CMHCs decided the sites for the TDHS outstationed workers, and TDHS has offered placements at additional CMHC sites. *Id.*

A minority of CMHC clinical sites is expected to have part-time TDHS workers, but the details of how they will work, or how the CMHCs will participate in their process of accommodation of the SPMI/SED enrollees remain to be defined and that process likely will take a minimum of 90 days. (Docket Entry No. 380, Blackburn Testimony at 59; Womack Testimony at 265–66). For the present, TDHS county offices lack sufficient information to be able to answer basic questions from the CMHCs. *Id.,* Blackburn Testimony, at 82–83.

The Court finds that this use of TDHS caseworkers shifts the costs associated with providing space and support for such TDHS staff to the CMHCs for obligations that the Court imposed on the Defendant; and the Defendant agreed to provide.

As to the evidence of the SPMI or SED individuals' abilities to navigate the Medicaid eligibility process or similar processes through TDHS, Defendant cites statistics that, as of September 15, 2001, of the persons on TennCare as Medicaid eligible, 112,494 were SPMI/SED individuals. (Docket Entry No. 381, Smith Testimony at 277). Of that number, 67,850 came to Medicaid through the TDHS eligibility process (as opposed to qualifying for Medicaid by virtue of SSI eligibility having been established through the Social Security Administration). *Id.* at 277, 285. As of September 15, 2001, there were 67,449 SPMI/SED waiver enrollees in TennCare. Of those enrollees, 19,783 were Medicaid

rollovers who originally came on the TennCare program through the TDHS eligibility process. In sum, as of September 15, 2001, approximately 108,000 people who were enrolled in TennCare were in the SPMI/SED category and, of that 108,000, approximately 88,000 entered the TennCare program through the TDHS eligibility process. (Docket Entry No. 381, Smith Testimony at 277–78, 285).

Defendant also refers to the majority of families of SED children on the TennCare program as recipients of other benefits such as food stamps or cash assistance, for which they were qualified through a TDHS eligibility process that is substantially similar to the Medicaid process. (Docket Entry No. 380, Bryson Testimony, at 121–122). To maintain these benefits, these families also must periodically re-established their eligibility. *Id.* at 123. The Defendant also notes that individuals with mental retardation, autism, and learning disabilities satisfactorily navigated the SSI/SSA process administered by TDHS that also required periodic eligibility redeterminations.

Yet, under SSA processes, particularly for persons with mental impairments, including children, the SSA actually collects the necessary data to determine eligibility, such as from physicians and health care providers and also contracts with health consultants to perform evaluations. *See e.g.,* 20 C.F.R. § 404.1503(e). In contrast, the new TennCare reverification procedure shifts that burden to enrollees who have serious mental disabilities. The 45–day time limit for a complete application also does not apply in the social security application process.

Carol Westlake, director of the Tennessee Disability Coalition, who has a masters in education, referred to the Social Security eligibility determination as a "fairly

challenging process." [15] (Docket Entry No. 381, Westlake Testimony at 46–47). Westlake cited a Kaiser Family Foundation survey finding that only 67% of eligible families apply for Medicaid and described the process as "confusing." *Id.* at 28. Of those surveyed, seventy-two percent (72%) described Medicaid's data collection requirements to be "nearly impossible for them to do." *Id.* at 28–29. The State's notice and application that requested self identification as disabled, in Westlake opinion, is also "difficult" for members of this group. *Id.* at 25. Westlake's awareness of disabled persons who apply for benefits through TDHS has included good and bad experiences. *Id.* at 37–38.

As to reassessments of SPMI and SED individuals, Westlake described a SPMI or SED as "a fairly permanent condition," *id.* at 30, and the Defendant's requirement that these persons obtain a mental health assessment in 45 days, "is going to be a challenge." *Id.* at 31. Moreover, for any person with a disability to obtain a rejection letter from an insurance company, particularly with the 45–day time limit, is "risky." *Id.* at 33.

There are persons who are not SPMI and SED, but have mental limitations that require assistance in the reverification process. *Id.* at 18, 21. These person include persons who are mentally retarded or have acquired brain injuries due to some external trauma. (Docket Entry No. 381, Westlake Testimony at 21–22). As it were with SPMI and SED individuals, these persons need assistance in understanding notices and acquiring the necessary information for the reverification process. *Id.* at 23, 24.

It is "fairly complicated" to expect TDHS interviewers to assess from a tele-

phone conversation or actual site visit, whether an applicant has a disability. (Docket Entry No. 381, Westlake Testimony at 34). The 45–day time limit on reverification makes accommodations prior to reverification especially important for this group of citizens. *Id.* at 25. In a "Reverification Pilot Project Outcomes" for SPMI and SED enrollees, TPAL, identified 1021 SPMI and SED individuals to survey during the reverification process, but actually contacted only 735 before terminating its study. (Plaintiffs' Exhibit No. 57). Of the 735 SPMI and SED individuals, 317 could not be located. *Id.* Of the remaining persons in this group, only 159 or 21.6% actually completed the reverification process successfully. *Id.*

As to evidence of the effectiveness of the Defendant's procedures for SPMI/SED enrollees, when the State conducted a pilot reverification process involving the SPMI enrollees in 2000, the response to mail notices, with telephone follow-up by TPAL, was so poor that the report convinced State officials to defer reverification of this group altogether. (Docket Entry No. 380, Blackburn Testimony at 54–57, 90–91; Plaintiffs' Exhibit No. 57, Reverification Pilot Project Outcomes; Plaintiffs' Exhibit No. 50, Johnson Testimony at 9, 64).

A compliance review conducted by the Pacific Health revealed that, in May of 2002, eight of the ten CMHCs contacted stated they were assisting their clients in accordance with the protocol. The other two CMHCs respondents were unfamiliar with the protocol, but had processed CRG/TPG assessments and forwarded TennCare applications during the period from October 1, 2001 through June 30, 2002. As of the day before the hearing, senior

---

**15.** Johnson, Defendant's monitor, agreed that the Medicaid regulations for eligibility are "complex" (Docket Entry No. 380, Johnson Testimony at 227), and may take more than 45 days to determine. *Id.* at 231. For such instances, the TDHS worker has discretion to extend the time limit. *Id.*

TennCare management were distributing to mental health providers, advocates and community groups basic information about the new eligibility process and criteria that was erroneous. (Plaintiffs' Exhibit No. 72, TennCare Flow Chart; Docket Entry No. 380, Bryson Testimony at 128–29; Docket Entry No. 381, Miller Testimony at 6–14; Docket Entry No. 381, Smith Testimony at 274–76)

Yet, in a more recent survey of the new TennCare program, Johnson testified that TennCare has failed to provide full information to 20 of the CMHCs in Tennessee's 95 Counties. (Docket Entry No. 380, Johnson Testimony at 160–63; Plaintiffs' Exhibit No. 15, Blackburn Declaration ¶ 4; Docket Entry No. 380, Blackburn Testimony at 35–36, 77–81, 92–93 and Johnson Testimony at 160–63; Plaintiffs' Exhibit No. 50, Johnson Deposition, at 17–18). Some providers helped SPMI/SED applicants through the process, despite the lack of guidance from the State and the defendant's failure to implement the protocol. (Defendant's Exhibit No. 23, Community Mental Health Center Report; Docket Entry No. 380, Johnson Testimony at 160). The Mental Health Cooperative that has 4,500 clients processed 553 applicants through the TennCare process before July 1, 2002. (Docket Entry No. 38, Womack Testimony at 261–64). Yet, at the time of the evidentiary hearing, this agency did not have a contract to complete the reverification process for its clients. *Id.* at 266–67. Since July 1, such voluntary *ad hoc* efforts have ended.

In its earlier directive on the CMHC protocol (Docket Entry No. 201), the Court found that effective accommodation of this vulnerable population required the active and informal involvement of the CMHCs who treat them and are familiar with these class members. The Testimony at the hearing was in accord. (Docket Entry No. 380, Blackburn Testimony at 33–38; *Id.,*

Bryson Testimony at 104, 117; *Id.,* Womack Testimony at 262, 264, 267). The new eligibility process is significantly more demanding for the SPMI/SED enrollees than the former process, especially without the support of the CMHCs that the Court directed under last September's protocol. (Docket Entry No. 201).

The Court finds that the Defendant has not established a clear role nor provided adequate support for the CMHCs that are at "the heart" of the September 2001 protocol for processing eligibility for the SPMI/SED enrollees. (Docket Entry No. 201). Defendant's consultants concede that CMHCs are on the "front line" in serving this vulnerable population. ( Plaintiffs' Exhibit No. 50, Johnson Deposition at 17–18, 38; Docket Entry No. 215). The Court also finds that in the current system, the redetermination process lacks sufficient assistance and guidance for a substantial number of enrollees with mental impairments. (Docket Entry No. 380, McCormick Testimony at 14–16; Docket Entry No. 380, Blackburn Testimony at 41–45; Docket Entry No. 380, Bryson Testimony at 112; Docket Entry No. 381, Westlake Testimony at 25–26, 29–30; Docket Entry No. 380, Womack Testimony at 264).

The Court finds that these enrollees cannot handle the burdens imposed by the Defendant's new reverification process and the Defendant's efforts to assist them are inadequate. The Court also finds that the current procedures for accommodating the SPMI/SED do not provide consistent, necessary assistance from the CMHCs to enable all class members to compile and submit their applications for timely reverification.

### 6. Accommodations for Enrollees with Limited English Proficiency ("LEP")

In March 2001, Johnson examined the state computer data base to identify per-

sons with LEP. (Docket Entry No. 380, Johnson Testimony at 171–72). Johnson conceded that paragraph (1)(A)(7) of the Settlement Agreement required the Defendant to provide accommodations for persons with LEP. *Id.* at 172.

The TennCare Bureau never collected information on LEP from either applicants or current enrollees. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 7, 9–10; (Docket Entry No. 381, Sharp Testimony at 216). The new TDHS applications do not capture this information (Defendant's Exhibit No. 1, Johnson Declaration, Attachment B, 4th unnumbered page; Docket Entry No. 381, Teasley Testimony at 164), but TDHS intends to start collecting such information in August, 2002 for giving individuals notice, but these notices will not be sent until May, 2003. *Id.,* Teasley Testimony at 164–165).

Such TennCare Bureau notices, however, are translated into Spanish. (Defendant's Exhibit No. 1, Johnson Affidavit at Attachment B), as well as other languages: Kurdish–Badinani, Kurdish–Sorani, Arabic, Somali, Bosnian. *Id.* In addition, a toll free telephone line is available for language assistance. *Id.* Two of the Plaintiffs in the Supplemental complaints are of Vietnamese descent, but Vietnamese is not included in these translated language forms.

TDHS notices, however, including those informing enrollees of appointments or explaining why they have been denied Medicaid and how to appeal, are provided only in English, even if TDHS is aware of the person's limited English proficiency. This policy will continue for Spanish-speaking class members until translation of the notices is complete in May 2003. In addition, TDHS officers cannot always accommodate Spanish speakers when they contact the agency about the notices sent to them. (Plaintiffs' Exhibit No. 50, Johnson Deposition at 28–29; Plaintiffs' Exhibit No. 55,

Pacific Health Policy Group report, "DHS Spanish Monitoring Calls").

Pacific Health's test calls to TDHS offices found that seven of the ten offices contacted were unable or unwilling to accommodate a caller speaking Spanish. *Id.* Pacific Health's testing of TDHS capacity after July 1, 2002 revealed serious lack of understanding of how to accommodate people with LEP. (Plaintiffs' Exhibit No. 53, Plaintiffs' Exhibit No. 54, Plaintiffs' Exhibit No. 55; Docket Entry No. 380, Johnson Testimony, at 157–158). Private agencies that serve the Spanish population report similar experiences when they contact TDHS offices. (Plaintiffs' Exhibit No. 6, McClellan Declaration ¶ 4; Plaintiffs' Exhibit No. 43, Hough Declaration ¶ 2).

### 7. The Effects of Multiple Eligibility Reverification

Plaintiffs contend that by virtue of the two reverification processes and appeals processes, the Defendant will terminate coverage to some members of the plaintiff class whom the State knows, based upon its records, nonetheless meet the technical eligibility and/or medically eligibility criteria requirements.

The Defendant expected that 75,000 of the current waiver eligible population of approximately 625,000 will lose their coverage as a result of the reverification or redetermination process. (Plaintiffs' Exhibit No. 1, Reynolds Deposition, at 46–47). The Defendant estimated that 25% of current TennCare enrollees will "choose" not to re-apply, and will lose coverage. Experienced mental health workers estimate that many of those persons who fail to complete the new process will be persons with mental impairments. (Docket Entry No. 380, Bryson Testimony at 110, 114, 115; Blackburn Testimony at 33, 41–44, 62–63; Womack Testimony at 268). For such individuals, the failure to re-apply and complete the process will not be a "choice," but a result of their disabilities,

and difficulty in completing the process without adequate accommodation. (Docket Entry No. 257, Reynolds Testimony at 58–59).

By stipulation, the most recent statistics on the reverification reveal that on July 31, 2002, the State mailed eligibility notices to 221,923 individuals. (Docket Entry No. 448). As of November 19, 2002, the redetermination process was complete for 89,359 individuals, or 40% of the total number of individuals who were sent the notice, and 66,801 individuals, or 30%, are still being processed. *Id.* Of those whose process was complete, 91% were determined to be eligible and 7,277, or 3% of the total number of individuals sent notices, were found ineligible. *Id.* There were 77,323 individuals, or 35%, who did not submit a redetermination application. *Id.* Of those 77,323 individuals, 65,763, or 30% of the total number of individuals sent notices for

redetermination, made no contact during the 90 day period and have been terminated. *Id.* Coverage continues for the other 11,560 because of timely appeals. *Id.*

On August 30, 2002, the State mailed eligibility notices to 177,208 individuals of which 78,378, or 44%, have responded. *Id.* On September 30, 2002, the State mailed eligibility notices to 113,061 individuals of which approximately 33% have responded. *Id.* On October 3, 2002 the State made an additional mailing to 43,061 individuals who are Medicaid eligible but, may be eligible for continued TennCare coverage under the "grandfather" statute and approximately half have responded. *Id.*

The graphic display of these members and their effects on the new process are as follows:

### a. WAIVER ELIGIBLE REDETERMINATION PROCESS

| | Notices to individuals | Response Only | Completed process | Medicaid Eligible | TennCare Standard | Not Eligible | Still In Process | Appeals | No Response |
|---|---|---|---|---|---|---|---|---|---|
| 7/30/02 | 221,923 | | 89,359 | 28,929 | 53,153 | 7,2777 | 66,801 | 11,560 | 65,763 |
| 8/30/02 | 177,208 | 78,378 | | | | | | | 98,830 |

| | Notices to individuals | Response Only | Completed process | Medicaid Eligible | TennCare Standard | Not Eligible | Still In Process | Appeals | No Response |
|---|---|---|---|---|---|---|---|---|---|
| 9/30/02 | 113,061 | 37,687 | | | | | | | 75,374 |
| 10/3/02 | 43,061 | Approx 21,531 | | | | | | | Approx 21,531 |
| Total | 555,253 | ≈137,596 or 25% | 89,359 or 16% | | | | | | ≈261,498 or 47% |

Plaintiffs attribute any decline in enrollment to the complex reverification process that will result in many enrollees who will be unable to complete the process within the 45-day time limits. (Plaintiffs' Exhibit No. 2, Cummings Declaration ¶¶ 2–3; Plaintiffs' Exhibit No. 11, McCormick Dec-

laration, ¶¶ 2–8; Plaintiffs' Exhibit No. 12, Marshall Declaration, ¶¶ 3–7; Plaintiffs' Exhibit No. 13, Judge Declaration, at 2; Plaintiffs' Exhibit No. 14, Evans Declaration, ¶¶ 4–9; Plaintiffs' Exhibit No. 15, Blackburn Declaration ¶ 8; Plaintiffs' Ex-

hibit No. 20, Powers Declaration ¶ 8; Plaintiffs' Exhibit No. 23, Smith Declaration ¶¶ 13–15).

### 8. The Medical Care Advisory Committee ("MCAC")

Plaintiffs again charge that prior to adopting the new TennCare policies and procedures at issue, the Defendant failed to consult a duly constituted MCAC regarding the eligibility determination policies and procedures. The former TennCare Director, Mark Reynolds, testified by deposition that the policies and procedures now at issue have not been reviewed by a MCAC. (Plaintiffs' Exhibit No. 1, Reynolds Deposition at 39–40).

The Defendant has offered the declaration of Dr. Conrad Shackleford, who asserts that as of February, 2002, the Defendant has a duly constituted MCAC that satisfies the requirements of the federal regulations. (Defendant's Exhibit No. 3). Yet, from Dr. Shackleford's declaration none of the committee members is a Medicaid recipient, as required by Medicaid regulations. Moreover, Dr. Shackleford does not contradict TennCare's former Director's Testimony that this committee never reviewed the TennCare policies and procedures now before the Court, prior to the submission of the proposed waiver amendment to CMS in October, 2001. At best, Dr. Shackleford's declaration shows that this committee was established in February, 2002 and met on June 14, 2002 for the first time to review the new TennCare waiver. Dr. Shackleford does not state that the committee had an opportunity for participation in policy development and program administration before its submission to CMS. Dr. Shackleford's committee's June 14th meeting was after CMS's May 30th letter of approval. *Id.* attached thereto.

There is also evidence that key state legislative committees previewed the proposed amendments to the TennCare waiver action plan prior to its submission to CMS and approved them. The Court finds that the Defendant did not consult with a duly constituted MCAC prior to its submission of the amended TennCare waiver to CMS.

The Defendant notes that after the entry of the Agreed Order, the TennCare Bureau met with the advocacy community groups to share information and to receive comments. (Docket Entry No. 384, Declaration of Nancy McLeon). Yet, according to the proof, there are substantial differences of opinion on the exchanges of information with advocacy groups. *Compare* Docket Entry No. 405, Defendant's Exhibit No. 41, Kilgas Declaration ¶ 3; Defendant's Exhibit 42, Bates Declaration ¶ 3 *with* Plaintiffs' Exhibit No. 118, Garr Declaration ¶ 1. The Court does not deem it necessary to resolve these disputes other than to highlight the differences of opinions on the efficacy of the Defendant's dialogue with local community groups.

### E. Individual Plaintiffs

#### 1. Michael Rosen

Michael Rosen is a 34 year old resident of Davidson County, Tennessee, and self-employed in the recording industry. (Docket Entry No. 1, Complaint ¶ 35). On May 30, 2001, Michael Rosen gave written notice that he wished to cancel his TennCare coverage; he has since been terminated from the program. (Docket Entry No. 223, Sharp Declaration, Attachment A). There is no proof introduced by Plaintiff that Mr. Rosen will imminently suffer from the waiver changes.

#### 2. Barbara Huskey

Ms. Huskey is a 51 year old housewife and a resident of Sevier County, Tennessee. Ms. Huskey suffers from mitral valve prolapse and osteoarthritis. Mitral valve prolapse requires the use of medications each day to regulate blood flow around the

heart. Ms. Huskey is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 1, Complaint ¶ 53; Docket Entry No. 233, Sharp Declaration ¶ 2). Ms. Huskey depends upon her TennCare coverage to pay for medication for her arthritis and for treatment of her mitral valve prolapse. The Defendant is requiring Ms. Huskey, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 3. Emanuel Martin By Next Friend Cheryl Martin

Emanuel Martin is a resident of Maury County, Tennessee, with his parents, Emanuel was born on March 21, 1996, with a prolapsed umbilical cord that caused permanent brain damage and that has resulted in developmental delays. (Docket Entry No. 1, Complaint ¶ 59). Martin cannot sit on his own, crawl or walk. *Id.* He cannot swallow and is fed through a G-tube. *Id.* Martin needs extensive home nursing and therapy services. Emanuel Martin is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Emanuel Martin, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 4. Wanda Campbell

Wanda Campbell is a resident of Hawkins County, Tennessee. She is a 32 year old housewife suffering from dystonia, depression and chronic pain syndrome. (Docket Entry No. 1, Complaint ¶ 79). Campbell's symptoms include severe muscle spasms in her face, neck, back and throat, with intermittent difficulty speaking and breathing. *Id.* Wanda Campbell is currently enrolled in TennCare as a waiver

eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Wanda Campbell, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 5. Connie Hoilman

Connie Hoilman is a resident of Washington County, Tennessee. She is a 43 year old housewife who suffers from Multiple Sclerosis. (Docket Entry No. 1, Complaint ¶ 84). Connie Hoilman is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Ms. Hoilman, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 6. Mark Hughes

Mark Hughes is a resident of Greene County and is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Mark Hughes, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 7. Jacob B. By Next Friend Martin B.

Jacob B. is a severely emotionally disturbed 14 year old patient at Hermitage Hall, a residential mental health facility in Nashville, Tennessee. (Docket Entry No. 1, Complaint ¶ 94). Jacob B. is not currently enrolled in TennCare. (Docket Entry No. 233, Sharp Declaration ¶ 2). There is no proof introduced by Plaintiff

that Jacob B. will imminently suffer from the waiver changes.

### 8. Jackie Baggett

Jackie Baggett is 48 years old resident of Haywood County, Tennessee, and a high risk diabetic. (Docket Entry No. 1, Complaint ¶ 98). Jackie Baggett is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Jackie Baggett, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 9. Brenda Clabo

Brenda Clabo is a resident of Sevier County, Tennessee. She is a 45 year old housewife who manages two apartments during the day. (Docket Entry No. 1, Complaint ¶ 103). She suffers from rheumatoid arthritis and asthma. *Id.* Ms. Clabo is not currently enrolled in TennCare. (Docket Entry No. 233, Sharp Declaration ¶ 2). There is no proof introduced by Plaintiff that Ms. Clabo will imminently suffer from the waiver changes.

### 10. Pradie Tibbs

Pradie Tibbs is a 54 year old construction worker who has undergone multiple surgeries for colon obstruction and has a permanent colostomy. (Docket Entry No. 1, Complaint, ¶ 108,112). Tibbs also suffers from high blood pressure that requires daily medications. *Id.* ¶ 113. Pradie Tibbs is currently enrolled in TennCare as a waiver eligible. (Docket Entry No. 233, Sharp Declaration ¶ 2). The Defendant is requiring Pradie Tibbs, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 11. Gayle Cummings

Gayle Cummings currently receives TennCare benefits as an uninsurable person. (Docket Entry No. 343, Plaintiff's Exhibit 2: Cummings Declaration ¶ 1). Ms. Cummings suffers from memory deficit and impairments to her attention skills, new learning skills, reading and auditory skills. *Id.* Ms. Cummings has a hard time understanding what she reads and has difficulty filling out forms. *Id.* ¶ 2. Noise and crowds give Ms. Cummings panic attacks and she does not leave her house unless going to the grocery store or doctors office. *Id.* ¶¶ 2, 3. The Defendant is requiring Ms. Cummings, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 12. Bach Thuy Nguyen

Bach Thuy Nguyen is a resident of Brentwood, Tennessee and is currently enrolled as a TennCare uninsurable. (Plaintiff's Exhibit 41: Bach Thuy Nguyen Declaration ¶ 2). Ms. Bach Thuy Nguyen is a monolingual Vietnamese speaker who cannot communicate in English. *Id.* ¶ 3. Ms. Nguyen suffers from high blood pressure, high cholesterol, and hypertension. *Id.* ¶ 2. Additionally, she suffers from swollen limbs and joint pain. *Id.* Bach Thuy Nguyen is dependant upon TennCare for prescriptions and doctors visits. *Id.* ¶ 4. The Defendant is requiring Bach Thuy Nguyen, like all waiver eligibles, to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

### 13. Di Nguyen

Di Nguyen lives in Davidson County, Tennessee and is currently enrolled as a

TennCare uninsurable. (Plaintiff's Exhibit 42: Di Nguyen Declaration ¶ 2). Di Nguyen is a monolingual Vietnamese speaker who cannot communicate in English. *Id.* ¶ 3. Di Nguyen has problems with arthritis, migraine headaches, and her shoulder frequently becomes dislocated. *Id.* ¶ 2. Additionally, a lump has been found in her breast. *Id.* ¶ 2. She is seeking treatment and needs mammograms to monitor the lump. *Id.* ¶ 4. Di Nguyen is dependant on TennCare for her medicine, doctor visits, and mammograms. *Id.* ¶ 4. The Defendant is requiring Di Nguyen, like all waiver eligibles, to participate in the new re-verification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

**14. Sherry Justice**

Sherry Justice lives in Chapmansboro, Tennessee. (Docket Entry No. 409, Plaintiffs' Exhibit No. 94, Justice Declaration ¶ 1). Ms. Justice stopped working in January of this year due to poor health. (Docket Entry No. 383, Justice Declaration ¶ 1). She has had three digestive tract surgeries, which attempted to repair damage to her stomach lining and esophagus; she has a spot on her lung; and she is currently suffering from unexplained rectal bleeding. *Id.* ¶¶ 3–4. Ms. Justice has no income, no access to health insurance, and has been refused coverage by BlueCross/BlueShield. *Id.* ¶¶ 2–3, 5. She is dependent on TennCare for medical treatment. *Id.* ¶ 4.

In order to apply for TennCare coverage, Ms. Justice filed an application at TDHS for Medicaid eligibility. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.08, at 20–21). Subsequently, Ms. Justice filed an application for TennCare coverage at her local TDHS office on July 15, 2002. *Id.* ¶ 6. TDHS denied her application that same day, and told her she would receive a ME packet

from TennCare. *Id.* Ms. Justice's packet was not received when promised but, after subsequent inquiries, she received a TennCare ME packet on September 9, 2002. (Docket Entry No. 409, Plaintiff's Exhibit 94, Justice Declaration ¶ 4). The packet was required to be completed by September 19, 2002. *Id.* at ¶ 7. After sending in the Part B requirements of the ME packet, Ms. Justice was informed on September 19, 2002 that her application was incomplete and that she filled out the portion of the form reserved for SPMI individuals. *Id.*

The Tennessee Justice Center contacted the TennCare lawyers and arranged for Ms. Justice to re-submit her application although the September 19, 2002 deadline had passed. (Docket Entry No. 419, Plaintiff's Exhibit No. 110, Justice Declaration ¶¶ 3–4). Ms. Justice has re-submitted her application and is awaiting the TennCare Bureau's decision. *Id.* ¶ 4.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Justice's declaration by stating that the case worker inadvertently did not indicate that an ME packet should be sent to Justice. (Docket Entry 430, Rudolph Declaration ¶ 11). This has been corrected, but contrary to Justice's declaration, she has not provided her necessary medical records information. *Id.* Justice's TDHS Medicaid–Disability application is still pending with DDS. *Id.* No decision can be made on TDHS Medicaid application until her application with DDS is completed. *Id.*

**15. Lorri Griffin**

Lorri Griffin is a resident of Morristown, Tennessee, and has been enrolled in TennCare since 1994 when TennCare began. In late August 2002, Ms. Griffin completed the redetermination process and continues to be waiver eligible for Tenn-

Care Standard through August 2003. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17). Lorri Griffin is diagnosed with low blood sugar, gastro-esophageal reflux disease, colon polyps, peripheral vascular disease and arthritis. (Docket Entry No. 440, Third Supplemental Complaint ¶ 6). Additionally, Ms. Griffin suffers from an as yet undiagnosed heart condition, that causes chest wall pain. *Id.*

### 16. Melanie Jackson & Wilson Dale Jackson

Melanie Jackson and her husband, Wilson Dale Jackson, live in Franklin, Tennessee and have been enrolled in TennCare since 1994. (Plaintiff's Exhibit 109, Jackson Declaration ¶ 1). They are both waiver eligible. Mr. and Mrs. Jackson are currently participating in the reverification process through TDHS. *Id.* ¶ 4. Mr. Jackson suffers from Idiopathic Thrombocytopenia Purpura ("ITP"), an auto-immune disease that causes him to have a very low platelet count that can cause spontaneous hemorrhaging. *Id.* ¶ 2. Mrs. Jackson suffers from sensory neuropathy and must take medications to manage pain. *Id.* ¶ 3. The Jacksons, like all waiver eligibles, are required to participate in the new reverification process for TennCare coverage through TDHS. (Plaintiffs' Exhibit 51, TennCare Standard Rules, Rule 1200–13–14–.02(7), at 17).

In August 2002, both individuals received letters stating that they needed to make appointments at the local TDHS office to be recertified for TennCare. *Id.* ¶ 4. On September 4, 2002, after meeting with a TDHS case worker, both individuals received letters stating that their coverage would end on September 8, 2002. *Id.* ¶ 5. Noting that they had ten (10) days to appeal, the Jacksons sent in a letter on September 7, 2002 appealing the denial of coverage. *Id.* ¶ 6. Mrs. Jackson stated

that she did not have time to gather medical records for the appeal. *Id.*

Subsequently, Ms. Jackson learned from TennCare advocates that they could apply through the ME application. *Id.* ¶ 7. "No one at [T]DHS had mentioned the medical eligibility option to [them]. If [Mrs. Jackson] had not spoken to a TennCare advocate, [she] would never have known the option existed." *Id.* On September 11, 2002, Ms. Jackson called their local TDHS office to request a ME packet. *Id.* ¶ 8. She spoke to several people who did not know how to address the situation before she was able to speak to personnel who understood her request. *Id.*

On September 16, 2002, Mrs. Jackson called the TennCare Bureau to check on the status of her appeal and to find out whether the ME packet had been sent. "[She] was told they could not check the status of [her] appeal, and that [T]DHS had not indicated to them that a medical eligibility packet should be sent to [her]." *Id.* ¶ 9. She again called the TDHS office. The TDHS worker apologized for the mistake and assured her that a ME package would be sent. *Id.* In mid September 2002, Mrs. Jackson checked on the status of their TennCare coverage. Mrs. Jackson's coverage had been terminated as of September 8, 2002 but, it is unknown why her husband's coverage was not terminated. *Id.* ¶ 10.

Mrs. Jackson received a ME packet dated September 18, 2002 which stated that it must be completed and returned by November 2, 2002. (Plaintiff's Exhibit 113, Jackson Declaration, ¶ 2). Mr. Jackson did not receive the medical eligibility packet although TennCare stated that both were mailed on the same day. *Id.* Mrs. Jackson is required to apply through Part B of the medical eligibility application because sensory neuropathy is not on the TennCare Medical Condition List and she

has no mental illness, therefore, she must acquire a letter from an insurance company stating that she is uninsurable. *Id.* ¶ 4. Mrs. Jackson has applied for insurance from Farm Bureau, but has been told the process will take 3–4 weeks although, they have verbally informed her that she is uninsurable. *Id.*

On September 25, 2002, the Jacksons received a bill for their October premium which covers both individuals. In addition they received a letter approving Mr. Jackson's coverage but, there was no mention of coverage for Mrs. Jackson. (Plaintiff's Exhibit 113, Jackson Declaration). It is currently unclear whether Mrs. Jackson has TennCare coverage.

Lonnie Roberts is the chief executive officer of Tennessee Rural Health Improvement Associations ("TRH"), a Tennessee nonprofit organization. (Docket Entry No. 434, Declaration of Lonnie Roberts ¶ 1). Roberts submits her declaration in response to the Declaration of Melanie Jackson and her application for health insurance through "Farm Bureau." (Plaintiff's Exhibit 113). Roberts states that if TRH is supplied with a completed application then it would take three to six days to process the application, but with an incomplete documentation, the process can take longer. (Docket Entry No. 434, Declaration of Lonnie Roberts ¶ 3). TRH typically informs applicants without supporting documentation that their application could take three to four weeks. *Id.* Roberts states that the Jackson's application was incomplete because it lacked appropriate medical documentation but, that Mrs. Jackson "called to say that she and her husband did not want to 'put the application back in.'" *Id.* ¶ 4.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS also responds to Jackson's declaration by stating that the case worker did not correctly set the indicator for her to be sent a ME packet. (Docket Entry 430, Rudolph Declaration ¶ 15). An ME packet was sent to Mr. Jackson because encounter data indicated that he automatically meets the medically eligible criteria. *Id.* Ms. Jackson will have to complete the ME packet because there was not enough information in the system to automatically qualify her as medically eligible. *Id.* Ms. Jackson has been informed that her coverage remains open pending determination of her eligibility. *Id.*

### 17. Sean Addison By Next Friend Lisa Addison

Sean Addison lives in Murfreesboro, Tennessee, and is nine years old. (Docket Entry No. 413, Plaintiff's Exhibit 102, Addison Declaration ¶ 1). Sean Addison has post traumatic stress disorder, a depressive disorder and attention deficit disorder. *Id.* ¶ 2. While picking up a prescription on September 16, 2002, Lisa Addison, Sean's mother, was told by the pharmacist that Sean's TennCare coverage had been terminated. *Id.* ¶ 9. Ms. Addison had received no notification of the termination and immediately tried the telephone number on Sean's TennCare card. *Id.* ¶ 9–10. She was told to contact TDHS because TDHS was administering the program. TDHS informed Ms. Addison that she would have to come to a TDHS office in person to get an appointment. *Id.* ¶ 11.

Addison went to the TDHS office twice, both times waiting between two (2) and five (5) hours. *Id.* ¶ 11–12. During her communications with TDHS she tried to get interim coverage, but was told there was nothing in place at that time. *Id.* ¶ 14. No one informed Ms. Addison of her appeal rights or how to keep coverage during an appeal. *Id.* ¶ 17. In addition, no one at TDHS told Ms. Addison that there was a special procedure for processing SED children. *Id.* Addison is still attempting to

reapply for TennCare coverage for Sean. (Plaintiff's Exhibit 114: Addison Declaration).

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Addison's declaration by stating that Addison was not notified that her benefits were ending because she moved and did not change her address with the agency providing her benefits. (Docket Entry 430, Rudolph Declaration ¶ 18). Addison filed a new application for Tenn-Care/ Medicaid on September 19, 2002 and since the application was made within thirty (30) days of the closure date, TennCare coverage was reinstated without a break in coverage pending determination of eligibility. *Id.* Addison's children were determined to be eligible and currently have coverage. *Id.* Ms. Addison is not eligible for TennCare Standard as uninsured but will receive a ME packet. *Id.* Addison's extended Medicaid coverage remains open pending her ME determination. *Id.*

### F. Other Individuals and Class Members

#### 1. Ruth B. Manning

Ruth Manning is the mother of Rusudan Kambarashvili, a foster child from the Republic of Georgia. [Republic of Georgia is independent and not part of Russia] (Plaintiff's Exhibit 92, ¶ 1). Since her immigration to the United States, Rusudan has been a patient of St. Jude's Hospital in Memphis where she has been treated for cancer. *Id.* In January 2001, Ms. Manning applied for TennCare coverage for Rusudan who could not obtain health insurance because of her history of cancer and was approved. *Id.* ¶ 2.

On August 15, 2002, Rusudan received a notice from the TennCare Bureau for reverification. *Id.* ¶ 3. Rusudan and Ms. Manning tried for several days to reach TDHS to schedule an appointment, but were unable to reach TDHS by telephone. *Id.* The TDHS telephone line was often busy and when Ms. Manning did get through, the only answer was a recorded message without an option to speak with a person or make an appointment. *Id.* On August 27, 2002, Ms. Manning went to a TDHS office and gave the receptionist a completed reverification application and requested an appointment. *Id.* The next day Ms. Manning was sent a letter stating the appointment time was 9:00 AM on Thursday, August 29, 2002. *Id.*

Ms. Manning arrived on time for her appointment and gave her appointment letter to the receptionist, but was never called for her appointment. *Id.* ¶ 4. Ms. Manning then spoke with the receptionist again who stated that her appointment was not entered in the TDHS computer and there was no record of her appointment time. *Id.* At 2:00 PM, she was called for an appointment at which she was told that Rusudan was being denied continued TennCare coverage because she was attending college in Searcy, Arkansas. *Id.* ¶ 5. Ms. Manning argued that Rusudan was still living in Tennessee and was simply away for the semester at college. *Id.* ¶ 6. When Ms. Manning told the supervisor that she had been waiting for five (5) hours for her appointment, the TDHS supervisor replied that five (5) hours was to be expected and still within TDHS policy guidelines. *Id.* ¶ 6.

On September 5, 2002, Rusudan received a letter stating that she had been denied coverage because she had not signed an application for benefits. *Id.* ¶ 7. Ms. Manning states that Rusudan did sign her application and that it was filed in person on August 27, 2002. *Id.* The letter directed her to read the enclosed yellow sheet, but there was no appeal information sheet enclosed. *Id.* ¶ 8.

Another TDHS appointment was scheduled for 9:00 AM on September 11, 2002, at which Manning waited until 11:00 AM

when she was told that TDHS did not understand why Rusudan had received the September 5, 2002 letter. *Id.* ¶ 9–10. Ms. Manning was again told that her daughter was being denied because Rusudan was out of state at college and that proof of her residence at her Tennessee address was insufficient to be recertified. *Id.*

On September 20, 2002, Rusudan received another letter stating that she was ineligible for Medicaid. (Plaintiff's Exhibit No. 112, ¶ 2). Ms. Manning left a message with her TDHS worker who had not returned her call at the time of her declaration, September 25, 2002. *Id.* ¶ 3. The last TDHS letter informed Rusudan that "If you cannot get Medicaid, we will see if you can get TennCare Standard. You will get a letter from the Bureau of TennCare telling you if you meet the rules for Tenn-Care Standard." *Id.* ¶ 4. Rusudan had not received this letter at the time of Ms. Manning's declaration, September 25, 2002. *Id.*

On September 25, 2002, Ms. Manning called the number listed on the yellow appeal sheet that was included with Rusudan's second letter. *Id.* ¶ 6. During this telephone call, Ms. Manning was told that Rusudan was actually placed back on TennCare on September 17, 2002. *Id.* Ms. Manning told the Tennessee Justice Center about the situation and she was told that she should get written confirmation and that TDHS had made a mistake because Rusudan should have been eligible for Medicaid. *Id.* ¶ 7. TDHS explained that because Ms. Manning was not found Medicaid eligible, her benefits would be reduced and her cost-sharing requirements would rise. *Id.* Ms. Manning then appealed the denial of Medicaid benefits by calling the number on the appeal sheet. *Id.* ¶ 8. This time Ms. Manning waited on hold for over an hour. *Id.* Ms. Manning is currently still appealing the denial of Rusudan's Medicaid and awaiting confirma-

tion of her TennCare Standard eligibility. *Id.* ¶ 9.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Manning's Declaration by stating that the error in failing to send yellow appeals sheets was corrected by TDHS. (Docket Entry 430, Rudolph Declaration ¶ 10). In addition, Rudolph states that when the Rapid Response Team of Tenn-Care was notified about Manning's problem at 10:20am on September 13, 2002, the Team had it corrected by 3:52pm the same day. *Id.* Finally, Rudolph noted that district workers have never considered a three hour wait time acceptable and the district director is discussing the problem with the supervisor involved in Manning's case. *Id.*

### 2. Robert Lee Daniels

Robert Daniels has been on TennCare since January 1994. (Docket Entry No. 410, Plaintiff's Exhibit No. 95 ¶ 1). In December 2001, Daniels was approved for social security disability because of a mental impairment. *Id.* Daniels does not understand how or why he has TennCare but, stated that his doctor helped him sign up for TennCare. *Id.*

Daniels received a letter from TDHS with an appointment time and information that his application for TennCare had been sent to TDHS. *Id.* ¶ 2. Daniels did not understand this information since he had not requested a TennCare application. *Id.* Daniels attended his TDHS appointment where he was told to ignore the next notice he would received in the mail. *Id.* The notice which he received stated that he did not qualify for Medicaid because he had too many resources and insufficient medical bills. *Id.* Daniels stated that his monthly income was his disability check of $686. *Id.* ¶ 1. The letter told him to see the enclosed yellow sheet for appeal infor-

mation, but the sheet was not enclosed. *Id.* ¶ 2. Currently, Daniels does not understand if he can keep his TennCare coverage or whether he must do anything else to complete the reverification process. *Id.* ¶ 3.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Daniel's Declaration by noting that the failure to mail the yellow appeals forms has been remedied, as discussed *supra,* and he will receive a letter extending his time to appeal although no appeal is necessary in this case. (Docket Entry 430, Rudolph Declaration ¶ 12). Daniels was approved for TennCare Standard on September 9, 2002 and Rudolph notes that he experienced no break in coverage. *Id.*

### 3. Mary Cunningham

Mary Cunningham is a 44 year old with Type II diabetes, neuropathy, and lymphedema of the right leg (Plaintiff's Exhibit 97, ¶ 1–2), for which she takes *several* prescription medications to control pain and her diabetes. *Id.* Cunningham's receives a monthly income of $1,153 that comes from workers compensation and disability payments for a shoulder injury she incurred thirteen years ago in New York. *Id.* ¶ 2.

On May 9, 2002, Cunningham reapplied for TennCare at TDHS. *Id.* ¶ 4. The TDHS caseworker informed Cunningham that she was ineligible for Medicaid/TennCare. *Id.* The TDHS caseworker also told Cunningham that they did not consider her disabled because she did not get social security or supplemental security income. *Id.* Cunningham appealed the denial and asked for a medical evaluation. *Id.*

Cunningham was told to provide her disability records from New York, which she mailed to TDHS. *Id.* ¶ 5. TDHS next sent a letter stating that Cunningham had not provided her records. *Id.* When Cunningham called her case manager, she was told to ignore the notice, but Cunningham later learned that TDHS did not have her information and so she re-mailed the information on June 24, 2002. *Id.* Cunningham still does not know the status of her TennCare redetermination, and currently, her TennCare coverage has been terminated. *Id.*

Cunningham also applied to the TennCare Bureau for TennCare coverage. *Id.* ¶ 6. She was informed by the Bureau that she could not re-apply for TennCare because she had a premium balance of $313.87. *Id.* Ms. Cunningham does not remember any notices she received for these overdue premiums. *Id.* She received an administrative order dated September 12, 2002 which states that she cannot reapply for TennCare until she pays the outstanding premium balance. *Id.*

Ms. Cunningham was unable to purchase her medications and was in a great deal of pain by the time she received the administrative order. *Id.* ¶ 8. She called both the Tennessee Justice Center and the State informing both that "[she] wanted to kill [her]self because they had treated [her] so badly." *Id.* ¶ 7–8. She stated in her declaration that "I really wanted to die. The pain was just unbearable." *Id.* ¶ 8.

An advocate at the Tennessee Justice Center was able to get the State to provide interim Medicaid/TennCare benefits because they had taken more than 90 days to make a decision on her application. *Id.* ¶ 9.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Cunningham's declaration by noting that when Cunningham did place a call into the TDHS evaluation unit and threatened to commit suicide, workers referred her to the Crisis Hot Line for assistance. (Docket Entry 430, Rudolph Declaration ¶ 13). Rudolph does admit that the unit was late in providing interim benefits

and she has instructed and directed the Medicaid Policy Unit to do whatever work is needed to catch up to ensure that interim benefits are provided in a timely manner. *Id.*

#### 4. Eugena Patterson

Eugena Patterson has been attempting to apply for TennCare coverage for herself and her three year old daughter since early August 2002 when COBRA coverage from her previous employment expired. (Docket Entry No. 412, ¶¶ 1–2). Patterson has a brain tumor, epilepsy and narcolepsy. *Id.* ¶ 1. She takes several medications for her illnesses and is unable to afford them on her unemployment benefits. *Id.* ¶ 3.

At the beginning of August, Patterson called the TDHS office to apply for TennCare coverage and was given an appointment for two weeks later. *Id.* At her August 14, 2002 appointment, Ms. Patterson brought a letter from her neurologist stating that she was uninsurable because of her medical conditions. Patterson states that at her appointment, the TDHS worker:

> did not want to see the letter but instead asked me about my car title. She also asked me to take out my wallet and show her how much money I had. All I had was some coins. I asked her why she was asking me about my car title and what was in my wallet instead of the letter from my neurologist. She said that she did not know, that she was in training herself...[She] asked me if I had any unpaid medical bulls and I told her I did not. Then she told me that TennCare was closed to new applicants.

*Id.* ¶ 4.

On August 20 or 21, 2002 Patterson went to the Tennessee Department of Public Health to try again to get medical coverage. *Id.* ¶ 5. Patterson was referred to the Tennessee Health Care Campaign where she was given help and received a call from a Ms. Lenox at TDHS who was her case worker's supervisor. *Id.* Lenox asked Patterson for certain documentation which she faxed to TDHS immediately. *Id.* On September 3, 2002, Patterson received a letter which stated that she would be turned down unless she submitted proof as to the amount of her telephone bill. *Id.* ¶ 6. She submitted this documentation on September 6, 2002. *Id.*

When she did not hear from TDHS for several days, Patterson she called Lenox again. *Id.* ¶ 7. Lenox did not return the call for two days, but when the call was returned she asked Ms. Patterson for more documentation that Ms. Patterson faxed to TDHS that day. *Id.* On September 17, 2002, Patterson was told by the Tennessee Health Care Campaign that she should have received a packet to apply for TennCare as a medically eligible person, but she never received this packet. *Id.* ¶ 8–9(sic).

On September 16, 2002, Tony Garr at the Tennessee Health Care Campaign told Patterson that he had spoken to TDHS and a medical eligibility packet would be forthcoming. (Docket Entry No. 420, Plaintiff's Exhibit 111, ¶ 2). Patterson has still not received the packet but, she gave TDHS a letter from her doctor stating that she could not get insurance because of her health conditions. *Id.* ¶ 1. Ms. Patterson has now received a letter stating that she is not medically eligible even though she has not received the packet and no one has reviewed her medical records. *Id.* ¶ 2.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Patterson's declaration by stating that the reason Patterson did not receive a ME packet was because her August income was over 100% of the federal poverty level and so she was not eligible at that time for a ME packet. (Docket Entry

430, Rudolph Declaration ¶ 14). When she faxed her income verification for September her income was under the limit and she then was eligible for the ME packet. *Id.* She was sent an ME packet on October 2, 2002. *Id.* In addition, Rudolph notes that the September 3, 2002 letter was a notice of outstanding verifications for all assistance programs for which she applied. *Id.* The utility verification was a requisite of the Food Stamps program. *Id.*

### 5. Mary Parker

Mary Parker has been enrolled in Tenn-Care since 1998. (Plaintiff's Exhibit 99, ¶ 1). Parker who suffers from bipolar disorder, takes several medications and cannot get private insurance. *Id.* ¶ 1, 6. In late July or early August, she received a letter from the TennCare Bureau stating that she needed to make an appointment with TDHS before October 29, 2002 to re-apply for TennCare coverage. *Id.* ¶ 2. Parker called TDHS and was given an appointment on August 5, 2002 at which she was told that her husband made too much money for them to qualify for TennCare. *Id.* ¶ 3.

Through the TennCare Information Line, Parker learned of her appeal rights and contacted her local legal aid for help. *Id.* ¶ 4. She was referred to the Tennessee Justice Center where she was told how to appeal the termination of her coverage and Ms. Parker faxed her appeal on August 15, 2002. *Id.* ¶ 5. Because she is unable to afford the medications for her bipolar disorder, Parker requested to be put on TennCare interim coverage while she waits for a determination. *Id.* ¶ 5–6. Ms. Parker called the TPAL on September 13, 2002 and was told that she would be put back on TennCare while awaiting the Bureau's decision, but she has not received any information about her application being processed through TennCare. *Id.* ¶ 7–8.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Parker's declaration by stating that in the original transaction of information sent to TennCare by TDHS on August 6, 2002, DHS inadvertently did not indicate that Parker was to receive a ME packet. (Docket Entry 430, Rudolph Declaration ¶ 16). TennCare did mail the ME packet to Parker on September 18, 2002 and her coverage will continue until the medical eligibility process is completed. *Id.* TDHS has taken steps to prevent this error by indicating that an ME packet should be sent to all enrollees who do not have access to insurance, but have excess income for the purposes of eligibility as uninsured and all applicants without access to insurance with income below 100% of the federal poverty level. *Id.* In addition, a procedure was put in place on September 17, 2002, that allows coverage to be reinstated with no break for those whose eligibility should have been continued while they apply as medically eligible. *Id.*

### 6. Samuel H. Lewis

Samuel Lewis has been enrolled in TennCare since 1994 and qualified as an uninsurable due to his medical conditions. (Plaintiff's Exhibit 100, ¶ 2). Mr. Lewis suffered a heart attack in 1983 and when his private insurance ended in 1985 he was turned down for further coverage because of his heart attack. *Id.* ¶ 1. In addition, Mr. Lewis had a severe case of blood poisoning in 2001 and has been told by private insurance companies that he can get insurance, but it will not cover anything related to his previous conditions. *Id.*

In late July or early August 2002, Mr. Lewis received a letter stating that he had to re-apply for TennCare coverage. *Id.* ¶ 3. "I went to my county [TDHS] office on September 2, 2002. My case worker

looked at my income and told me that I was not eligible for TennCare. She said she did not know how long it would take for my TennCare to terminate, but that I would lose my TennCare coverage. My caseworker did not say anything about any other way that I could keep my Tenn-Care." *Id.*

Lewis contacted the Tennessee Health Care Campaign who faxed an appeal on Lewis's behalf. *Id.* ¶ 5. On September 17, 2002, Lewis called the Bureau to ask about his appeal and was told that they were very backed up and did not know if they had received his appeal at the time. *Id.* ¶ 5. After talking further with advocates, Lewis learned that he could apply for TennCare through the medical eligibility packet. *Id.* ¶ 7. Lewis stated that "[n]o one at [T]DHS said anything to me about applying for TennCare as medically eligible. I have never received the medically eligible packet." *Id.*

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Lewis's declaration by stating that although Lewis was denied TennCare Standard as an uninsured person because his income was above the set limit, the ME flag was set for Lewis to be sent a ME packet. (Docket Entry 430, Rudolph Declaration ¶ 17). TennCare has since informed TDHS that there is encounter data in Lewis's file that allows him to be deemed medically eligible. *Id.* Rudolph notes that Lewis's coverage has been continuous throughout the process. *Id.*

### 7. Barbara Gooch

Barbara Gooch has been enrolled in TennCare for five (5) years as an uninsurable person because she suffers from a leaky mitral valve and high blood pressure. (Plaintiff's Exhibit 106, ¶ 3). On August 20, 2002, Gooch went to the TDHS office for her TennCare redetermination interview and was told that she was ineligible for TennCare because she exceeded the income limits. *Id.* ¶ 4. Gooch asked the TDHS worker whether there was anything she could do to keep her TennCare coverage and the TDHS worker told her that the only way to keep coverage was to have one of the listed medical conditions recognized by TennCare. *Id.* ¶ 4. Since Ms. Gooch's conditions were not on the Tenn-Care list, she was told her TennCare would be terminated. *Id.* ¶ 5.

It was not until undergoing training as a shelter worker that she was informed that individuals who had been turned down by private health insurance companies because of their medical conditions could qualify for TennCare. *Id.* ¶ 6. Ms. Gooch is currently in the process of sending in her medical eligibility packet but, is having trouble obtaining all the documentation with in the 45 day time limitation. *Id.* ¶ 7.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Gooch's declaration by stating that the packet of information sent to Gooch clearly describes the three ways that a person can establish medical eligibility. (Docket Entry 430, Rudolph Declaration ¶ 21). In addition, Rudolph notes that the TennCare Information Line number is listed at the bottom of the information sheet if there are questions or an individual needs help filling out the forms. *Id.*

### 8. Robert Hoffman

Rose Hoffman's husband, Robert Hoffman, has been diagnosed as schizophrenic and has diabetes and high blood pressure and has been on TennCare since September 2001 as an uninsurable person. (Plaintiff's Exhibit 107, ¶ 1). Mr. Hoffman was hospitalized in a psychiatric hospital for 21 days in March 2002 because of a reaction to a change in his medications. *Id.* ¶ 2.

On August 21, 2002, Ms. Hoffman took her husband to the TDHS office to see if

he was still eligible for TennCare. *Id.* ¶ 2. At that appointment, Mr. Hoffman was told that he was ineligible under Medicaid, but he could apply as a medically eligible person and he should get a ME packet in the mail. *Id.* Mr. Hoffman never received a ME packet in the mail, but did receive a letter, dated August 23, 2002, stating that Mr. Hoffmans' TennCare would end September 2, 2002. *Id.* ¶ 3. The letter informed Mr. Hoffman of his right to appeal and Ms. Hoffman filled out the appeal and mailed it the next day. *Id.* ¶ 4.

On September 2, 2002, Mrs. Hoffman called the TennCare telephone number and learned that her husband's coverage had been terminated. *Id.* ¶ 5. Mrs. Hoffman called the number again and waited on the line for an hour until she could speak to a person. *Id.* Ms. Hoffman was told that TennCare had not received a request from the TDHS office to send a ME packet. Ms. Hoffman was also told that they were behind on putting appeals into their computer, therefore, the TennCare worker did not know anything about Ms. Hoffman's appeal. *Id.*

Mrs. Hoffman then called her TDHS worker to get them to request a ME packet for Mr. Hoffman. *Id.* ¶ 6. It took the TDHS worker two days to return Mrs. Hoffman's call. *Id.* The TDHS worker said it took so long because she could not get a telephone line out. *Id.* On September 9, 2002, Mrs. Hoffman called again to check on the status of her appeal and the medical eligibility packet. *Id.* ¶ 8. Mrs. Hoffman's call was not returned until September 11, 2002 when Mrs. Hoffman was told that her difficulties would be reported to a supervisor. *Id.* The supervisor then told Mrs. Hoffman the problem was fixed and Mr. Hoffman's TennCare coverage would be reinstated on October 1, 2002. *Id.* At that point, Mr. Hoffman had been without medication for almost a month. *Id.* ¶ 9.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Hoffman's declaration by stating that Mr. Hoffman's coverage dates were corrected on September 20, 2002 by the Rapid Response Team to reflect his continuous coverage and TennCare has assisted him in obtaining needed medications. (Docket Entry 430, Rudolph Declaration ¶ 22). Rudolph does admit that the caseworker in this instance did fail to indicate that a ME packet was to be sent. *Id.* However, information was returned to TDHS by the TennCare system showing that sufficient claims data existed to indicate that Mr. Hoffman automatically met the medical eligibility criteria. *Id.*

### 9. Gaile Martin

Gaile Martin has been diagnosed with clinical depression and is on social security retirement. (Docket Entry No. 415, Plaintiff's Exhibit No. 108, ¶ 1–2). Martin has had severe reactions to her medications causing disruption in her circulatory system. *Id.* ¶ 2. Martin went to TDHS in July or August of 2002 to apply for TennCare. *Id.* ¶ 3. Martin was told that she would be sent a medical eligibility packet which she received two weeks later. *Id.* ¶ 2–4. On August 26, 2002, Martin went to Dee Dee Wallace for an assessment. *Id.* Ms. Martin stated that "[t]he person who did the assessment only met with [her] for 20 minutes and then gave me papers saying that [she] had 'moderate depression.' *Id.* Martin did not understand how the caseworker could meet with her for 20 minutes and give any kind of assessment." *Id.*

On or about September 3, 2002, Martin submitted the medical eligibility application along with the application fee and medical records from several doctors and psychiatrists who had treated her and explained her current condition. *Id.* ¶ 5. On

September 10, 2002, Martin's application was returned with a letter stating that the application was incomplete and that she should go to her local CMHC and take her forms. *Id.* ¶ 6. In her declaration, Martin states that "I don't even know what a CMHC is. There were no numbers to call or any other advice. I am very overwhelmed by the process. I don't know what to do now." *Id.* ¶ 6–7.

### 10. Marcus Shane Osborne

Marcus Shane Osborne is 25 years old and has been on TennCare since age 18. (Docket Entry No. 418, Plaintiff's Exhibit No. 116, ¶ 1). In July, 2002, after being married, Osborne went to a TennCare office to get an application for his wife and her child. *Id.* ¶ 2. Osborne was informed by the receptionist that his TennCare coverage had been terminated although he had never received notification. *Id.* Osborne and his wife applied for TennCare through their county TDHS office. *Id.* ¶ 3. His wife's application was approved, but his was not. *Id.* Osborne was not informed of his appeal rights until he spoke to the Tennessee Justice Center in September 2002 and is now appealing. *Id.* ¶ 5. Osborne is currently in need of surgery for recurring knee problems. *Id.* ¶ 4.

### G. Organizational Plaintiffs

### 1. Mid–South Arc

The Mid–South Arc, a Tennessee not-for-profit corporation, provides advocacy and services to individuals with developmental disabilities. (Plaintiffs' Exhibit 48, Leaper Declaration, ¶ 1). The Mid–South Arc has 400 individual members, some of whom have developmental disabilities and are covered by TennCare as uninsured or uninsurable persons. *Id.* When persons in the Memphis area who have developmental disabilities have TennCare benefits denied or terminated, the Mid South Arc devotes its time and resources to assist its members and other individuals to obtain health care and to secure TennCare coverage. *Id.*

### 2. Tennessee Disability Coalition

The Tennessee Disability Coalition ("TDC") is a Tennessee not-for-profit corporation (Docket Entry No. 376, Plaintiff's Revised. Supplemental Complaint (Corrected), ¶ 4), with statewide membership. *Id.* TDC members include forty-five disability organizations that advocate for public policy that ensures self-determination, independence, empowerment, integration and inclusion of individuals with disabilities in all aspects of society. *Id.* Many of the member organizations of TDC have members who receive TennCare because they are uninsured or uninsurable. (Docket Entry No. 381, Westlake Testimony at 18–19; Docket Entry No. 376, Plaintiff's Revised Supplemental Complaint (Corrected), ¶ 4).

TDC members devote time and resources to assist persons with disabilities who are unable to negotiate the eligibility determination process on their own. (Docket Entry No. 381, Westlake Testimony at 19–20). To the extent that persons with disabilities have difficulty obtaining TennCare benefits through this process, TDC and its member organizations devote time and resources to identify sources of medical treatment and attempts to get individual's TennCare benefits reinstated. (Docket Entry No. 381, Westlake Testimony at 18–20; Docket Entry No. 376, Plaintiff's Revised Supplemental Complaint (Corrected), ¶ 4).

### H. TennCare Advocacy Groups

### 1. Tennessee Chapter of Family Voices

Tennessee Chapter of Family Voices is a non-profit organization that advocates for children with special needs. (Docket Entry No. 408, Plaintiff's Exhibit 91, ¶ 1). In addition, Dara Howe, its director, has one

son, Alex, who also has special needs. *Id.* Howe is very experienced with TennCare through trainings provided by her employer. *Id.* ¶ 2–3.

On or about September 10, 2002, Howe received a notice dated September 5th 2002, that her son, Alex, was approved for Medicaid. *Id.* ¶ 4. On September 7, 2002, Howe received a second notice, dated September 6, 2002, stating that Alex's Medicaid (TennCare) would be closed on September 30, 2002 because he is eligible for SSI. *Id.* ¶ 5. Howe contends that her son's eligibility for SSI should have rendered him eligible for Medicaid, and thus, TennCare. *Id.* The September 6th letter referred to a yellow notice of appeal rights, but the yellow page was not enclosed with the notice. *Id.* ¶ 6.

The September 6th letter also stated **"Important:** 30 days before your Tenn-Care ends, the Bureau of TennCare will write to you." *Id.* ¶ 7. This was the first and only notice that Howe received that Alex's TennCare coverage would end on September 30, 2002. *Id.* The notice also says: "To see if you can still get Medicaid, call your Human Services worker." *Id.* ¶ 8. Howe was confused because the notice already stated that Alex cannot get Medicaid. *Id.*

The explanation of Alex's loss of Tenn-Care was also confusing because the September 6th letter stated that "SSI IN-COME ONLY WILL NOT BE ON THE ACCENT." *Id.* ¶ 9. Because Howe has experience with the TennCare system she knew that ACCENT was the TDHS computer system, but opines that "none of the other families I work with would know." *Id.* In addition, Ms. Howe did not understand the purpose of this statement. *Id.* The notice further says that: "WE WILL GENERATE A PAPER CASE FOR ALEXANDER." *Id.* ¶ 10. In her declaration, Howe states that "[e]ven with [her] expertise in TennCare policy, this statement makes no sense and cannot explain [her son's] loss of coverage." *Id.* ¶ 10. Even with her training and experience with the TennCare system, Howe found the notices to be confusing and inadequate.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Howe's statements by saying that "[w]hile errors were made in conveying information to Ms. Howe regarding the change in her son's case, none of these errors resulted in a denial of due process, or in any disruption of Alexander's coverage." (Docket Entry 430, Rudolph Fifth Declaration ¶ 9). She states that the procedure followed by TDHS was correct but the comments inserted by the caseworker were incorrect causing Howe's confusion and concern. Rudolph states that the caseworker has been further informed and now understands the process. *Id.* In addition, Rudolph states that the flyers in the September 6th letter are flyers included in all Medicaid termination notices and because there are many different categories of Medicaid the information may not apply to all individuals. *Id.*

### 2. MANNA, Inc.

According to Dale Gray, its executive director, MANNA, Inc., is an anti-hunger advocacy organization based in Nashville, Tennessee that assists low income families in the Nashville area in obtaining food stamps and other public benefits administered by TDHS. (Docket Entry No. 411, Plaintiff's Exhibit No. 96, ¶ 1). Gray has served as executive director since 1980, and in addition, has served on various TDHS advisory bodies to provide advice to TDHS on policy and operations affecting low income clients. *Id.*

Gray's experience with TDHS has provided him a working knowledge of TDHS's computer system, ACCENT, that is used to determine eligibility and issue beneficia-

ry notices for Families First, now, TANF, food stamps and TennCare programs. *Id.* ¶ 2. ACCENT contains a set of stock notices that are used in connection with different agency actions that have been, or are about to act on an applicant's or beneficiary's case. Most of the text of the notices is pre–programmed. The notices contain blank spaces for the insertion of text to that describe the particular facts or policies that govern the addressee's circumstances. At a computer workstation, the TDHS caseworker selects the particular notice to be used, and inserts the message unique to that case.

> The ACCENT system then guides the printing and mailing of the notices from a central automated location. At that location, addition, pre-printed "stuffers" are added to the envelopes containing the ACCENT generated notice. The pre-printed stuffers contain certain information or messages that apply to all notices, such as information on appeal rights and direction in foreign languages about how to obtain translation services. These forms are color coded and referred to in the ACCENT notices by their color.

*Id.* ¶ 2–3.

### 3. TennCare for Children Project

Angela McClellan, the pilot site coordinator with the TennCare for Children project, assists Spanish speaking clients with TennCare and Medicaid matters. (Plaintiff's Exhibit No. 101, ¶ 1). McClellan has had numerous trainings and meetings about TennCare, the new eligibility and redetermination process. *Id.* ¶ 2. On September 11, 2002, McClellan accompanied a client, the Hispanic parent of a child on TennCare, to her redetermination/Food Stamp appointment at the Davidson County TDHS office to act as her interpreter. *Id.* ¶ 3. Citing numerous difficulties during the appointment process, McClellen opined that without her assistance, her client could not have secured the eligibility interview. *Id.* ¶ 4.

### 4. Tennessee Voices for Children

Tennessee Voices for Children ("TVC") advocates for children with mental illness and helps their families obtain care and insurance for these children. (Docket Entry No. 414, Plaintiff's Exhibit 103, ¶ 1). Towanda Pepers, a TVC employee, received training on the reverification process and how to help families complete the process successfully to keep their children on TennCare. *Id.* ¶ 3. Pepers is also the mother of four boys who are all enrolled in TennCare. *Id.* ¶ 2. Two of her children have attention deficit/hyperactivity disorder ("ADHD") and TennCare pays for their medications that enable them to attend school. *Id.*

On September 11, 2002, Pepers received a redetermination letter for her four boys that told her to go to her local TDHS office to get an appointment to be recertified. *Id.* ¶ 4. Pepers called the general number listed in the telephone book and was given another telephone number to call to make an appointment. *Id.* ¶ 5. Pepers tried this number for two days, but never got an answer or a recording. *Id.* On September 16, 2002, Ms. Pepers went in person to the TDHS office where she was told to stand in line to get an appointment. *Id.* ¶ 7. The wait was too long and, because Pepers could not miss work that day, she left without an appointment. *Id.* ¶ 8. "The whole reason [she] had come in was to get an appointment so that [she] could arrange with [her] employer to take off." *Id.* ¶ 7. She has arranged to take time off of work to go stand in line for an appointment. *Id.* at ¶ 8.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Pepers' declaration by stating that although Pepers' experiences are un-

fortunate Rudolph is attempting to alleviate these problems in Davidson County. (Docket Entry 430, Rudolph Declaration ¶ 19). In addition, Rudolph notes that Pepers filed her application on September 26, 2002 and came to her appointment scheduled on September 30, 2002. *Id.*

### 5. Legal Aid Society of Middle Tennessee

Renee Turner, a staff attorney with Legal Aid Society of Middle Tennessee and the Cumberlands, assists clients with TennCare and Medicaid. (Plaintiff's Exhibit 105, ¶ 1). On August 28, 2002, Tommie L. Caddell came to see her after receiving a letter from TennCare stating that his TennCare would end on August 17, 2002. *Id.* ¶ 2. Caddell is being treated for kidney failure with kidney dialysis and medications. *Id.* at ¶ 6. Caddell has been on TennCare since 1999 as an uninsurable person and was also a Medicaid beneficiary prior to January 1, 2002. *Id.* ¶ 3.

According to TennCare rules, people who were enrolled prior to January 1, 2002 who were also Medicare beneficiaries before January 1, 2002, would be "grandfathered" into continuing TennCare eligibility status. (See TennCare public necessity rule 1200–13–14–.01(72)(d); TennCare public necessity rule 1200–13–14–.02(3)(d); Plaintiff's Exhibit 105, ¶ 3–4 and attachments). Cadell was incorrectly told by his TDHS worker that his income was too high to be "grandfathered" into the program and his TennCare was terminated. (Plaintiff's Exhibit 105, ¶ 5). Cadell has not be able to afford his treatments or medications since the erroneous termination of his TennCare coverage. *Id.* ¶ 6.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Turner's declaration by stating that Cadell does not qualify for "grandfathered-in" status because he had Medicaid coverage from March 13, 2001 through March 12, 2002. (Docket Entry 430, Rudolph Declaration ¶ 20). In addition, Rudolph notes that while Cadell appealed TennCare's decision that he did not qualify for TennCare Standard because of his income, his coverage was reinstated with no break in coverage while his appeal is pending. *Id.*

### 6. Legal Aid Society of East Tennessee

Roverta Russaw, a paralegal with Legal Aid Society of East Tennessee also assists low-income clients with Medicaid and TennCare. (Plaintiff's Exhibit No. 115, Russaw Declaration, ¶ 1). On August 1, 2002, Russaw was contacted by Margaret Cameron who had received a letter from TennCare stating that she was ineligible for TennCare because she was not in "one of the groups of people TennCare accepts now." *Id.* ¶ 2

Cameron, who has possible congestive heart failure, took a letter of denial from a private insurance company to her TDHS office on July 17, 2002 to prove she was uninsurable when she applied for TennCare coverage. *Id.* ¶ 3. At her TDHS interview, Cameron was told that TennCare was closed to uninsured people. *Id.* ¶ 4. In fact, Cameron was determined to be below the 100% poverty level and should have been sent a ME packet because even during periods of closed enrollment, people with 100% poverty can qualify for TennCare, if they are medically eligible. *Id.* Cameron was never given this information by her TDHS worker and was never sent a medical eligibility packet. *Id.*

Russaw submitted an appeal and called Cameron's TDHS worker who continued to state that TennCare was closed to applicants like Ms. Cameron. *Id.* ¶ 6. After Russaw requested the TDHS worker to check on the situation, the TDHS worker

called a few moments later to state that she had been mistaken and would re-authorize Ms. Cameron back to July 17, 2002 and would mail her a medical eligibility packet. *Id.*

In her declaration Russaw states that as to the appeal process, there was no clear response; even after inquiries.

> I appealed the denial of TennCare for Ms. Cameron in early August but have never heard anything further about the status of her appeal. In fact, when Ms. Cameron called the TennCare Solutions Unit to find out the status of her appeal, she was told by Mr. Steven McCoy that her appeal was not in the Solutions Unit. He told her that her appeal was probably in the Administrative appeals unit but, since the Solutions Unit did not talk with the Administrative Appeals Unit, he did not have any information about her appeal. When I asked Mr. McCoy for the phone number of the Administrative Appeals Unit, he told me he could not give it to me.

*Id.* ¶ 9.

Mary Anne Rudolph, the director of the Medicaid/TennCare Policy Unit of TDHS responds to Russaw's declaration by stating that there was an error made by the caseworker in Cameron case. (Docket Entry 430, Rudolph Declaration ¶ 23). The caseworker did not indicate that an ME packet should be sent to Cameron and did not discuss this option with Cameron. *Id.* In addition, Rudolph notes that staff members in the Jefferson County TDHS office were recently retrained to correct any misconceptions about the status of new enrollment in TennCare Standard. *Id.*

### 7. Comprehensive Care Center ("CCC")

The Comprehensive Care Center ("CCC") helps individuals with HIV/AIDS. (Plaintiff's Exhibit 117, Senter Declaration, ¶ 1–2). John Senter, a licensed social worker and Medical Care Manager at CCC, has had extensive training on the TennCare system and has daily contact with workers at the TennCare Bureau. *Id.* ¶ 3. In his declaration, Senter cites several problems facing individuals with HIV/AIDS in the new TennCare reverification system.

First, individuals with HIV/AIDS are not being coded correctly into the computer, and therefore, are not being automatically qualified as medically eligible. *Id.* ¶ 5. These enrollees are being sent medical eligibility packets slowing down the process and causing confusion. *Id.* Second, the application uses terminology which individuals with HIV/AIDS would not understand despite a full understanding of their disease and the tests associated with its diagnosis. *Id.* ¶ 6. Third, of the TDHS trainings Senter has attended, Don Sharp, a TDHS trainer, provided incorrect information regarding the process for redetermination, causing Senter to distribute this false information to his patients. *Id.* ¶ 7. Fourth, Senter notes that his patients receive TDHS letters denying them TennCare Medicaid, but these notices do not clearly state that the individual may still be medically eligible for TennCare Standard. *Id.* ¶ 8.

### 8. Tennessee Association of Mental Health Organizations ("TAMHO")

The Tennessee Association of Mental Health Organizations ("TAMHO") is a trade association that represents CMHCs and other behavioral health providers across Tennessee that make up the TennCare Partners Program provider network. (Plaintiff's Exhibit No. 93, Third Declaration of Charles R. (Dick) Blackburn, ¶ 1). According to Charles Blackburn, TAMHO's executive director, the CMHCs job was to provide CRG/TPG evaluations and other services for their patient population.

(Docket Entry No. 351, Plaintiff's Exhibit No. 15, ¶ 4). In the past, CMHCs did not have a formal role in the TennCare enrollment process. *Id.* The CMHCs were approached recently by State officials about taking a specific role in the TennCare enrollment process. *Id.*

> Michael Dedmon, Deputy Commissioner of [T]DHS had discussed with [Mr. Blackburn] the possibility that case workers from local [T]DHS offices could be placed in CMHC facilities to facilitate reverification of persons with SPMI and SED. At [the] last discussion, on May 9, 2002 at a TAHMO Board of Directors meeting, Mr. Dedmon again explained that [T]DHS was willing to outstation its workers at CMHC locations...[Mr. Blackburn] remains very concerned that there has not been an adequate number of locations identified statewide to offer any real improved access for SPMI/SED individuals to [T]DHS case workers for reverification purposes. Moreover, there has not been enough information provided to the CMHCs in regard to how the project will work, for example, what days and hours to expect the local [T]DHS worker to be available at a specific clinic location. Several CMHCs have only within the past few days received an executed Letter of Agreement from [T]DHS, but that general agreement does not answer a multitude of question as to the detailed operational plan.

(Docket Entry No. 351, Plaintiff's Exhibit No. 15, ¶ 7).

In his third declaration, Blackburn updates the progress of the outstationing of caseworkers in CMHCs:

> [I]t remains the case that the majority of clinical sites do not have outstationed workers, and that those that do are staffed by outstationed workers only part time, usually for only a few hours a week. The experience of centers that have [T]DHS outstationed workers has been that the workers are often poorly informed about the new eligibility process or requirements and are often unable to respond to staff or consumer questions or requests for assistance. Even in the best circumstances, where workers spend an entire day in a facility and know what they are doing, they are only able to handle six or seven cases during the workday. In contrast, centers each serve thousands of enrollees who are SPMI or SED.

(Plaintiff's Exhibit No. 93, ¶ 2–3).

Blackburn also states that his organization has attempted to develop a mechanism to obtain CRG/TPG assessments for new applicants who need an assessment in order to establish their eligibility as an SPMI/SED individual. *Id.* ¶ 4. Due to changes in TennCare eligibility and application procedures, CMHCs are no longer able to conduct such assessments because there is no longer the reasonable prospect of being reimbursed. *Id.*

In recognition of these circumstances, the State has created a new $6 million dollar fund to cover the costs of the new applicants while their TennCare applications are pending, but the arrangement has not worked and none of the centers has received any payment from the fund. *Id.* ¶ 5. As of September 12, 2002, TAMHO was informed that the Bureau of Health Organizations ("BHO") data systems must be modified in order to accommodate the new system for payment for CRG/TPGs. *Id.*

To refute Blackburn's statement that CMHCs do not participate due to the lack of a reasonable prospect of being reimbursed, Sherry Harrison, director of the Office of Managed Care in the Tennessee Department of Mental Health and Developmental Disabilities ("TDMHDD") (Docket Entry 432, Declaration of Sherry

Frazier Harrison ¶ 1), responds that she is responsible for the administration, management and oversight of certain aspects of the TennCare Partners Program which include policy development, contract development, contract compliance and monitoring, and liaison activities with the BHO. *Id.* Harrison states that:

the majority of CMHC's are in fact conducting state only assessments and the statewide numbers for July and August CRG/TPGs look similar to last year's numbers. CMHC's are still submitting claims for CRG/TPG assessments, and it is reasonable to conclude that the number will increase. During a meeting with Mr. Blackburn and members of the Tennessee Mental Health Organization on September 12, 2002, the directors of the CMHCs advised that they were indeed conducting CRG/TPG assessments... While there is concern about the financial future of Magellan, the State is monitoring this matter to ensure that there is no disruption of services to enrollees. The concern about Magellan's financial status does not appear to have negatively affected the willingness of providers to serve enrollees.

(Docket Entry 432, Declaration of Sherry Frazier Harrison ¶ 3).

In addition, Ms. Harrison refutes the payment issues in Blackburn's declaration.

The BHOs [in this case AdvoCare] are responsible for payment of services to State Only eligibles. This has always been the case and did not change as a result of eligibility changes...AdvoCare staff [ ]went through the billing and reimbursement process with Mr. Blackburn, concluding that it was too soon in the billing process for CMHCs to have received reimbursement.

(Docket Entry 432, Declaration of Sherry Frazier Harrison ¶ 4). Finally, Ms. Harrison states that the $6 million dollars was never intended to pay for services provided to State Onlys, but instead, this money is earmarked for "safety net services" for this population. *Id.* ¶ 6.

## VII. CONCLUSIONS OF LAW

### A. The Purposes of the Medicaid Act

To provide some context for the evaluation of the parties' numerous legal contentions, a brief overview of the Medicaid Act and its purposes is presented. In *Schweiker v. Hogan*, 457 U.S. 569, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982) the Supreme Court addressed a state Medicaid plan and explained the historical origin of these types of waiver programs.

The Medicaid program was established in 1965 in Title XIX of the Act "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy person." Participating States are required to provide Medicaid coverage to certain individuals—now described as the "categorically needy"; at their option States also may provide coverage (and receive partial federal reimbursement) to other individuals—described as the "medically needy".

\* \* \* \* \* \*

In 1972, Congress replaced three of the four state-administered categorical assistance programs with a new federal program entitled Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U.S.C. § 1381 *et seq.* (1976 ed. And Supp. IV). The SSI program establishes a federally guaranteed minimum income for the aged, blind, and disabled. Under the program, however, the States may (and in some cases must) raise that minimum standard and supplement the benefits provided by the Federal Government. Moreover, if supplemental payments are made to person who would be eligible for SSI benefits except for the amount

of their income, the State also may provide Medicaid benefits to those persons. *Id.* at 571, 581, 102 S.Ct. 2597 (quoting *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 and citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460).

As to the two groups that are beneficiaries under this state waiver plans, the Sixth Circuit described them as follows.

Persons eligible for participation in the medicaid program fall into two classes. The "categorically needy" are those individuals or families who are eligible for medicaid because they are eligible for Aid to Families with Dependent Children ("AFDC") or Supplemental Security Income ("SSI") benefits. 42 C.F.R. § 435.4 (1983). Also included within this class are individuals who are excluded from AFDC or SSI because of an eligibility requirement that does not apply to medicaid. 42 C.F.R. § 435.122. The "medically needy" are those individuals not receiving AFDC or SSI, but whose income and resources, in comparison to their medical expenses, are within the limits established by the Department of Health and Human Services (hereinafter "HHS"). *Id.* Coverage of this latter class of persons is optional for a state which participates in the program. 42 U.S.C. § 1396a(a)(10)(C).

*Crippen v. Kheder*, 741 F.2d 102, 103 (6th Cir.1984).

More recently, in *Rodriguez v. City of New York*, 197 F.3d 611 (2d Cir.1999), the Second Circuit stated that equal treatment for these groups is necessary to assure that the categorically needy are treated equally.

Section 1396a(a)(10)(B) guarantees that if a state elects to provide Medicaid to the medically needy, it must also provide it to the categorically needy and that it may not provide more assistance to the former group than to the latter. *See id.*

[*Camacho v. Perales*, 786 F.2d 32] at 39 [(2d Cir.1986)]. Moreover, states may not provide benefits to some categorically needy individuals but not to others. *See* 42 U.S.C. § 1396a(a)(10)(B)(i); see also *Schweiker v. Hogan*, 457 U.S. 569, 573 n. 6, 102 S.Ct. 2597, 73 L.Ed.2d 227 (1982) (stating that Section 1396a(a)(10)(B) ensures "that the medical assistance afforded to an individual who qualified under any categorical assistance program could not be different from that afforded to an individual who qualified under any other program"); *see also Sobky v. Smoley*, 855 F.Supp. 1123, 1140 (E.D.Cal.1994) (holding that current text of § 1396a(a)(10)(B) requires comparability between groups of the categorically needy as well as between individuals within the same group). Section 1396a(a)(10)(B) thus precludes states from discriminating against or among the categorically needy.

197 F.3d at 615.

Once a state waiver plan is approved, the State is given "substantial discretion" as to its administration and covered services. In *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Supreme Court noted that: The federal Medicaid Act makes this point clear. The Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, *as long as care and services are provided in "the best interests of the recipients."* 469 U.S. at 303, 105 S.Ct. 712 (citing 42 U.S.C. § 1369a(a)(19))(emphasis added).

■ Yet, "[o]nce a state voluntarily chooses to participate in Medicaid, the state must comply with the requirements of Title XIX and applicable regulations." *Alexander*, 469 U.S. at 289, n. 1, 105 S.Ct. 712 (citing *Harris v. McRae*, 448 U.S. 297,

301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). Moreover, "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." *DeSario v. Thomas,* 139 F.3d 80, 93–94 (2d Cir.1998).

### B. Plaintiffs' Standing

As a threshold legal issue, the Defendant contends that Plaintiffs have offered only descriptions of hypothetical situations in which *some* unnamed plaintiff might not be able to navigate the new TennCare redetermination and application processes. Thus, in the Defendant's view, Plaintiffs lack standing to challenge the Defendant's reverification process.

The threshold requirement for any civil action is a "case or controversy" under Article III of the Constitution asserted by a plaintiff who has standing to raise the issue. No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies. *See Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Standing is one facet of this limitation and the standing requirement "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Id.,* at 99, 88 S.Ct. 1942.

■ The standing question, in essence, "is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 498–499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "In sum, when a plaintiff's standing is brought into issue *the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.* Absent

such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 37–38, 96 S.Ct. 1917, 48 L.Ed.2d 450, (1976)(emphasis added).

In determining whether a "case or controversy" exists and whether the named plaintiff has standing to assert a claim, in *Warth,* 422 U.S. at 508, 517–18, 95 S.Ct. 2197, the Supreme Court stated:

We hold only that a plaintiff who seeks to challenge exclusionary zoning practices *must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review"* or that relief can be framed "no broader than required by the precise facts to which the court's ruling would be applied."

\* \* \* \* \* \*

The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. *It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.*

(citation and footnote omitted and emphasis added); *accord County of Riverside v. McLaughlin,* 500 U.S. 44, 51, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) ("At the core of the standing doctrine is the requirement that 'a plaintiff [must] allege personal injury fairly traceable to the defendant's alleg-

edly unlawful conduct and likely to be redressed by the requested relief.'") (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

 This action has been certified as a class, but it is well settled that the standing of a class is no broader than the standing of the class representatives who appear before the court, and that standing is a "claim-by-claim issue." *Rosen v. Tennessee Commissioner of Finance and Administration,* 288 F.3d 918, 928 (6th Cir. 2002). Class representatives must show "that they personally have been injured, not that unidentified members of the class to which they belong and which they purport to represent" may be injured. *Blum v. Yaretsky,* 457 U.S. 991, 1001 n. 13, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). As pertinent to this action, the Sixth Circuit stated that Plaintiffs "cannot sue to enforce the rights of the unnamed class members for the unnamed members sake; if at all, plaintiffs can only sue to enforce their own rights as parties to the agreed order." *Rosen,* 288 F.3d at 931.

### 1. Individual Plaintiffs

 In contrast to the Plaintiffs in the earlier appeal, the individual Plaintiffs who are named in the supplemental complaints as well as named class members assert that they expected to be adversely affected or, in fact, have been adversely affected by DHS's administration of the new Tenn-Care polices during the reverification process. In *Lujan,* the Supreme Court held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is concrete, particularized, actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision. 504 U.S. at 560–61, 112 S.Ct. 2130. *See also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Under class action precedents, consideration of the controversy can continue notwithstanding that the class representative may have achieved the relief at issue. *Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Since *Sosna,* in *Blum,* a class action on behalf of patients "who have been are or will be threatened or forced to leave their nursing homes and have their Medicaid benefits reduced or terminated," the Supreme Court stated that:

It is axiomatic that the judicial power conferred by Art. III may not be exercised unless the plaintiff shows "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99[, 99 S.Ct. 1601, 60 L.Ed.2d 66] (1979). It is not enough that the conduct of which the plaintiff complains will injure *someone.* The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigation conduct of another kind, although similar to which he has been subject.

457 U.S. at 999, 102 S.Ct. 2777 (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 166–167, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972)).

Ultimately, in *Blum,* the Supreme Court held that "the threat of facility-initiated discharges or transfers to lower levels of

care is sufficiently substantial that respondents have standing to challenge their procedural adequacy." *Id.* at 1000, 102 S.Ct. 2777. The Court, however, denied standing on transfers to higher care, citing the lack of personal threat to the named class representatives. *Id.* at 1001, n. 13, 102 S.Ct. 2777.

In the Defendant's earlier appeal, the Sixth Circuit vacated this Court's October 25, 2001 order, noting that none of the named plaintiffs had the required personal stake in the litigation against the state's proposed closing of TennCare enrollment to future uninsurable applicants because the closing would only affect adult uninsurables who applied for TennCare after October 1, 2001. *Rosen,* 288 F.3d at 930.

The Court concludes that the individual named Plaintiffs with the exception of three individuals, Michael Rosen, Jacob B. by next of friend Martin B., and Brenda Clabo, meet the standing requirements. With the exception of Sherry Justice, all of these latter individual Plaintiffs are waiver eligibles. The Defendant is requiring all waiver eligibles, to "actually reapply" for TennCare coverage through TDHS. (Plaintiffs' Exhibit No. 51, Public Necessity Rules of the Tennessee Department of Finance and Administration, Chapter 1200–13–14, TennCare Standard (hereinafter "TennCare Standard Rules"), Rule 1200–13–14–.02(7) at 17;Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 7–8 and Attachment A). Sherry Justice is a new applicant who asserts difficulties receiving materials timely and is awaiting a decision on her ME application that was not timely received after she was denied Medicaid coverage.

Under the Defendant's reverification rules and policies, Plaintiffs' continued coverage is threatened. Some of the Plaintiffs' reverifications are still pending. The Agreed Order entered in this action permanently enjoined the Defendant from terminating, reducing or suspending TennCare coverage of Plaintiff class members without affording them the due process rights in accordance with 42 C.F.R. Part 431, Subpart E. (Docket Entry No. 171, Agreed Order ¶ 1). The same protections apply to the TennCare application process and to Plaintiff, Sherry Justice. *Id.* Plaintiffs allege that the State's eligibility process fails to comply with this provision of the Agreed Order and that the process therefore impairs the individual's rights under the Agreed Order. Under *Hammond v. Baldwin,* 866 F.2d 172, 176 (6th Cir.1989), an allegedly infirm process is an injury in itself.

These Plaintiffs' and class members' proof includes evidence of their disabilities that will require accommodations that are unavailable from the Defendant. The TDHS offices that will handle the redetermination process, do not sufficiently accommodate parents whose children suffer from disabilities, *see,* e.g., Plaintiffs' Exhibit No. 10, Spencer Declaration; (Plaintiffs' Exhibit No. 46, Second Spencer Declaration), individuals who need assistance with communication (*see, e.g.,* Plaintiffs' Exhibit No. 21, Claiborne Declaration ¶ 7), individuals who need accommodations because of physical disabilities (*see* Plaintiffs' Exhibit No. 19, Thornton Declaration ¶ 4), or mental limitations (Plaintiffs' Exhibit No. 2, Cummings Declaration ¶ 3; Plaintiffs' Exhibit No. 18, Stewart Declaration ¶ 4), and those who require accommodations because of a language barrier. (Plaintiffs' Exhibit No. 41, Bach Thuy Nguyen Declaration ¶ 3). *See also* (Plaintiffs' Exhibit No. 50, Johnson Deposition at 10–13, 54–55).

The Defendant's failure to comply with the provisions of the Settlement Agreement and Agreed Order will cause these individual class members who need accommodations to suffer an "injury in fact" if

the lack of these accommodations causes them to be unable to complete the reverification process. Further, these Plaintiffs have shown "an injury to [themselves] that is likely to be redressed by a favorable decision." *Simon,* 426 U.S. at 37–38, 96 S.Ct. 1917.

If the individual Plaintiffs do not submit to the challenged reverification requirements, or if they are unable to comply with those requirements within State-imposed time limits, the waiver eligible Plaintiffs will lose their TennCare coverage. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(7) at 17; *see also* Plaintiffs' Exhibit No. 20, Powers Declaration ¶¶ 6–8; Plaintiffs' Exhibit No. 25, Herring Declaration; Docket Entry No. 381, Transcript of Proceedings of July 22, 2002; Westlake Testimony). A loss of TennCare coverage will cause these individuals to suffer harm because of lack of health care insurance and inability to obtain appropriate medical care. (Docket Entry No. 1, Complaint, ¶ 58; Plaintiffs' Exhibit No. 20, Powers Declaration ¶ 9). Another class member with depression would not get any assistance. (Plaintiffs' Exhibit No. 108, Martin Affidavit). Because many of these individuals have illnesses or chronic diseases, they are vitally dependant on health care coverage.

Finally, current TennCare enrollees, who are class members and have submitted affidavits, assert that they have been improperly denied coverage (Docket Entry No. 94, Sherry Justice Declaration; Docket Entry No. 109, Johnson Declaration; Plaintiffs' Exhibit No. 95, Daniels Declaration; Plaintiffs' Exhibit No. 97, Cunningham's Declaration; Docket Entry No. 412, Patterson Affidavit) or have not received notices of their rights to appeal. (Docket Entry No. 102, Addison Declaration; Plaintiffs' Exhibit No. 92, Manning Declaration; Plaintiffs' Exhibit No. 95, Daniels Declaration; and Plaintiffs' Exhibit 116, Osborne Affidavit).

Other individual class members have submitted evidence that they did not receive TennCare reverification information. (Docket Entry No. 442, Patterson Declaration; Plaintiffs' Exhibit No. 99, Parker Affidavit; Plaintiffs' Exhibit No. 100, Lewis Affidavit; Plaintiffs' Exhibit No. 107, Huffman Affidavit). There is evidence of class members who experience difficulties in obtaining the requested information for verification within the 45–day limitation. (Plaintiffs' Exhibit No. 106, Gooch Declaration; Plaintiffs' Exhibit No. 109, Jackson Declaration).

Given the evidence presented by Plaintiffs and named class members, the complexity of the reverification process, the lack of accommodations for SPMI/SED individuals as well as the proof that more than 200,000 TennCare enrollees lost their coverage purportedly due to the Defendant's alleged inadequate reverification process, the Court concludes that there is a great likelihood of injury to these Plaintiffs and class members so as to confer standing upon them to pursue these claims.

Thus, the Court concludes that these individual Plaintiffs in the supplemental complaints have standing because they have demonstrated that (1) they will suffer an "injury in fact" that is particularized and imminent; (2) the injury is fairly traceable to the Defendant's reverification process; and (3) it is likely that the injury will be redressed by a favorable decision. *See Lujan,* 504 U.S. at 560–561, 112 S.Ct. 2130.

**2. Organizational Plaintiffs**

■ The Plaintiffs in their supplemental complaints also includes two associations, The Mid–South Arc, a Tennessee not-for-profit corporation, dedicated to providing advocacy and services to individuals with

developmental disabilities. (Plaintiffs' Exhibit No. 48, Leaper Declaration, ¶ 1). The Mid–South Arc has 400 individual members, some of whom have developmental disabilities and are covered by TennCare as uninsured or uninsurable persons. (Plaintiffs' Exhibit No. 48, Leaper Declaration ¶ 1). The Tennessee Disability Coalition ("TDC"), a statewide membership organization, that includes forty-five disability organizations that collectively advocate for the independence, empowerment, integration and inclusion of individuals with disabilities in all aspects of society. (Docket Entry No. 376, Plaintiffs' Revised Supplemental Complaint, ¶ 4). Many of the TDC member organizations have members who receive TennCare as uninsured or uninsurable. (Docket Entry No. 376, Plaintiffs' Revised Supplemental Complaint, ¶ 4; Docket Entry No. 381, Westlake Testimony at 18–19).

■ An association has standing to sue on behalf of its members when, (1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693. In *Warth*, the Supreme Court stated:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the

nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. 422 U.S., at 511, 95 S.Ct. 2197. *See also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39–40, 96 S.Ct. 1917, 48 L.Ed.2d 450, (1976); *Meek v. Pittenger*, 421 U.S. 349, 355–356 n. 5, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In *Simon*, the Supreme Court again addressed associational standing. In *Simon*, several indigents and organizations composed of indigents filed an action against Secretary of Treasury and Commissioner of Internal Revenue Service ("IRS") asserting that the IRS violated the Internal Revenue Code and the Administrative Procedure Act by issuing a revenue ruling allowing favorable tax treatment to a nonprofit hospital that offered only emergency room service to indigents. The Supreme Court, held that organizations which described themselves as dedicated to promoting access of the poor to health services could not establish their standing simply on basis of that goal. The Court in *Simon* stated:

> *Insofar as these organizations seek standing based on their special interest in the health problems of the poor their complaint must fail.* Since they allege no injury to themselves as organizations, and indeed could not in the context of this suit, they can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right. *The standing question in this suit therefore turns upon whether any individual respondent has estab-*

*lished an actual injury, or whether the respondent organizations have established actual injury to any of their indigent members.*

426 U.S. at 40, 96 S.Ct. 1917 (citations omitted) (emphasis added).

The Court in *Simon* also noted that the individual respondents who sought to maintain this suit as a class action on behalf of all persons similarly situated, also lacked standing stating: "[t]hat a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" 426 U.S. at 40, 96 S.Ct. 1917 (quoting *Warth,* 422 U.S. at 502, 95 S.Ct. 2197).

The Supreme Court elaborated in *Warth* on the type of relief that an association could properly pursue on behalf of its members:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. *If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.* Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.

422 U.S. at 515, 95 S.Ct. 2197 (emphasis added); *Washington State Apple Advertising Com'n,* 432 U.S. at 342–343, 97 S.Ct. 2434.

In *Washington State Apple Advertising Com'n,* the Court summarized the requirements of associational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. 2434.

In a recent Sixth Circuit decision, *Westside Mothers v. Haveman,* 289 F.3d 852 (6th Cir.2002), the Sixth Circuit found standing for organizations whose members had "otherwise unnecessary expenditures, meaning that the organizations' members have suffered an injury by not receiving compensation, for medical services their members are ethically compelled to provide." *Id.* at 864. To be sure, the Sixth Circuit affirmed dismissal of the welfare rights organization for lack of standing "because plaintiffs' complaint contained little information about the organization." *Id.* at 863.

Mid–South Arc actually provides services to TennCare enrollees with developmental disabilities. If the TennCare redetermination process does not properly accommodate individuals with developmental disabilities, the Mid–South Arc will suffer a drain on its resources. (Plaintiffs' Exhibit No. 48, Leaper Declaration, ¶ 1). All persons enrolled in TennCare as waiver eligibles, including Mid–South Arc individual members, will be required to undergo a redetermination process within the six month reverification period. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(7) at 17; Defendant's Exhibit No. 1, Johnson Declaration ¶¶ 7–8 and Attachment A). Unless the Mid–South Arc's members who have special needs, are provided accommodations for these needs, many of

its members will be unable to complete the redetermination process and will lose their TennCare coverage. (Plaintiffs' Exhibit No. 48, Leaper Declaration ¶ 1).

This new TennCare process also directly affects the TDC's capacity to perform its work. (Docket Entry No. 376, Plaintiffs' Revised Supplemental Complaint; Docket Entry No. 381, Westlake Testimony at 19–20). TDC and its members organizations must devote time and resources to assist TennCare enrollees with disabilities who are unable to negotiate the eligibility determination process alone. *Id.* To the extent that these enrollees with disabilities are deprived of TennCare benefits as a result of this process, TDC and its member organizations must increase their resources to secure TennCare benefits for their members. (Docket Entry No. 380, Westlake Testimony at 18–20). These efforts represent an injury-in-fact, i.e., a drain on TDC's financial resources.

Because the Mid–South Arc and the Tennessee Disability Coalition will suffer injuries in fact, that are traceable to the Defendant's new TennCare verification rules and processes and because these injuries could be prevented by the equitable relief sought by Plaintiffs, the Court concludes that these organizations have standing to assert the claims in this action. *See Lujan,* 504 U.S. at 560, 112 S.Ct. 2130; *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Further, these organizations' members will suffer an injury fairly traceable to the defendant's conduct; the interests at stake in the action are germane to the organizations' purposes; and the claims and relief requested here do not require the participation of the organizations' members. *See Washington State Apple,* 432 U.S. at 343, 97 S.Ct. 2434. Thus, the Court concludes that these organizations have standing to assert claims in this action on behalf of their members.

*Friends of the Earth,* 528 U.S. at 181, 120 S.Ct. 693.

**C. Plaintiffs' Implied Right of Action to Enforce Medicaid Regulations**

A related defense argument is that Plaintiffs do not have an implied right of action to enforce Medicaid regulations, particularly the MCAC requirement, in this Section 1983 action.

■ Courts consider three factors when determining whether a statutory provision allows persons to file a private action to vindicate a federal right awarded under that statute. *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). First, "Congress must have intended that the provision in question benefit the plaintiff." *Id.* "Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Id.* at 340–41, 117 S.Ct. 1353. "Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353.

■ The Court concludes that the MCAC requirement passes the three tests for enforcement under Section 1983. In 42 U.S.C. § 1396a, Congress authorized the Secretary of the Department of Health and Human Services to grant waivers to states with plans approved by the Secretary. With this statutory authorization, Congress intended these benefits to extend to those persons covered under State plans that are approved by the Secretary, as reflected in HCFA's June 17, 1996 memorandum extending all Medicaid regulations to apply to these waiver eligibles. In gaining the Secretary's approval of TennCare, 42 U.S.C. § 1396a(a)(3) requires its proce-

dural protections to extend to all Tenn-Care recipients.

The express purpose of TennCare that the Secretary approved was to provide medical coverage to Medicaid recipients and to those individuals not covered by Title XIX. The coverage of these latter individuals was contemplated both by the State in submitting the waiver plan and by HCFA and CMS in ultimately accepting the waiver and amendments thereto. Thus, the first requirement that the statute, as administered, was "intended to benefit plaintiffs" is satisfied here because the class action is on behalf of all TennCare enrollees, including Medicaid recipients, uninsured and uninsurable applicants who were covered or seek to be covered under TennCare.

Second, the requirement of a state to consult the MCAC is not "vague or amorphous." *See* 42 C.F.R. § 431.12. To the contrary, the federal regulation directs the state to provide for a MCAC that meets the requirements of the section. The regulation also instructs the state on which issues it must consult the MCAC, namely those issues relating to health and medical care services, policy development, and program administration. See 42 C.F.R. § 431.12(a), (b) and (e). As discussed *infra*, this Court finds this MCAC regulation to be "clear" and in the prior proceedings, the Court ordered the Defendant to follow this regulation. *Jennings v. Alexander*, No. 80–2043–NE–CV (M.D.Tenn. Order and Memorandum filed September 3, 1980).

Third, the MCAC regulation places a binding obligation on the states and is couched in mandatory terms. "Once a state voluntarily chooses to participate in Medicaid, the state must comply with the requirements of Title XIX and applicable regulations." *Alexander*, 469 U.S. at 289, n. 1, 105 S.Ct. 712 (citing *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)). 42 C.F.R. § 431.12(a) expressly provides that "[a] state plan *must* provide for a medical care advisory committee . . . to advise the Medicaid agency director about health and medical services." *Id.* (emphasis added). Section 431.12(e) further provides that "the committee *must* have the opportunity for participation *in policy development and program administration*, including furthering the participation of recipient members in the agency program." (emphasis added). In *Jennings*, this Court has held the MCAC requirement to be "mandatory" in a § 1983 action by Medicaid enrollees.

As to the Defendant's reliance on *Blessing*, the Court deems this action to be distinguishable in that this statute provides a statutory scheme that confers procedural rights upon recipients that courts have consistently found to grant them implied rights to enforce its provisions. Federal Medicaid regulations are enforceable on behalf of program beneficiaries in actions of this type that are brought under 42 U.S.C. § 1983. *Boatman v. Hammons*, 164 F.3d 286, 289 (6th Cir.1998). *Accord Westside Mothers*, 289 F.3d at 863 citing a Medicaid regulation.

TennCare's waiver arises under the Social Security Act and the Defendant administers federal and state funds to provide medical benefits to eligible citizens. The Supreme Court has held that a § 1983 action can be maintained against state officials for due process violations in such instances. In *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court held that a § 1983 action was proper to address secure noncompliance with the provisions of the Social Security Act by state officials.

While we view with concern the escalating involvement of federal courts in this highly complicated area of welfare bene-

fits, one that should be formally placed under the supervision of HEW, at least in the first instance, *we find not the slightest indication that Congress meant to deprive federal courts of their traditional jurisdiction to hear and decide federal questions in this field.* It is, of course, no part of the business of this Court to evaluate, apart from federal constitutional or statutory challenge, the merits or in the large or in the particular. *It is, on the other hand, peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use.* As Mr. Justice Cardozo stated, speaking for the Court in *Helvering v. Davis,* 301 U.S. 619, 645[, 57 S.Ct. 904, 81 L.Ed. 1307] (1937): "When [federal] money is spent to promote the general welfare, the concept of welfare or the opposite is shaped by Congress, not the states." Cf. *Lassen v. Arizona ex rel. Arizona Highway Dept.,* 385 U.S. 458[, 87 S.Ct. 584, 17 L.Ed.2d 515] (1967).

397 U.S. at 422–23, 90 S.Ct. 1207 (emphasis added); *Accord Maine v. Thiboutot,* 448 U.S. 1, 6–8, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (wherein the Supreme Court allowed a § 1983 action to enforce the Social Security Act).

The Sixth Circuit held in *Wood v. Tompkins,* 33 F.3d 600, 602 (6th Cir.1994), that a Section 1983 action with procedural and substantive due process claims, was cognizable for applicants who alleged violations of the Medicare Act and regulations involving a waiver under the Social Security Act. In *Wood,* the applicants sought benefits from the "Medically Fragile Waiver" program operated by the state of Ohio under a waiver from the Secretary. *Id.* at 602. The Plaintiffs applied, but were denied benefits and at a hearing before a

state official, the applicants were not allowed to introduce proof that the state's cap on home nursing services was in violation of the Medicaid Act and regulations. In *Wood,* as here, the Defendants alleged a lack of standing and failure to state a viable procedural or substantive due process claim. *Id.* at 604. In sum, without repeating the Court's sophisticated analysis, *Wood* held that the Medicare Act "conferred rights upon home care Medicaid recipients that are enforceable under § 1983" so long as the Medicaid statutory benefits at issue were "intended to benefit Plaintiffs as Medicaid recipients." *Id.* at 611.

The Sixth Circuit also entertained a Section 1983 action where "Medicaid–Eligible Enrollees" were found to have valid due process claims under Section 1983 against the defendants who managed the Tenn-Care program. *Daniels v. Wadley,* 926 F.Supp. 1305, 1306, 1311–14 (M.D.Tenn. 1996) *rev'd on other grounds* 1998 WL 211763, 145 F.3d 1330 (6th Cir.1998). This is the type of determination by the District Court that the Supreme Court in *Blessing* required. 520 U.S. at 346, 117 S.Ct. 1353. This Court concludes that *Blessing* does not bar this Court's conclusion that the Plaintiffs have standing to enforce these Medicaid statutes and regulations at issue.

Other courts have found that Medicaid recipients are entitled to protectable due process interest. In *Gonzalez v. Sullivan,* 914 F.2d 1197, 1203 (9th Cir.1990), the Ninth Circuit stated: "An applicant for social security benefits has a property interest in those benefits." In *Easley v. Arkansas Dept. of Human Services,* 645 F.Supp. 1535 (E.D.Ark.1986), the Court concluded that protectable interests exist in the Medicaid program.

the plaintiffs have clearly established that their property rights to Medicaid benefits have been deprived by the De-

partment's failure to establish the constitutionally and statutorily mandated due process safeguards of notifying Medicaid recipients of its disposition of requests for payment and an appeal process by which to challenge the disposition. Plaintiffs should be given the opportunity to challenge unfavorable dispositions of requests for payment administratively as required by law.

*Id.* at 1545. *See also Ortiz v. Eichler,* 794 F.2d 889 (3rd Cir.1986); *Gray Panthers v. Schweiker,* 652 F.2d 146 (D.C.Cir.1980); *Dealy v. Heckler,* 616 F.Supp. 880 (W.D.Mo.1984); *David v. Heckler,* 591 F.Supp. 1033 (E.D.N.Y.1984).

The Defendant relies upon the Honorable John T. Nixon's 1994 ruling in *Daniels v. Tennessee Dept. of Public Health,* No. 79–3107 (M.D.Tenn. Memorandum date June 24, 1994), contending that Judge Nixon "held that a notice requirement imposed by federal Medicaid laws did not apply to waiver eligibles even though those individuals receive benefits similar to those provided by Medicaid." *Id.* at 10. Judge Nixon's ruling does not contain such a holding. In ruling on a TRO application, Judge Nixon stated only that:

> This Court is therefore skeptical that the TennCare waiver demonstration project is subject to the Medicaid plan statutes relied upon by plaintiffs. 42 U.S.C. §§ 1396(a)(8) and 1396a(19) and 42 C.F.R. §§ 435.916 and 435.930. Accordingly, because at this time it does not appear that the uninsured and uninsurable coverage is provided for in the federal statutes and regulations, the Court finds that plaintiffs have failed to demonstrate a strong likelihood of success on the merits.

*Id.* at 9–10. In fact, Judge Nixon later applied Medicaid statutes and regulations to uninsured and uninsurables in the same case. *Daniels v. Wadley,* 926 F.Supp. 1305, 1306, 1310–11 (M.D.Tenn.1996), *rev'd*

*in part on other grounds,* 145 F.3d 1330 (6th Cir.1998)(unpublished).

In addition, HCFA's and CMS's letters reflect their views that Medicaid regulations apply to the uninsured and uninsurables. The Defendant's entry into an Agreed Order to apply 42 C.F.R. § 431, Subpart E, setting forth its procedural requirements to the uninsured and uninsurables also reflects the Defendant's concession that the Medicaid Act's regulations apply to this group of class members.

Thus, the Court concludes that an implied right of action exists under the Medicaid statutes and regulations for covered enrollees to enforce the MCAC and Medicaid's other due process regulations in this § 1983 action.

### D. Plaintiffs' MCAC Claims

The next issue for the Court's consideration is the Plaintiffs' claim that the new TennCare program is invalid for the lack of prior review of the amendments by a Medical Care Advisory Committee ("MCAC"). Plaintiffs contend that the Defendant's change of policies and procedures for determining the eligibility of plaintiff class members is a material alteration of the TennCare program for which prior MCAC review, is required by 42 U.S.C. § 1396a(a)(4) and 42 C.F.R. § 431.12.

Federal Medicaid regulations require the State to establish a MCAC to advise the Medicaid agency on matters relating to health care services. 42 U.S.C. 1396a(a)(4); 42 C.F.R. § 431.12. This Committee "must have opportunity for participation in policy development and program administration." 42 C.F.R. § 431.12(e). 42 C.F.R. § 431.12, provides in relevant part, that:

> \* \* \* \* \* \*
>
> (f) State plan requirement. A state plan must provide for a medical care

advisory committee meeting the requirements of this section to advise the Medicaid agency director about health and medical care services

* * * * * *

(e) Committee participation. The committee must have opportunity for participation *in policy development and program administration*, including furthering the participation of recipient members in the agency program.

*Id.* (emphasis added).

The requirement of 42 C.F.R. § 431.12 was not listed among the statutes and regulations waived under the Defendant's new waiver. (Docket Entry No. 331, Notice to Court of New TennCare Waiver, Exhibit A at. 1–4). Therefore, the MCAC regulation remains applicable to Tennessee, since "all requirements of the Medicaid statute will be applicable to [TennCare] expenditures, except those waived above and those specified below as not applicable..." *Id.* at 3.

The former TennCare Director, Mark Reynolds, testified by deposition that the policies and procedures now at issue have not been reviewed by a Medical Care Advisory Committee. (Plaintiffs' Exhibit No. 1, Reynolds Deposition at 39–40). The State has offered the declaration of Dr. Conrad Shackleford, who asserts that Tennessee has a duly constituted MCAC that purports to satisfy the requirements of the federal regulations. (Defendant's Exhibit No. 3). Dr. Shackleford does not contradict his former Director's testimony that the committee never reviewed the policies and procedures before the submission of the proposed waiver amendments to CMS. At most, Dr. Shackleford's declaration establishes that in February, 2002, the committee was appointed and for the first time in June, 2002, reviewed the Defendant's new waiver. The latter meeting was after CMS's approval letter of May 31, 2002.

As this Court stated previously, the MCAC regulation serves the statutory requirement that "A state plan for medical assistance must—... (22) include descriptions of (A) the kinds and numbers of professional medical personnel and supporting staff that will be used in the administration of the plan and of the responsibilities they will have ...(D) other standards and methods that the State will use to assure that medical or remedial care and services provided to recipients of medical assistance are of high quality ...[.]" 42 U.S.C.S. § 1396a(a)(22)(A)(D). Thus, the existence of a MCAC is mandatory as an assurance that the State Plan will provide "medical assistance of—high quality." *See* Docket Entry No. 259, Memorandum at 3. The requirement of consultation with persons knowledgeable about the needs of the beneficiary population is not a meaningless formality.

This Court earlier held that 42 C.F.R. § 431.12(e) clearly requires MCAC's prior consultation and participation in policy development. In 1980, the late Honorable L. Clure Morton of this Court issued a temporary restraining order and injunction to prevent implementation of a Medicaid policy to reduce state reimbursement for services covered by Medicaid programs. *Jennings v. Alexander*, No. 80–2043–NE–CV (M.D.Tenn. Order and Memorandum filed September 3, 1980). Judge Morton found that a MCAC was never contacted or consulted when "it first became evident that reductions in expenditures were necessary." Memorandum at 9. Judge Morton observed that "[h]ad the MCAC been fully involved in considering the changes in the manner contemplated by the federal regulators, 42 C.F.R. § 431.12, solutions might well have been found which would have had a much less severe impact on the availability of services than ... the regulators proposed." *Id.* at 8.

In granting injunctive relief due to the State's failure to consult a properly constituted MCAC, Judge Morton wrote:

And while the state has the undeniably strong interest in confining Medicaid expenditures within the amount appropriated by the state legislature, [citing state statutes] that interest cannot justify the contravention of clear federal mandates to the resulting injury of Medicaid recipients.

*Id.* at 9–10.

Other courts have found the State's prior consultation of a properly constituted MCAC to be mandatory on matters involving policy development and program administration. *Kansas Hosp. Assn. v. Whiteman,* 835 F.Supp. 1556, 1572–73 (D.Kan.1993);[16] *Turner v. Heckler,* 573 F.Supp. 867, 871 (N.D.Ohio 1983) *rev'd* on other grounds, 783 F.2d 657, 662 (6th Cir. 1986); *Morabito v. Blum,* 528 F.Supp. 252, 264 (S.D.N.Y.1981). As the District Court stated in *Morabito,* decisions are uniform in requiring prior consultation before enactment of the state's policy decision.

The cases are unanimous that, where consultation with the medical care advisory committee is required, the *committee's input must be sought and received before the state action in question, and not after the fact. Jennings v. Alexander,* (1981–1) Medicare & Medicaid Guide (CCH) P 30,735, at 9163–64 (M.D.Tenn. Sept. 3, 1980); *Dunn v. Ginsberg,* supra note 10, (1981–1) Medicare & Medicaid Guide (CCH) at 9465; *Becker v. Toia,* 439 F.Supp. 324, 332–33 (S.D.N.Y.1977); Ho v. Chang, (1977) Medicare & Medicaid Guide (CCH) P 28,433, at 9526–27 (D.Hawaii Apr. 27, 1977); *Robinson v. Maher,* (1976) Medicare & Medicaid Guide (CCH) P 27,707, at 9052–53 (D.Conn. Jan. 19, 1976). See

also Medical Assistance Manual, supra, at 16 (state agency must "consult the (medical care advisory committee) before initiating programs and before taking action within the realm of any of its designated functions") (emphasis added). *The requirement of prior consultation is rooted in the fact that medical care advisory committees are purely advisory in nature, having no power either to ratify or to veto any action that the state Medicaid agency proposes to take. Benton v. Rhodes,* 586 F.2d 1, 3 (6th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1539, 59 L.Ed.2d 791 (1979). Thus, the only way that medical care advisory committees can be given the "meaningful participation" that is required by 42 C.F.R. s 431.12(e) is to consult them prior to the action in question.

*Morabito,* 528 F.Supp. at 252 (emphasis added).

Moreover, the importance of a prior review by a MCAC is reflected in Judge Morton's observation that "[h]ad the MCAC been fully involved in considering the changes in the manner contemplated by the federal regulators, 42 C.F.R. § 431.12, solutions might well have been found which would have had a much less severe impact on the availability of services than ... the regulators proposed." *Jennings,* 80–2043–NE–CV at 8. *See also Morabito,* 528 F.Supp. at 264 (citing cases and other authorities).

The Sixth Circuit has stated that once "the Medical Assistance Advisory Committee was sufficiently apprised of the problems, 'it was not necessary for the state officials to obtain the consent of the Committee to the reduction of the optional benefits.' " *Benton v. Rhodes,* 586 F.2d 1,

---

**16.** To be sure, in *Whiteman,* the District Court did not deem a MCAC violation to warrant injunctive relief. 835 F.Supp. at 1573. *Contra Jennings* and *Becker v. Toia,* 439 F.Supp. 324, 332 (S.D.N.Y.1977) (awarding injunction).

3 (6th Cir.1978). Here, Dr. Shackleford's committee never reviewed the proposed new TennCare waiver before its submission to CMS.

The Second Circuit has held that the MCAC regulation is inapplicable to changes made by the state legislature. *Himes v. Shalala*, 999 F.2d 684, 691 (2d Cir.1993). The new TennCare waiver changes are not statutory changes that were enacted by the General Assembly. While key legislative committees were consulted and approved the waiver changes, these waiver changes were not statutory changes authorized by the state legislature.

In sum, this Court concludes that this MCAC regulation applied to the "policy development" of the new TennCare waiver that clearly impacts the level of "care and medical services" available to enrollees. Further, as in *Jennings*, a properly constituted MCAC was not consulted on the new TennCare waiver prior to the Defendant's submission of the amended waiver to CMS.

■■■ Even if post-approval consultation were sufficient, the Court also concludes that from a review of its members, Dr. Shackleford's committee was not a duly consulted MCAC due to the lack of a committee member who is a Medicaid recipient. 42 C.F.R. §§ 431.12(d) requires such representative members for a duly constituted MCAC and these are mandatory provisions. From Dr. Shackleford's description of this committee, its membership does not include a Medicaid recipient, as required by 42 C.F.R. § 435.12(d)(2). This committee membership regulation has been held to be mandatory. *Kansas Hosp. Assn. v. Whiteman*, 835 F.Supp. 1556, 1577, n. 32 (D.Kan.1993) (citing 42 C.F.R. § 435.12(d)(2) and noting that "[t]he committee must include—members of consumer groups, including Medicaid recipients....").

Thus, the Court concludes that the Defendant's clear failure to consult a MCAC on this policy development that adversely impacts current enrollees prior to its submission to CMS, as required by 42 C.F.R. § 431.12(e), invalidates any attempt to effect this policy change.

The Defendant argues that the MCAC regulation is limited to consultation on issues of "health and medical services." See 42 C.F.R. § 431.12(a) and (b). Yet, 42 C.F.R. § 431.12(e) clearly mandates a MCAC's "participation in policy development." When subsection (a) and (e) are read together, the consultation obligation under § 431.12(e) applies to the Defendant's new waiver application process because that decision is a "policy development" that clearly impacts "health and medical services" available under the plan. The defense argument is without merit.

The Defendant's reliance upon *Georgia Hospital Assn. v. Dept. of Med. Assistance*, 528 F.Supp. 1348, 1355 (N.D.Ga. 1982) is misplaced because there, "the Court [found] that the Medical Advisory Committee, through the expanded Hospital Subcommittee had ample opportunity to advise the Department regarding the project." *Id.* Here, a MCAC does not exist and could not have been consulted. Further, the Defendant's argue that in *Georgia Hospital Assn.*, the Court ruled that "because the relevant Medicaid statute 'contains no requirement that a project must not impose additional changes on non-Medicaid or non-Medicare patients,'" that the Defendant's policy change was permissible. (Docket Entry No. 230, Defendant's Memorandum at 19 (quoting *Georgia Hospital Assn.*)). That Court actually noted that "the secretary lawfully waived this provision...compliance with it is [therefore] irrelevant." *Id.* at 1357. In the Court's view, *Georgia Hospital Assn.* is factually inapposite.

■ This Court follows *Jennings,* a decision of this Court. The other circuit decisions are not binding on this Court. *Roddy v. State of Tennessee,* 366 F.Supp. 33, 35–36 (E.D.Tenn.1973). The record does not reflect that CMS or HCFA was informed of the lack of MCAC's participation and, even if they were, the Sixth Circuit does not allow administrative agencies to ignore their applicable rules and regulations. *Antonuk v. United States of America,* 445 F.2d 592, 595 (6th Cir. 1971)("Where Congress or administrative agencies themselves lay down procedures and regulations, these cannot be ignored in deference to administrative discretion.") (citations omitted). Judicial deference to an administrative agency's determination arises where the agency actually interprets the applicable regulation. *Rust v. Sullivan,* 500 U.S. 173, 186–87, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991).

The Defendant next cites *Visiting Nurse Assoc. of North Shore v. Bullen,* 93 F.3d 997, 1010 (1st Cir.1996) and *Mississippi Hospital Assoc., Inc. v. Heckler,* 701 F.2d 511, 523 (5th Cir.1983) for the contention that violations of the MCAC regulation do not warrant judicial relief. The First Circuit in *Bullen* did not actually decide this question *Bullen,* 93 F.3d at 1010, n. 14: "Plaintiffs urge us to affirm the district court on another ground...[that] [b]efore implementing the final class rates in January 1994, Defendants failed to consult with a Medical Care Advisory Committee...We decline Plaintiff's request." *Id.* The First Circuit, however, did note that "HCFA might reasonably conclude that (1) a state's failure to consult a MCAC...does not constitute a sufficient ground for disapproving a plan amendment in all circumstances." Yet, in its approval letter, CMS, HCFA's successor, did not consider the MCAC issue. Prior correspondence with HCFA to Tennessee officials reflected that there would not be an implied waiver of any applicable regulations.

Second, the *Mississippi Hospital Assn.* has been characterized as seriously in doubt in light of subsequent precedents. *Illinois Health Care Assn. v. Bradley,* 776 F.Supp. 411, 419, n. 18 (N.D.Ill.1991). As to the MCAC regulation, the Fifth Circuit conceded:

Conceivably the complete absence of an MCAC or one that is improperly constituted or exists in name only, *or in the failure to consult the committee on a fundamental policy change in a reimbursement plan, might contravene the vague requirement in 42 C.F.R. § 431.12(e)* that "[t]he committee must have the opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program."

701 F.2d at 523 (quoting 42 C.F.R. § 431.12(e)) (emphasis added).

The Defendant also cites *Florida Pharmacy Assn. v. Cook,* 17 F.Supp.2d 1293, 1302 (N.D.Fla.1998) for the proposition that the MCAC regulation is unenforceable. Yet, in *Cook,* an Eleventh Circuit ruling barred the District Court's enforcement of a Medicaid regulation. *Id.* (citing *Harris v. James,* 127 F.3d 993, 1009 (11th Cir.1997)). Further, the District Court concluded that the MCAC was not "intended to benefit health care providers." 17 F.Supp.2d at 1302, citing *inter alia Blessing.* Here, unlike *Harris,* Plaintiffs are Medicaid recipients, not health care providers. Plaintiffs are also the intended beneficiaries of the MCAC regulation that involves professional as well as Medicaid recipients who have a role in what services will be provided and the policies and procedures governing those services. Further, the Eleventh Circuit's ruling in *Harris* is not binding on this Court and is contrary to this Court's precedents, i.e. *Jennings.*

This Court concludes that where, as here, there is a complete lack of any MCAC participation in the adoption of this fundamental policy change, this is the type of situation contemplated by the Fifth Circuit when the MCAC regulation should be enforced. The Court concludes that these authorities cited by the Defendant are inapposite.

### E. Plaintiffs' Procedural Due Process Claims

Plaintiffs assert procedural due process claims for alleged inadequate notices, lack of effective appeals from terminations or denials of coverage and failure to provide reasonable accommodations to mentally disabled and LEP individuals. These claims arise under the Medicaid regulations and parties' Agreed Order and Settlement Agreement.

The applicable Medicaid regulations require the State's procedures comply with constitutional due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). 42 C.F.R. § 431.205(d). Paragraph One of the Agreed Order, at p. 2, permanently enjoins the defendant "from terminating, reducing or suspending the TennCare coverage of members of the plaintiff class who are enrolled in the TennCare program, without affording such individuals notice and an opportunity for hearing in accordance with 42 C.F.R. Part 431, Subpart E." The same paragraph also permanently enjoins the defendant from failing to afford such notice and opportunity for hearing when class members' applications for TennCare are denied.

The Defendant argues that in the new TennCare waiver, CMS clearly authorized termination of coverage "in the absence of a reapplication and redetermination of eligibility." (Docket Entry No. 436, Defendant Exhibit at 3).[17] In such instances, the Defendant argues that continuation of TennCare coverage is not required nor does Subpart E apply. *See* Docket Entry No. 436, Defendant's Memorandum at 11. In a word, CMS's authorization preempts the applicability of Subpart E.

Plaintiffs respond that in its "List of Sections Waived" in its letter of approval of the TennCare waiver application, CMS did not mention Subpart E. (Docket Entry No. 331, Notice of New TennCare Waiver, Exhibit A at 1–4). The May 30, 2002 letter from CMS granting the waiver states:

> Under the authority of section 1115(a)(2) of the [Social Security] Act, expenditures made by the State for the items identified below (which are not otherwise included as expenditures under section 1903) shall, for the period of the project, be regarded as expenditures under the State's Title XIX plan. *All requirements of the Medicaid statute will be applicable to such expenditures, except those waived above and those specified below as not applicable to these expenditure authorities* ...

(Docket Entry No. 331, Notice of Waiver, Exhibit A at 3 (emphasis added)). In response to Plaintiffs' counsel's letter, CMS reaffirmed its policy against an implied waiver of Medicare regulations. (Docket Entry No. 437, Stipulations of Parties at Exhibit D).

Under *Alexander*, the State waiver plan must comply with Medicaid regulations. 469 U.S. at 289, n. 1, 105 S.Ct. 712. As discussed above, Supreme Court and Sixth

---

**17.** If CMS fails to act or approve a plan proposal in six (6) months, the plan is automatically approved. 42 C.F.R. § 430.16 (1996). The Defendant's original waiver was submitted on October 1, 2001, and supple-mented in February, 2002. The waiver amendments had been pending more than six (6) months as of CMS's May 30, 2002 approval letter.

precedents impose constitutional limitations on the denial of applications for benefits and/or coverage under the Medicaid Act. The Medicaid regulation, 42 C.F.R. § 431.205(d), endorses and incorporates these constitutional principles into all state plans. These legal principles, coupled with CMS's policy against implied waivers, lead the Court to conclude that Subpart E remains applicable to the new TennCare program, notwithstanding the cited language in the TennCare waiver plan.

The Defendant next argues: (1) that Plaintiffs do not have cognizable legal interests to give rise to enforceable rights under Subpart E, and (2) that Subpart E does not apply to the denial of coverage based upon an enrollee's failure to complete the reverification process. For its first contention, Defendant cite *Banks v. Block*, 700 F.2d 292, 294 (6th Cir.1983) and *Holman v. Block*, 823 F.2d 56, 59 (4th Cir.1987) for the legal proposition that the due process protections under *Goldberg* do not apply to government benefits that are available only for specific time periods. Thus, the Defendant contends that with the requirement of an annual reverification process, Plaintiffs lack any protectable property or liberty interests in their Tenn-Care coverage.

In *Banks,* the Sixth Circuit reviewed the Food Stamp Program that has a "certification period authorized by statute, 7 U.S.C. § 2012, under which a person is approved for food stamps only for 3 to 12 months." 700 F.2d at 293. This certification period was held to preclude any constitutional interest in the certification card pending a reverification determination beyond the certification period. *Id.* at 297. The Sixth Circuit deemed those plaintiffs to be "like first-time applicants." *Id.* at 298. Yet, the Sixth Circuit distinguished its holding from government "benefits, on a continuous basis, so long as they remained eligible... The welfare benefits involved in *Goldberg* were not statutorily limited, but continuous." *Id.* at 297.

The Fourth Circuit's ruling in *Holman* relies on *Banks,* and makes the same distinction as the Sixth Circuit in *Banks.* 823 F.2d at 59 ("[The Sixth Circuit] distinguished the due process rights of food stamp recipients from those individuals in cases such as *Goldberg* ... who received welfare benefits *unlimited by any statutory period.*")(emphasis added).

Unlike the Food Stamps Act, the Medicaid Act does not have a limited statutory certification period that automatically expires. To be sure, 42 C.F.R. 435.916(a) and TennCare Rule 1200–13–12–02(5)(12) refer to an annual reverification process. Yet, Medicaid regulations require these benefits to be continuous until all appeals are exhausted. 42 C.F.R. §§ 431.230(a) and 431.232(d). This Circuit and other courts have ruled, persons who receive benefits under the Medicaid Act are entitled to the continued receipt of Medicaid benefits pending a final determination of ineligibility. *Crippen v. Kheder,* 741 F.2d 102, 107 (6 th Cir.1984). *Daniels v. Wadley,* 926 F.Supp. 1305, 1312 (M.D.Tenn. 1996) *rev'd on other grounds,* 145 F.3d 1330, 1998 WL 211763 (6th Cir.1998); *Moffitt v. Austin,* 600 F.Supp. 295, 297 (W.D.Ky.1984).

Given that *Banks* and *Holman* involved food stamp recipients who received a different federal statutory scheme than the Plaintiffs here, the Court deems *Banks* and *Holman* to be legally and factually distinguishable from TennCare enrollees.

The Medicaid Act requires state Medicaid agencies to provide notice and "the opportunity for a fair hearing to any individual whose claim for medical assistance is denied or not acted upon with reasonable promptness." 42 U.S.C. §§ 1396a (a)(3). Under Subpart E, state agencies are explicitly required to adopt a hearing

system that satisfies the due process standards established by *Goldberg* and additional standards established by the regulations. 42 C.F.R. §§ 431.205(d); *Perry v. Chen,* 985 F.Supp. 1197, 1203 (D.Ariz. 1996); *Moffitt,* 600 F.Supp. at 298–99. In *Goldberg,* the Court held that welfare payments could not be discontinued without notice and evidentiary hearing. The hearing must be at a meaningful time and in a meaningful manner. 397 U.S. at 267, 90 S.Ct. 1011. *Goldberg* held that the recipient must be able to appear personally before the final decisionmaker, to present evidence orally, and to confront and cross-examine adverse witnesses. *Id.* Moreover, the recipient must be permitted to retain counsel, if he or she so desires. *Id.* at 270, 90 S.Ct. 1011. Finally, the decisionmaker's conclusion must rest solely on evidence adduced at the hearing. *Id.*

Prior to termination of any benefits under the TennCare waiver, 42 C.F.R. § 431, Subpart E requires, in pertinent part, that:

(a) The State agency must grant an opportunity for a hearing to the following:

(1) Any applicant who requests it because his claim for services is denied or is not acted upon with reasonable promptness.

(2) Any recipient who requests it because he or she believes the agency has taken an action erroneously...

42 C.F.R. § 431.220(a).

42 C.F.R. § 431.206(b) and (c) also impose the notice requirements to "every applicant or recipient" "[a]t the time of any action affecting his or her claim." 42 C.F.R. § 431.206(c)(2). In such instances, notice must inform the "applicant or recipient" of "[a] statement of what action the State ... intends to take"; "[t]he reasons for the intended action; and [t]he specific

regulations that support ... the action." 42 C.F.R. § 431.210(a)(b) and (c). The term "action" is defined as "a termination, suspension, or reduction of Medicaid eligibility or covered services." 42 C.F.R. §§ 431.201. 42 C.F.R. § 431.220(a).

Paragraph One of the Agreed Order, permanently enjoins the defendant "from terminating, reducing or suspending the TennCare coverage of members of the plaintiff class who are enrolled in the TennCare program, without affording such individuals notice and an opportunity for hearing in accordance with 42 C.F.R. Part 431, Subpart E." The same paragraph also permanently enjoins the defendant from failing to afford such notice and opportunity for hearing when class members' applications for TennCare are denied. The federal regulations enforced by the injunction include a requirement that the State's procedures comply with constitutional due process standards set forth in *Goldberg;* 42 C.F.R. § 431.205(d).

As the Court understands the Plaintiff's procedural claims,[18] those claims are as follows: (1) the Defendant's reverification notices are generally intimidating particularly to SPMI and SED enrollees so as to be ineffective notices; (2) that the notices to the SPMI and SED enrollees are inadequate for Defendant's failure to consult an appropriate expert on the notices' content; (3) the denial notices to enrollees who did not submit a complete application is insufficient due to an improper reason for denial and inadequate explanation to allow the enrollee an effective appeal; (4) the notices do not inform SPMI and SED enrollees of the Family Assistance Line or the importance of the 45 day application period for ME coverage; (5) the notices do not in-

---

**18.** *See* Plaintiff's Revised Proposed Findings of Fact and Conclusions of Law at 77–110. Given the excessive duplication in the Plaintiff's Proposed Findings of Fact and Conclu-

sions of Law, the Court has had great difficulty understanding the Plaintiffs' precise claims and their rationale.

form enrollees of the good cause rule for extensions of deadlines; (6) the notice returning an incomplete ME reverification packet does not inform the enrollee of his or her appeal rights; (7) the dual appeals processes impermissibly restrict the scope of an enrollee's appeal.

### 1. Plaintiffs' Claims of Notice Violations

The challenged notices are provided to enrollees at different stages of the reverification process: (1) at the application stage; (2) at the determination of eligibility stage; and (3) at the appeal stage.

### a. Adequacy of Notices to SPMI and SED Enrollees

 The Court addresses all of the inadequate notice claims affecting SPMI and SED enrollees jointly except for the inadequate notice of the good cause rule. First, the undisputed evidence is that an expert was not consulted to evaluate notices sent directly to SPMI and SED enrollees. Second, from the Court's review of the notices and the various forms and applications, the Court concludes that a SPMI and/or SED enrollee could not understand these notices. As found earlier, these enrollees need CMHCs and/or personal attention to understand their obligations in the reverification process. The notices do not inform the SPMI and SED enrollees of the Family Assistance Line.

The Court finds that the notices, considered collectively, inform enrollees of the significance of the deadlines. In some notices, the importance of the deadline is in page two (2) of the notices. The notices would be more effective if the prospect for denial of coverage for failure to comply with the deadlines were prominently displayed at the beginning of page one (1) of the first notice and on each notice thereafter. Yet, for the reasons stated above, notwithstanding notice of the deadlines' importance, those notices are ineffective for the SPMI and SED enrollees.

Given that the reverification process can result in a termination of coverage, 42 C.F.R. § 431.210 requires notice of "what action the State... intended to take." Under 42 C.F.R. § 431.205(d), the notice requirements must also satisfy the *Goldberg* constitutional standards. These constitutional standards for adequate notice requires the notice be reasonably calculated to inform the recipient of the action to be taken and an "effective opportunity to be heard.." *Goldberg*, 397 U.S. at 268, 90 S.Ct. 1011; *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

The Court concludes that the Defendant's election to include the same notices to SPMI and SED enrollees as a part of the issuance of notices to all waiver eligibles, is not notice reasonably calculated to inform these enrollees in compliance with the constitutional requirements set forth in *Goldberg*. The Court earlier found that a protocol with CMHC was necessary to provide effective communication with this group of enrollees and required the Defendant to develop a protocol to do so. The Defendant's notices in the reverification process are contrary to that protocol. Thus, the Court agrees that notices sent directly to SPMI and SED enrollees are inadequate notices of reverification and do not comply with 42 C.F.R. § 431.210.

### b. Lack of Notice of Good Cause

 Plaintiffs' next challenge is that the Defendant's initial notices fail to provide sufficient information to all enrollees about the good cause exception of the time limits. For enrollees who are subject to redetermination and who submit a signed application, these enrollees have 45 days to complete the first phase of the reverification process, including an interview. The only exception to the forty-five (45) day limit is good cause extension. TDHS may

grant a good cause extension in accordance with Bureau/TDHS policies. (Plaintiffs' Exhibit No. 51, TennCare Standard Rules, Rule 1200–13–14–.02(7)(f) at 18).

For the reverification, the notice requirements of § 431.206(b) and (c) apply to "every applicant or recipient" who is entitled to notice "[a]t the time of any action affecting his or her claim." 42 C.F.R. § 431.206(c)(2). In such instances, notice must inform the "applicant or recipient" of "[a] statement of what action the State . . . intends to take"; "[t]he reasons for the intended action; and [t]he specific regulations that support . . . the action." 42 C.F.R. § 431.210(a)(b) and (c). Here, none of the notices cite the regulations upon which the Defendant relies.

From the Court's review of the initial notices to enrollees before the determination of eligibility, the Defendant does not inform enrollees of this good cause regulation to extend the deadlines. Given the significance of non-compliance within the stated 45–day deadline, coupled with Defendant's failure to cite the Medicaid regulation authorizing the reverification, the Court concludes that this failure to inform enrollees of the good cause exception, violates the enrollees' rights to be informed of "what action the state intends to take." 42 C.F.R. § 431.210(a)(b) and (c). Clearly, the TDHS workers may decide to exercise their discretion to find good cause. Yet, the enrollees are not informed of the action the Defendant intends to take.

To be sure, there are other notices of good cause, but only after an adverse decision on ME coverage. If the initial Medicaid reverification process is not completed timely, that omission is not only ground to terminate coverage, but also can bar the enrollee's consideration for any TennCare Standard coverage. A person may reapply, but without coverage during the interim. Courts have recognized this interim denial as a cognizable injury. *Markva v.*

*Haveman,* 168 F.Supp.2d 695, 719 (E.D.Mich.2001)(". . . [T]he preceding cases . . . establish the principle that denial or delay in benefits which effectually prevents plaintiffs from obtaining needed medical care constitutes irreparable harm."). Thus, the Court concludes that the notice's failure to inform the enrollee of good cause regulation to extend the deadline, violates 42 C.F.R. § 431.210.

### c. Inadequate Notices of Appeals at the Termination Stage

■ Plaintiffs next challenge the Defendant's effective termination of coverage without notice of appeal rights for those enrollees who did not submit a completed ME packet and whose incomplete ME application is returned without notice of the enrollee's right to appeal its rejection.

It is clear from the Defendant's form letter that the enrollee whose ME recertification packet is returned as incomplete, is not informed of his or her appeal rights on the Defendant's letter returning the packet. (Defendant's Exhibit No. 1, Johnson Declaration at Attachment H). If the enrollee resubmits the packet, notices of appeal rights are given for denial of coverage as well as for denial for an untimely submission. *Id.* at Attachment I.

Given the separate ME application process under TennCare rules, the complexity in the Defendant's reverification process and the adverse impact of an enrollee's failure to submit a timely application, the Court concludes that an enrollee for ME eligibility must be informed of his or her right to appeal at every stage, including in the letter returning the enrollee's incomplete ME application. *See Harrell v. Harder,* 369 F.Supp. 810, 826 (D.Conn. 1974). To this extent, for the failure to inform such enrollees of their rights to appeal the Defendant's notice in this form (Defendant's Exhibit No. 1, Johnson Dec-

laration at Attachment H) is inadequate under 42 C.F.R. § 431.210(a).

### d. Inadequate Notice of Reasons of Denial

■ The Plaintiffs' next claim is that the Defendant provides an inadequate notice of denial for enrollees whose reverifications are denied as incomplete, but only in those letters that use variable reason number eight (8) stating: "You did not finish the application process for Tenn-Care." (Defendant's Exhibit No. 1, Johnson Declaration, Attachment F at unnumbered page 6).

■ *Goldberg* expressly requires that the notice must be sufficient to allow an "effective opportunity to be heard." 397 U.S. at 268, 90 S.Ct. 1011. Constitutionally sufficient notice is notice that will "permit adequate preparation for an impending hearing." *Craft*, 436 U.S. at 14, 98 S.Ct. 1554 (citations omitted). Thus, "[w]hat Goldberg essentially held . . . and federal regulators seek to implement is that a public welfare recipient must be given information sufficient to avail him the opportunity to defend the impending termination of his benefits." *Richardson v. Kelaher*, 1998 WL 812042 *6 (S.D.N.Y. 1998) (citing *Henry v. Gross*, 803 F.2d 757, 766 (2nd Cir.1996)). 42 C.F.R. § 431.220(b) grants "any recipient" the right to request a hearing "if he or she believes the agency has taken an action erroneously." 42 C.F.R. § 431.221(b) mandates that "[t]he agency may not limit or interfere with the applicant's or recipient's freedom to request a hearing." In such instances, coverage must be reinstated "if a recipient requests a hearing not more than 10 days after the date of the action."

Inasmuch as the failure to complete a signed application within 45 days is ground to terminate TennCare coverage of an enrollee, the Court concludes that this consequence constitutes an adverse action that triggers the right to effective notice for an appeal under Medicaid regulations. These enrollees who receive these notice of denial letters are not informed of the specific deficiency in their applications. Given that the Defendant is in the better position to identify the particular deficiency as to what was lacking to cause the enrollee not to complete the reverification process, the Court finds that this particular notice form, when used, is legally insufficient notice, in violation of 42 C.F.R. §§ 431.205(d) and 431.210.

As stated earlier, the TennCare enrollees in the reverification process are not applicants, but current recipients whose eligibility for TennCare was previously determined. As such, these enrollees, including those enrollees who did not complete the initial reverification form, have the right to notice of their appeal rights and to appeal the terminations of their TennCare coverage under 42 C.F.R. § 431.220(b). The Defendant cannot interfere with or limit this right. 42 C.F.R. § 431.221(b).

■ Plaintiffs' related challenge is that the notices do not inform the enrollee of the dual appeals process, i.e., Medicaid appeals to TDHS and TennCare Standard decisions to TennCare Bureau. To be sure, the form denial letters reflect notices of the different types of appeals processes. (Defendant's Exhibit 1, Johnson Declaration at Attachments F, G, I, N and P). The Court concludes that with these notices of the right to appeal, the enrollees are effectively informed of the multiple appeal processes.

### F. Plaintiffs' Rights to Accommodations

According to the Plaintiffs, the Defendant breached his legal obligation to accommodate enrollees with known disabilities, specifically SPMI and SED enrollees

as well as enrollees with LEP, in the following respects: [19]

- Failure of TennCare rules to provide exceptions in the reverification process for SPMI, SED, LEP enrollees and other disabled enrollees;
- Failure to provide adequate information about assistance during the reverification process;
- Failure to develop methods to identify SPMI and SED enrollees so as to ensure them accommodations in the reverification process;
- Failure to provide adequate assistance to meet these enrollees obligation for reverification.

Plaintiffs raise other issues, citing SPMI and SED enrollees that are essentially substantive policy changes that do not involve accommodations. Those contentions are discussed later in this Memorandum.

██ The Defendant has a legal responsibility to provide reasonable accommodations for individuals with disabilities. The Second Circuit in *Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2nd Cir.1982), stated that "[i]t is not enough to open the door for the handicapped...; a ramp must be built so the door can be reached." Further, the undisputed proof is that the parties' settlement agreement, the Defendant's new TennCare rules and federal Medicaid polices require an accommodation of disabled persons, particularly the SPMI and SED enrollees as well as of other enrollees with mental and physical disabilities during the Medicaid process.

In earlier proceedings, the Court found inadequacies in the State's treatment of Plaintiff class members with SPMI. On October 3, 2000, at a hearing on an earlier motion for a preliminary injunction, the Court heard testimony that the SPMI enrollees were subject to denials of TennCare coverage without being afforded even the most basic elements of due process guaranteed by federal regulations. At the conclusion of that hearing, the Court urged State officials to address the SPMI enrollees' urgent needs. (Docket Entry No. 143, Transcript, 10/2/00, at 142–48; Docket Entry No. 144, Transcript, 10/3/00, at 212).

On August 28, 2001, the Court held a hearing on the matter and ruled on September 14, 2001 that the State was still denying due process to the SPMI enrollees. (Docket Entry No. 200–201, Memorandum and Order). On September 28, 2001, the defendant filed documents outlining a new process that would ensure compliance with the Agreed Order and federal regulations as to the SPMI enrollees. (Docket Entry No. 214). The Court approved the procedures the same day (Docket Entry No. 215), but the State did not implement the new protocols, and the SPMI enrollees continued to suffer a denial of TennCare coverage without being afforded due process.

The protocol approved by the Court last September provided that, if an SPMI individual went to a CMHC seeking mental health services, the CMHC would help the person apply, or re-apply, for TennCare. (Docket Entry No. 213, Notice of Filing, Attachment 1, TDMHDD Procedures at 1). Without seeking relief from the September 28th order adopting that protocol, the Defendant adopted a new policy. Under this new policy, persons who have been identified in the past as SPMI or SED individuals, but who have not received assessments within the past 12 months, now merely receive the standard notice of reverification. Notwithstanding their past SPMI or SED status, this standard notice to these

---

**19.** Plaintiffs assert other claims for these enrollees that are rendered moot by the Court's earlier conclusions on the Defendant's inadequate notices of appeal rights and denials of appeals.

enrollees without current assessment is given without any *prior* effort being made to address their documented needs for assistance. The Court's protocol contemplated CMHC assistance before or contemporaneous with the issuance of any notice that could result in the loss of these enrollees' TennCare coverage.

The Court finds that Defendant has not provided these vulnerable enrollees with the necessary, consistent and uniform assistance, particularly with the new and complex reverification process requiring current assessments by defined dates or loss of their coverage. From the proof, Robert Lee Daniels, who is on Social Security disability with a mental impairment, was not given assistance. (Plaintiffs' Exhibit No. 95). Mary Parker, who has a bipolar disorder, likewise did not receive assistance in the reverification process. (Plaintiffs' Exhibit No. 99). The same is true for Gaile Martin, who suffers from clinical depression. (Plaintiffs' Exhibit No. 108). The inadequacies in the Defendant's notices, discussed earlier, underscore the necessity for this assistance. The Court accepts the testimony of the experienced mental health workers that, as a group, these enrollees need more time and assistance to protect against an erroneous termination of their coverage.

At the last evidentiary hearing, the proof was that the CMHCs that are the major source of assistance for this population, lack sufficient resources to assist the SPMI and SED individuals in completing the reverification process under the new TennCare procedures. (Plaintiffs' Exhibit No. 35, Draft Reverification Process for Non–Medicaid Enrollees with SPMI/SED). Plaintiffs' counsel asserts that they warned the Defendant of the harm to the SPMI population in the new process. (Certificate of Plaintiffs' Counsel in Support of Request for Enforcement of Order ¶ 9, and Attachment G; Plaintiffs' Notice of Filing,

Plaintiffs Exhibit 15, Declaration of Charles R. (Dick) Blackburn).

To be sure, significant members of SPMI and SED individuals have been processed under the new reverification process. Yet, the Fourth Circuit affirmed an injunction in *Alexander v. Hill,* 707 F.2d 780, 782–83 (4th Cir.1983), *cert. denied,* 464 U.S. 874, 104 S.Ct. 206, 78 L.Ed.2d 183 (1983), where, as here, there was a history of a State's noncompliance, stating that the goal is 100% compliance. In *Fortin v. Comm'r of the Massachusetts Dep't of Public Welfare,* 692 F.2d 790, 794–95 (1st Cir.1982), the First Circuit upheld a District Court's finding of "substantial noncompliance" despite a state agency compliance rates ranging from 79% to 94.4%. *Accord Smith v. Miller,* 665 F.2d 172, 175 (7th Cir.1981) ("[w]hile a state's participation in the Medicaid program is purely voluntary and its acceptance of substantial funds uncoerced, once electing to participate, it must fully comply with federal statutes and regulations in its administration of the program") (emphasis added). *See also Salazar v. District of Columbia,* 954 F.Supp. 278, 325 (D.D.C.1996).

Although the Defendant has taken additional measures to provide assistance to SPMI and SED individuals, including through TPAL and CMHCs, as of the July, 2002 hearing, the Court concludes the Defendant had not fully secured the CMHCs' role in assisting these enrollees to assure the Court that enrollees in this category were adequately accommodated during the July, 2002 to December, 2002 reverification process. To be sure, some members in this category did complete the process, but the Court remains concerned that for this particularly vulnerable group, the Defendant's accommodations are not reasonable. To remedy this inadequacy, requires reinstatement of coverage to these SPMI and SED enrollees whose cov-

erage was terminated during this reverification period beginning July 1, 2002.

## G. Lack of LEP Accommodations

As to LEP enrollees, the Defendant notes that language accommodations are not constitutionally required, citing *Soberal–Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir.1983) and *Vialez v. New York City Housing Authority*, 783 F.Supp. 109, 121 (S.D.N.Y.1991). Yet, the parties' Settlement Agreement is incorporated by reference into the Agreed Order. (Docket Entry No. 171, Agreed Order ¶ 4). Paragraph 7, of the Settlement Agreement provides that "the scope of the Pacific Group's review shall be as follows:"

> "*Develop policies and procedures* concerning accommodations for people with known disabilities *or limited English proficiency* during the application, reverification, and appeals processes, including standards by which to identify applicants or enrollees who may have a disability or limited English proficiency, and processes by which to retain this information in the person's TennCare file, for subsequent use in providing notice to the person."

(Docket Entry No. 171, Settlement Agreement § I(A)(7)).

■■■■ The "Agreed Order" (Docket Entry No. 171) is, in effect, a Consent Decree. Consent "decrees are settlement agreements 'subject to continue judicial policing.'" *Grand Traverse Band of Ottawa and Chippewa Indians v. Director, Michigan Dept. of Natural Resources*, 141 F.3d 635, 641 (6th Cir.1998) *cert. denied* 525 U.S. 1040, 119 S.Ct. 590, 142 L.Ed.2d 533 (1998) (quoting *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017, 1018 (6th Cir.1994)) (citing *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "In addition, a consent decree must be construed 'to preserve the position for which the parties bargained.'" *Id.* at 641(quoting *Vanguards* ). "A District Court has the jurisdiction to enforce consent decrees." *Id.* at 641, citing *Vanguards*. Thus, the Court has jurisdiction to decide this motion.

■■■■ For governing principles on private settlement agreements, the Sixth Circuit stated that "[s]ettlement agreements are a type of contract subject to principles of state law." *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir.1992). "It is well established that 'a court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement.'" *Brown v. County of Genesee*, 872 F.2d 169, 173 (6th Cir.1989) (quoting *Brock v. Scheuner*, 841 F.2d 151, 154 (6th Cir. 1988)); *Accord Mallory v. Eyrich*, 922 F.2d 1273, 1279 (6th Cir.1991). Yet, for a private agreement, the Court must expressly retain jurisdiction to enforce the settlement agreement and in order to conduct any further proceedings after a dismissal order. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Here, the parties also agreed to file compliance reports for two years from the date of entry of the Agreed Order. (Docket Entry No. 171 at 11). Thus, there is an alternate basis for the Court's jurisdiction.

■■■■ Under Tennessee law, as a matter of general contract law principles, "the ascertainment of the intention of the parties to a written contract is a question of law or judicial function for the court to perform when the language is plain, simple and unambiguous," *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955); *Forde v. Fisk University*, 661 S.W.2d 883, 886 (Tenn.Ct.App.1983), "but, where the writing is not plain and unambiguous, and is such to require the aid of parol evidence, and the parol evidence is conflicting or such as admits of more than one conclusion, it is not error to submit the doubtful

parts under proper instructions to the trier of fact." *Forde,* 661 S.W.2d at 886.

Yet, ambiguity as to a contract's terms is not created because the parties disagree as to its meaning. *Oman Construction Co. v. Tennessee Valley Authority,* 486 F.Supp. 375, 382 (M.D.Tenn. 1979). One party's view of the contract does not necessarily mean that such provisions are part of the contract. *In re D.L. Bouldin Construction Co.,* 6 B.R. 288 (Bankr.E.D.Tenn.1980). Tennessee law generally allows enforcement of the parties' contract as written without questioning the wisdom of the contract or the harshness of its enforcement absent some public policy consideration. *Metropolitan Life Insurance Co. v. Humphrey,* 167 Tenn. 421, 425–26, 70 S.W.2d 361, 362 (1934); *Wilson v. Scott,* 672 S.W.2d 782, 786 (Tenn.Ct.App.1984). See also, *In re Dynamic Enterprises,* 32 B.R. 509, 518 (Bankr.M.D.Tenn.1983).

Under Tennessee contract law, "modification of an existing contract cannot be accomplished by the unilateral action of one of the parties. There must be the same mutuality of assent and meeting of minds as required to make a contract." *Balderacchi v. Ruth,* 36 Tenn.App. 421, 256 S.W.2d 390, 391 (1952). Tennessee law also imposes an implied duty of good faith dealing in every contract. *Wallace v. National Bank of Commerce,* 938 S.W.2d 684 (Tenn.1997). Yet, this duty "does not extend to the formation of the contract... [nor] beyond the terms of the contract and the reasonable contractual expectations of the parties." *Id.* at 687.

In Part I of the Settlement Agreement, the parties' agreed to a process of "review and enhancement of TennCare procedures," including the impact on LEPs. Pacific Health was "to assess [the TennCare Bureau's] policies, procedures and systems" on this as well as other issues. 42 C.F.R. § 431, Subpart E. Yet, the parties' agreement also expressly provides, however, that "the State retains ultimate responsibility and authority to decide what reforms, if any, are to be instituted" and that "[T]he consultation, monitoring, and reporting process agreed upon herein does not give the Plaintiffs veto power over the State's exercise of its policy-making prerogatives." (Docket Entry No. 171, Settlement Agreement, 2–3).

The Court agrees with the Defendant that the language of Section I(A)(7), read in context, did not reflect the Defendant's agreement to delegate to Pacific Health the authority to make decisions regarding the timing and nature of any reforms. The Defendant has also significantly complied with its LEP by converting several of his forms to several languages and offering a toll free language service. Plaintiffs, who speak only Vietnamese, have not proved that the toll free telephone line language assistance does not address their language needs. Yet, the Court is concerned that, except for notice of a language services telephone line, the Defendant's forms terminating coverage do not include in the notice the different languages that are on its other notices for reverification coverage. There is no proof, however, that any enrollee who speaks only a foreign language found the telephone and language services to be inadequate.

## H. Arbitrary Policies and Administration

The balance of Plaintiff's claims are really substantive challenges to certain provisions of the new TennCare waiver plan that Plaintiffs, in effect, contend are arbitrary and capricious. In a word, Plaintiffs' assert that some new TennCare rules and policies are contrary to Medicaid regulations. The Defendant's use of nonconforming rules can constitute

an abuse of the Defendant's discretion. As the Sixth Circuit states: "Where Congress or administrative agencies themselves lay down procedures and regulations, these cannot be ignored in deference to administrative discretion." *Antonuk*, 445 F.2d at 595. Moreover, "[a]n agency is obligated to interpret implementing legislation [or authority] in a reasonable manner and may not...promulgate regulation in a manner that is arbitrary and capricious in substance..." *Clark Regional Medical Center v. U.S. Dept. of Health & Human Servs.*, 314 F.3d 241 (6th Cir. 2002).

As stated earlier, the Defendant has substantial discretion with CMS's approval of its plan, and the plan enjoys a judicial deference unless the plan is shown to be "arbitrary and capricious [or] an abuse of discretion." *DeSario*, 139 F.3d at 95.

As the Court understands their remaining challenges to TennCare rules and practices, Plaintiffs are essentially asserting that:

- The Defendant's use of the 45–day deadline as a reason for denying eligibility violates 42 C.F.R. § 435.911(e);

- The Defendant's imposition of multiple applications for eligibility requirements violates federal policy that requires the state to consider all grounds for an enrollee's eligibility, citing 42 C.F.R. §§ 435.906 and 435.930(a);

- The Defendant's requirement that TennCare enrollees who are SPMI or SED enrollees must obtain a current CRG/TPG assessment is arbitrary and capricious;

- The Defendant's requiring persons known to be SPMI or SED enrollees to personally sign the Medical Eligibility application form violates 42 C.F.R. § 435.907(a).

### 1. The 45 Day Rule

Under the Medicaid Act, the state plan must provide medical assistance "with reasonable promptness." 42 U.S.C. § 1396a(a)(8). This "reasonable promptness" statutory mandate is reflected in Medicaid regulations for State waiver plans, requiring that a state "must establish time standards for determining eligibility and inform the applicant of what they are." 42 C.F.R. § 435.911(a). Significant here is that these regulations provide, in pertinent part:

(a) ... These standards may not exceed—

(1) Ninety days for *applicants* who apply for Medicaid on the basis of disability; and

(2) Forty-five days for all other applicants.

\* \* \* \* \* \*

(e) The agency must not use the time standards—

(1) As a waiting period before determining eligibility; or

(2) As a reason for denying eligibility (because it has not determined eligibility within the time standards).

*Id.*

CMS interprets Section 435.911 to impose time limits on states for processing *completed* applications and does not prohibit states from imposing *separate* limits on how long individuals may take to complete the application process prior to the state rejecting their application as incomplete. *See* State Medicaid Manual ¶ 2910A ("The date the application is completed and signed ...is the application date for purposes of timely processing under 42 C.F.R. § 435.911."). Yet, § 435.911(e)(2) explicitly notes that a state may not use the time limits in subsection (a) as a reason for denying eligibility when "*it has not*

*determined eligibility within the time standards."* *Id.* (emphasis added).

██ Section 435.911, however, applies to "applicants," but the Defendant's reverification process at issue involves enrollees. Among the challenged rules is TennCare Rule, 1200–13–14–.02(7), that is entitled "Redetermination of Eligibility." (Docket Entry No. 437, Exhibit E at 21). "Redetermination" is defined by TennCare rules as "the process by which TDHS initially determinates whether waiver eligible TennCare (non-Medicaid) enrollees who were enrolled in the TennCare program as of June 30, 2002 are eligible for TennCare Medicaid or TennCare Standard under the terms of the waiver program in effect as of July 1, 2002." Rule 1200–13–14–.01(89). *Id.*

Under the Medicaid regulations, a "redetermination" occurs in a different factual setting, i.e., where there is a change in the individual recipient's circumstances (not a policy change) and requires a prompt redetermination.

(a) The agency must redetermine the eligibility of Medicaid recipients, with respect to circumstances that may change, at least every 12 months, however—

(1) The agency may consider blindness as continuing until the review physician under § 435.531 determines that a recipient's vision has improved beyond the definition of blindness contained in the plan; and

(2) The agency may consider disability as continuing until the review team under § 435.531 determines that a recipient's disability no longer meets the definition contained in the plan.

(b) Procedures for reporting changes. The agency must have procedures designed to ensure that *recipients make timely and accurate reports of any change in circumstances that may affect their eligibility.*

(c) Agency action on information about changes. (1) *The agency must promptly redetermine eligibility when it receives information about changes in a recipient's circumstances that may affect his eligibility.*

(2) *If the agency has information about anticipated changes in a recipient's circumstances,* it must redetermine eligibility at the appropriate time based on those changes.

42 C.F.R. § 435.916(a) through (c).

The District Court in *King v. Sullivan,* 776 F.Supp. 645 (D.R.I.1991) explain the origin and purpose of § 435.916.

[T]his regulation grew out of concerns that people might continue to receive assistance after their medical or financial needs have subsided, (and) it also implicitly recognizes that a recipient's needs might grow. The regulation's command, in any event, is unambiguous. As this Court interprets these regulations, the appropriate State agency has a duty to make a prompt redetermination of a current recipient's eligibility—a level-of-care determination—when the recipient formally brings to the agency's attention a change in his or her circumstances that could make him or her eligible for a different level of services. Before the duty arises, the agency must actually receive the new information, and the information must reach the agency in a substantial format, such as in writing.

*Id.* at 657–58.

In a word, the Defendant is using a Medicaid regulation term in a different context to effectuate a policy change. There is not any evidence here of any "changes in a recipient's circumstances that may affect his [or her] eligibility." Moreover, Section 435.911(a) that is relied upon by the Plaintiffs, refers to new applicants whose eligibility is yet to be deter-

mined. This reverification involves enrollees, but the Defendant does refer to the enrollees as "applicants." Nonetheless, under Section 435.911(c), the Defendant must promptly redetermine eligibility. There is not any evidence that the 90–day period for submission of the reverification information nor the 45 days to decide eligibility are unreasonable under § 435.916(c)(1).

To the extent that Section 435.911(e) applies here, there is evidence that the Defendant uses the 45 days as a waiting period. In a word, the Defendant waits 45 days after a receipt of a signed verification form to determine if the application is complete and the TDHS interview is conducted. The Court's conclusion that the Defendant is using the 45 days as a waiting period arises from the Defendant's reference in the denial notice to the incomplete application and/or failure to arrange a TDHS interview as a basis to deny coverage. This denial is without consideration of what evidence may be in the Defendant's records, e.g., prior CTG/TRG assessment, that reflects the enrollee's eligibility as a ME eligible. The Defendant's sole reliance on the incomplete

application process as a ground for denial supports the conclusion that the Defendant is using the 45 days as a waiting period in violation of 42 C.F.R. § 435.916(e)(1) and (2).

To be sure, while there is proof that the 45 days is being used as a waiting period to terminate enrollees, there can be instances where an enrollee's incomplete packet may nonetheless give the Defendant the ability to determine applicable eligibility. For example, if the Defendant, in fact, reviewed what information was in the enrollee's file and denied coverage on that basis, the Court would conclude that the Defendant properly denied coverage. The evidence, however, does not reveal the latter to be the Defendant's practice.

### 2. TennCare's Failure to Consider All Eligibility Standards

▆ Another common fact to many of these claims is the dual application process involving two agencies[20] that are assigned overlapping responsibilities for reverification. Under this dual process, a decision by TDHS to deny coverage based upon an incomplete application, can bar any appli-

---

**20.** Although not raised by the parties, the Court notes that 42 C.F.R. § 431.10(e)(1) and (3) provide for a single agency to be responsible for a state waiver plan.

A state's Medicaid plan must "provide for the establishment or designation of a *single State agency to administer or supervise the administration of the plan.*" 42 U.S.C. § 1396a(a)(5). Implementing regulations provide, in pertinent part, that to qualify as a Medicaid agency

(1) *The agency must not delegate, to other than its own officials, authority to—*
(i) Exercise administrative discretion in the administration or supervision of the plan, or
(ii) *Issue policies, rules, and regulations on program matters.*
 * * * * * *
(3) *If other State or local agencies or offices perform services for the Medicaid agency,*

*they must not have the authority to change or disapprove any administrative decision of that agency,* or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.
42 C.F.R. § 431.10(e)(emphasis added). The Court reads the requirement of a single state agency to be mandatory in its terms and specific and detailed in its command to the states. Here, TDHS governs the Medicaid eligibility part and TennCare Bureau the TennCare Bureau controls the TennCare Standard issues. TDHS also decides good cause extensions for Medicaid reverification that can be dispositive of other coverage and render the TennCare Bureau's authority moot.

cation or approval of eligibility by the TennCare Bureau.

42 C.F.R. § 435.930(b) that is cited by Plaintiffs requires that the state "must continue to furnish Medicaid regularly to all eligible individuals until they are found ineligible." Moreover, CMS's policy requires that "States must ensure that termination from Medicaid occurs only after a determination that the family or individual is not eligible under *any* category of coverage, or after the individual or family fails to complete the renewal process after receiving a reasonable opportunity to do so." (Defendant's Proposed Findings of Fact, Exhibit A, "Continuing the Progress: Enrolling and Retaining Low–Income Families and Children in Health Care Coverage", Centers for Medicare & Medicaid Services, August, 2001, at 18) (emphasis added).

Here, the Defendant uses the enrollee's failure to submit a completed packet on Medicaid eligibility to justify the denial of any coverage under the TennCare coverage groups. Prejudice arises where the initial Medicaid application is denied as untimely and incomplete by TDHS and the enrollee cannot submit a ME reverification package to the TennCare Bureau. If the enrollee does not submit a timely and complete Medicaid packet, coverage is denied even though the enrollee may be a SPMI or SED enrollee who lacks a current CRG/TRG. The Defendant's rules define this group of enrollees in such a manner as would clearly qualify them as ME eligibles. The latter fact is reflected by these enrollees' current coverage as uninsurables. This practice that an incomplete Medicaid application bars eligibility for any TennCare coverage clearly prejudices those enrollees who are SPMI and SED. TDHS and/or the TennCare Bureau is aware of the mental disability status of these enrollees and their ME eligibility, but nonetheless terminates them. These enrollees

have been previously screened and have been determined to meet TennCare eligibility requirements.

The Court concludes that a reasonable interpretation of § 435.930(b) and the above cited CMS policy is that the Defendant must consider all enrollees until they are found ineligible under the new TennCare coverages. The Defendant's use of the 45–day rule here can terminate coverage of enrollees without consideration of eligibility under other coverage groups. This interpretation is contrary to the CMS policy that the individual must be considered for eligibility under "any category of coverage." The Court concludes that the Defendant's use of separate application processes to deny coverage before consideration of an enrollee's eligibility for all TennCare coverage groups violates 42 C.F.R. § 435.930(b) and CMS policy.

### 3. A Current CRG/TPG Assessment for SPMI and SED Enrollees

As discussed in detail above, under the new TennCare rules the SPMI and SED enrollees must have a current CRG/TPG assessment to be considered in that category. Yet, given the rules description of these enrollee's chronic and persistent restrictions and limitations, 1200–13–14–.01(92)(b) and 1200–13–14–.01(93)(a)2, 3 and (b), as well as the mental health experts' testimony that a person with these conditions does not change, the Court concludes that the requirement of a current CRG/TPG assessment is arbitrary and capricious.

The requirement of a current assessment and medical records imposes an arbitrary burden on the enrollees who have been previously determined to be waiver eligible. To add these additional requirements has the effect of deterring their efforts to maintain the medical coverage that they desperately need.

State officials estimated that more than 150,000 children and adults who have been previously determined eligible, would lose coverage without any evidence of a change of their circumstances as required by Medicaid regulations on reverification. (Plaintiffs' Exhibit No. 77 at 4; Docket Entry No. 381, Dedmon Testimony at 251 (25% of current enrollees are expected to lose their coverage)). To be sure, the evidence is that perhaps more than 200,000 enrollee who successfully navigated the prior Tenn-Care eligibility application process, may now have lost their TennCare coverage. (Docket Entry No. 448).

The Court notes that the cited structural deficiencies in the TDHS's management processes could cause erroneous terminations of coverage for enrollees, particularly of those who have disabilities, but do not have a current assessment as a SPMI or SED. Yet, the Court does not reach that issue as to non SPMI and SED enrollees because the proof does not establish a causal relationship to the losses of coverages to the cited administrative management inadequacies. The Court concludes, however, that without adequate notice of the State's intentions to terminate their coverage without a completed application, in all likelihood, ME enrollees who lost their coverages due to an incomplete ME application also had their coverage denied due to inadequate notices and denials of their rights to appeal.

**4. SPMI and SED Enrollee's Personal Signature Requirement**

■ Finally, Plaintiffs cited the Defendant's practice of requiring persons known to be SPMI or SED to sign the ME application form personally that is reflected in Defendant's Exhibit No. 1, Johnson Declaration, Attachment K at 3, as a violation of 42 C.F.R. § 435.907(a). The Defendant's form, at issue, reads, in pertinent part, as follow: "If an adult enrollee designates someone else (an 'authorized representa-

tive') to go to [T]DHS on his/her behalf, s/he must still sign the completed application (unless a legal guardian has been appointed, in which case the guardian can sign the form)." (Defendant's Exhibit No. 1, Johnson Declaration, Attachment K at 3).

42 C.F.R. § 435.907(a) and (b) provide that:

(a) The agency must require a written application from the applicant, an authorized representative, or if the applicant is incompetent or incapacitated, someone acting responsibly for the applicant.

(b) Subject to the conditions specified in paragraph (c) of this section, the application must be on a form prescribed by the agency and signed under a penalty of perjury.

*Id.*

The Court concludes that the Medicaid regulations do not require an appointed legal guardian. The Defendant's form suggests that the SPMI and SED individuals have to go to court to get an appointed legal guardian. The above-cited Medicaid regulations, however, allow an authorized representative or a responsible individual to appear and act on these enrollees' behalf. Thus, the Court concludes that the Defendant's form's language is too restrictive and this restriction is contrary to § 435.907(a) that allows a person who is incompetent or incapacitated to have an application submitted on the person's behalf by an authorized representative or someone acting responsibly on the applicant's behalf.

**I. Limiting Scope of Appeals and Coverage**

■ Plaintiffs' final challenge is that the Defendant's rule, effective January 1, 2003, will limit the scope of appeals to TDHS to matters relating to Medicaid eligibility only, and preclude an appellant from establishing his or her entitlement to

TennCare coverage under all possible eligibility criteria established by law, citing Plaintiffs' Exhibit No. 50, Johnson Deposition at 105–106. Further, absent a reapplication and redetermination of eligibility, coverage is automatically terminated.

For completed applications that are denied, continued coverage is available, but only for 10 days after the date of the letter of denial. (Defendant's Exhibit No. 1 at Attachment F). Given the mail process, the Court concludes, as a practical matter, that this means 7 days of prior actual notice of coverage termination. See Fed. R.Civ.P. 6(e) ("Whenever a party has a right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon the party and the notice or paper is serve upon the party under Rule 5(b)(2)(B), (C) or (D), *3 days shall be added to the prescribed period.*") (emphasis added).

Under these new rules, coverage is automatically terminated for failure to comply with the reverification process. Yet, under 42 C.F.R. § 431.221(b), the Defendant "may not limit ... the applicant's request for a hearing." To be sure, 42 C.F.R. § 431.220(b) states that "[t]he agency need not grant a hearing if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all recipients." For enrollees who appeal, coverage must be continued until the conclusion of the hearing process.

Given an enrollee's right to request a hearing for any action that denies coverage, the Court concludes that the enrollee or applicant has a right to appeal and in the event of an appeal, a right to continued coverage pending the results of a hearing. 42 C.F.R. § 431.230(a). Given that under the Defendant's rules, the Defendant does not inform enrollees or applicants with incomplete ME reverification and new TennCare applicants, of their rights to appeal, the Court concludes that the January 1, 2003 TennCare rule for automatic termination coverage for incomplete application would violate the enrollee's right to notice of his or her right to appeal and would interfere with his or her right to appeal in violation of 42 C.F.R. § 431.221(b).

## VIII. RELIEF AWARDED

In the Sixth Circuit, a district court considers four factors when ruling on a motion for preliminary injunction, including: "(1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the injunction; (3) whether a preliminary injunction would cause substantial harm to others and (4) whether a preliminary injunction would be in the public interest." *Samuel v. Herrick Memorial Hospital,* 201 F.3d 830, 832 (6th Cir.2000). *See also Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997); *Washington v. Reno,* 35 F.3d 1093, 1099 (6th Cir.1994). Yet, with the disposition of the merits on all claims, consideration of the preliminary injunction is moot. The Court nonetheless considers the factors of public interest and substantial harm to others in the relief to be awarded.

42 U.S.C. § 1396a(a)(19) requires federally funded Medicaid programs to be administered "in the best interests of [the program's] recipients."[21] The denial or termination of coverage to eligible enroll-

---

**21.** Although the reverification is for waiver eligibles, 8% of those waiver eligibles who completed the reverification process were found to be Medicaid eligible. It is a reasonable inference that the more than 200,000 waiver eligibles whose coverage was termi- nated, includes a percentage of recipients who also would be Medicaid eligible. This latter group includes the "categorically needy" that are clearly the intended beneficiaries under the Medicaid Act.

ees, without proper notice and right to appeal, particularly for eligible children and adults with severe mental illness, is not in the best interest of TennCare, including the "categorically needy" who are clearly Medicaid's statutory beneficiaries.

Given the Court's conclusion that a duly constituted MCAC was not consulted in violation of 42 C.F.R. § 431.12, the Court could invalidate the entire new TennCare Plan. Yet, given that TennCare is a statewide program involving an ongoing reverification process affecting thousands of citizens and substantial federal and state resources, the Court is reluctant to award broad relief based solely on the MCAC violation until the Sixth Circuit appeal is concluded. Thus, the Court concludes that Defendant can continue its reverification process subject to conforming the reverification process with the requirements of this Memorandum. The Defendant, however, cannot terminate or restrict any enrollee's coverage of necessary medical treatment that would be available under the old TennCare rules. As noted earlier, "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." *DeSario*, 139 F.3d at 93–94.

In some instances, the Defendant's waiver rules and practices deprive Plaintiff class members, who are current SPMI and/or SED enrollees, of their rights to adequate notices. The policy and procedures also deprived other enrollees with incomplete ME reverification packets of their rights to appeal notice of their rights and to appeal terminations of TennCare coverage. Further, the Defendant's practices did not give enrollees whose coverages were terminated, prior notice of the good cause regulation. Enrollees who did not submit complete Medicaid applications were denied coverage without consideration of their eligibility for all TennCare coverage, as required by Medicaid policy.

By implementing a policy denying notice and appeal rights to these plaintiff class members under these circumstances, the Defendant violated of 42 C.F.R. Part 431, Subpart E. The Defendant has caused a harm to these enrollees whose coverages were terminated without compliance with Medicaid regulations. Courts recognize this type of injury as irreparable injury. *Daniels*, 926 F.Supp. at 1312; *Markva*, 168 F.Supp.2d at 719–20.

42 C.F.R. § 431.236 requires a state plan to afford appropriate corrective action, including retroactive relief as necessary, to remedy agency errors. Consistent with that regulation and pursuant to the Court's authority to remedy violations of federal law, an appropriate Order will be entered requiring reinstatement of these enrollees whose coverages were improperly terminated during the reverification process from July 1, 2002 to the present. These enrollees may be subjected to reverification provided that adequate notices, accommodations and appeal rights are given, consistent with this Memorandum.

An appropriate Order is filed herewith.

### FINAL ORDER

In accordance with the Memorandum filed herewith, the Court AWARDS a declaratory judgment that the new TennCare waiver program was adopted in violation of 42 U.S.C. § 1396a(a)(4) and 42 C.F.R. § 431.12(e). The Court AWARDS judgment to the Plaintiffs that the Defendant's reverification notices to class members who are current enrollees with Serious and Persistent Mental Illness ("SPMI") and Seriously Emotionally Disturbed Children ("SEDC"), are inadequate in violation 42 C.F.R. § 431 Subpart E. The Defendant has also failed to provide reasonable accommodations for class members who are SPMI and SEDC enrollees and applicants. The Court further AWARDS judgment

that the Defendant violated Medicaid policy in denying the Plaintiff class members' continued TennCare coverage without consideration of all bases of eligibility under the new TennCare waiver. Further, the Court AWARDS judgment that the Defendant failed to provide adequate notices, and notice of the good cause extension rule as well as failed to provide notice of appeal rights to certain class members whose incomplete reverification packets were returned without an adequate statement of the reasons for denial or notice of appeal rights, in violation of 42 C.F.R. § 431 Subpart E.

To remedy the Defendant's various violations, it is therefore ORDERED that except for those enrollees who were determined Medicaid eligible after a complete application, the Defendant shall RE-INSTATE TennCare coverage for all TennCare class members whose TennCare coverages were terminated during the reverification process beginning July 1, 2002.

The entry of this Order constitutes the Final Judgment of the Court.